UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ISABELLE M. MURPHY,<br>DAVID R. MURPHY,<br>LYNN GAY,<br>DAVID M. WAKEFIELD, and<br>JANET WAKEFIELD<br><br>Individually and on behalf of all others<br>Similarly situated<br><br><br>Plaintiffs,<br><br>v.<br><br>AMERIQUEST MORTGAGE<br>COMPANY<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 04-cv-12651RWZ<br><br><br><br>FIRST AMENDED<br>COMPLAINT<br>SEEKING DAMAGES<br>AND EQUITABLE RELIEF<br>INCLUDING INJUNCTIVE<br>RELIEF TO PREVENT<br>FORECLOSURE |

I. PRELIMINARY STATEMENT

1.     This is an action brought by Massachusetts homeowners against a lender,

Ameriquest Mortgage Company ("Ameriquest").  Ameriquest used a pattern of deceit,

misrepresentation and other stratagems to induce the Plaintiffs to enter into residential

mortgage loans with unfair financial benefits to Ameriquest and hidden costs to the

Plaintiffs.  In doing so, Ameriquest violated both state and federal consumer protection

statutes, including M. G.L. c. 93A (hereinafter "c. 93A"), together with that law's

implementing regulations, and the common law.

2.      Each of the Plaintiffs entered into a loan with Ameriquest that is fully secured by equity in their residences.  The loans are characterized by high points and fees or high interest rates.  In each transaction, Ameriquest engaged in bait and switch tactics or similar deception, by which Ameriquest misrepresented or failed to fully disclose important aspects of the loan terms until closing.  Each Plaintiff ultimately received a loan which, to their surprise, contained one or more of the following disadvantageous terms:

- A confusing variable interest rate structure in which the original note rate could only increase, but not decrease;

- A large number of "discount points" constituting thousands of dollars added to the principal of the loan even though Ameriquest provided no "discount" in the transactions;

- A prepayment penalty in the maximum amount allowed by law, thereby discouraging the Plaintiffs from refinancing on better terms with other lenders; and

- Other duplicative costs and closing fees in amounts designed to penalize borrowers who sought refinancing from Ameriquest  or others on better terms.

3.      When Plaintiffs inquired about why they were not receiving their loans on promised terms, they were uniformly promised early refinancing on more favorable terms.

4.      The consequence of Ameriquest's practices, taken as a whole, is to allow Ameriquest to profit by leaving borrowers with a three-way Hobson's choice.  Either the borrower can 1) choose to remain in a loan with unacceptable terms, 2) find another lender offering better terms and pay Ameriquest a substantial and unjustified prepayment penalty, or 3) refinance with Ameriquest and thereby provide Ameriquest with an opportunity to capitalize the points and closing costs from the first loan while charging

another set of points and/or closing costs in an equal or larger amount. By failing to disclose to the Plaintiffs prior to the loan closing that they would not receive loans on the terms originally promised, Ameriquest violated both the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681m(a), and the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691(d).

5.      In addition, upon refinancing Ameriquest violated Massachusetts' truth in lending act, the Consumer Credit Cost Disclosure Act (hereinafter "CCCDA"), G.L. c. 140D together with that law's implementing regulations, 209 C.M.R. § 32.1 *et seq.* by failing to give Plaintiffs and others information required by G.L. c. 140D, §10 concerning the right to cancel a refinanced loan.  A violation of the CCCDA is also a violation of c.93A.

6.      Plaintiffs seek monetary, declaratory and injunctive relief on their own behalf and for a class of similarly situated Massachusetts homeowners.


## II.  JURISDICTION AND VENUE

7.      This action was originally filed in Superior Court, Suffolk County, which had jurisdiction over this matter and this Defendant pursuant to G.L. c. 223A, §3, c. 212, §4 and c. 214, §1.

8.      The action was subsequently removed by the Defendant to this court pursuant to 12 U.S.C. §§ 1441, *et seq.*, and on the grounds that this court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Venue lies in this district pursuant to 28 U.S.C. 1391(a).

9.      By this amendment, the Court will also have jurisdiction of this matter pursuant to 15 U.S.C. §§ 1681p, 1691e, and 28 U.S.C. §§ 1331, 1337(a).

## III. PARTIES

10.    Plaintiffs Isabelle M. Murphy and David R. Murphy ("the Murphys") are individuals who reside at 13 Crescent Street, Plympton, MA 02367 (the "Plympton residence").

11.    Plaintiff Lynn Gay ("Ms. Gay") is an individual who resides at 43 Oak Street, Bridgewater, MA 02324 (the "Bridgewater residence").

12.    Plaintiffs David M. Wakefield and Janet Wakefield ("the Wakefields") are individuals who reside at 303 Marion Road, Wareham, MA 02571 (the "Wareham residence").

13.    Defendant Ameriquest Mortgage Company ("Ameriquest") is a Delaware corporation whose principal place of business is at 1100 Town & Country Road, Orange, CA 92000.

14.    Ameriquest does business from various locations in Massachusetts, including, without limitation, 25 Braintree Hill Park, Suite 304, Braintree, MA 02184 in Norfolk County.

15.    Ameriquest's business includes making and refinancing consumer loans secured by residential property.

16.    At all times relevant to this complaint, Ameriquest regularly extended consumer credit payable by written agreement in more than four installments or for which a finance charge is imposed.


## IV.    FACTUAL ALLEGATIONS

### Facts Applicable to the Murphys' Loan Transaction

17.    The Murphys are unsophisticated consumers with little experience in mortgage financing.  They own a home at 13 Crescent Street, Plympton, MA 02367.

18.     The Murphys purchased their home in July 2003 for two hundred forty-two thousand dollars ($242,000) and live there with their 3 children, ages 8 months, 8 and 8. The Plympton residence has a current fair market value of at least two hundred eighty-six thousand dollars ($286,000).

19.     The Murphys' initial home mortgage loan was a 30-year 5% fixed-rate loan with Wells Fargo (the "Wells Fargo" loan). The Murphys considered the Wells Fargo loan to be on advantageous terms.  They made all of the payments required by the Wells Fargo loan.

20.     The Murphys applied to Ameriquest to refinance the Wells Fargo loan in order to consolidate some of their other debts. Based on their discussions with Ameriquest, the Murphys understood that they were applying for a fixed rate loan with no points.  They understood that the rate would be 5.75% and that the estimated total settlement charges in excess of $10,000.00 were for fees associated with closing the loan.

21.     When the Murphys asked their loan officer, Jason Kerr, why the estimated closing costs were so high, and, specifically, what the "loan discount fee" of over $8,000.00 represented, he assured them it was "just to make the numbers work."

22.     The final CCCDA disclosures given to the Murphys at the April 22, 2004 loan closing stated that the Annual Percentage Rate applicable to the loan would be 6.529% and that the monthly payments would be $1,497.92 for the first two years and  $1,576.70 for the remaining 28 years. Ameriquest had not provided any notice of the change in terms to the Murphys prior to the loan closing

23.    A true and correct copy of the CCCDA disclosures made to the Murphys in connection with the April 22, 2004 refinancing is attached to the original complaint as Exhibit A.

24.    The Murphys were unaware that the loan closing was to take place until they received a call from Mr. Kerr telling Ms. Murphy that he and an attorney, Nicholas Barrett, were on their way to the Plympton residence.

25.    The closing was completed in less than one hour.

26.    A true and correct copy of the Settlement Statement provided to the Murphys in connection with the April 22, 2004 refinancing is attached to the original complaint as Exhibit B.

27.    A true and correct copy of the loan note in the transaction is attached to the original complaint as Exhibit C.

28.    At the closing, the Murphys expressed concern over the fact that the loan was an adjustable rate loan rather than a fixed rate loan, and that the loan terms included a prepayment penalty.

29.    Mr. Kerr then assured the Murphys that they could refinance within four to six months of the closing and obtain a lower, fixed-rate mortgage. Mr. Kerr also stated that if the Murphys refinanced with Ameriquest, they would not be subject to a prepayment penalty.

30.    Although the loan closing took place on April 22, 2004, the Settlement Statement indicates a closing date of April 29, 2004.

31.    The April 22, 2004 loan Settlement Statement shows that a "loan discount fee" of 3.326% ($8,537.18) was paid to Ameriquest Mortgage Company. [See Exhibit B: Line 802]

32.    The Murphys believe and therefore aver that they were not provided with a "discount" of any kind on the rate in the transaction.

33.    The Murphys were never offered an alternative loan with a higher rate that did not involve payment of discount points. Therefore, they had no opportunity to evaluate whether the "discount" would be advantageous to them.

34.    The loan contains a "one-way" variable rate provision under which the rate in the transaction could increase from the initial rate disclosed in the loan note, but could not decrease below that rate.

35.    The Murphys did not understand the variable rate associated with their loan until many months after their transaction.

36.    The Murphys are having significant problems affording the payments on April 22, 2004 loan. The Murphys would like to refinance with another lender on better terms, but have not explored that option because of the prepayment penalty associated with the Ameriquest loan.

37.    The Murphys also now understand that the thousands of dollars in points and closing costs that they paid in connection with the loan would act as an additional *de facto* prepayment penalty if they refinance early, even if that refinancing is with Ameriquest.  Since the points and closing costs are treated as earned when the loan is made, they drive up the effective rate on the original loan if the loan is repaid in a shorter period than its expected term.  In addition, by refinancing the points, the Murphys would be required to pay interest on the points in connection with the refinanced loan.

### *Facts Applicable to Lynn Gay's Loan Transactions*

38.     Lynn Gay is an unsophisticated consumer with little experience in mortgage financing.  She owns a home at 43 Oak Street, Bridgewater, MA 02324.

39.     Ms. Gay purchased her home in October 1999 for one hundred seventy-five thousand dollars ($175,000) and lives there with her husband and their four daughters, ages 9, 12, 15 and 15.  She has refinanced her home mortgage loan twice and has made numerous repairs and improvements to the property. A recent appraisal indicates that the Bridgewater residence has a current fair market value of approximately three hundred eighty thousand dollars ($380,000).

40.     On March 14, 2003, Ms. Gay refinanced her home mortgage loan with Ameriquest. The Bridgewater residence was collateral for this loan ("March 14, 2003 loan").

41.     Ms. Gay completed the application for the March 14, 2003 loan over the phone.

42.     Based on her discussions with Ameriquest, Ms. Gay understood that she was applying for a loan with a rate of 7.5%.

43.     The final CCCDA disclosures given to Ms. Gay at the March 14, 2003 closing stated that the Annual Percentage Rate applicable to the loan would be 9.259% and that the monthly payments would be $2,058.80. Ameriquest did not provide any notice of the change in terms to Ms. Gay prior to the loan closing.

44.     A true and correct copy of the CCCDA disclosures provided to Ms. Gay in connection with the March 14, 2003 loan is attached to the original complaint as Exhibit D.

45.     The March 14, 2003 closing took place at Ms. Gay's workplace during business hours. Ms. Gay and a closing agent were present.

46.     The closing was completed in less than one hour.

47.    A true and correct copy of the Settlement Statement provided to Ms. Gay in connection with the March 14, 2003 refinancing is attached to the original complaint as Exhibit E.

48.    A true and correct copy of the loan note in the March 14, 2003 loan is attached to the original complaint as Exhibit F.

49.    At closing, Ms. Gay expressed concern regarding the change in terms from the preliminary discussions; the APR and monthly payment amount had both increased and the settlement charges had doubled.

50.    Ms. Gay was told by the closing agent that he was not a representative of Ameriquest and that he therefore could not answer questions about the loan terms.

51.    Although the loan closing took place on March 14, 2004, the Settlement Statement indicates a closing date of March 21, 2003.

52.    The March 14, 2003 loan Settlement Statement shows a loan discount fee of 3.800% ($9,944.60) to Ameriquest Mortgage Company. [See Exhibit E: Line 802]

53.    Ms. Gay believes and therefore avers that she was not provided with a "discount" of any kind on the rate in the transaction.

54.    Ms. Gay was never offered an alternative loan with a higher rate that did not involve payment of discount points. Therefore, she had no opportunity to evaluate whether the "discount" would be advantageous to her.

55.    The March 14, 2003 loan contains a "one-way" variable rate provision under which the rate in the transaction could increase from the initial rate disclosed in the loan note, but could not decrease below that rate.

56.    Ms. Gay did not understand the variable rate associated with her loan until many months after the transaction.

57.    Following consummation of the March 14, 2003 loan, Ms. Gay received a telephone call from an Ameriquest loan officer, during which he offered to refinance her home mortgage at a lower rate.

58.     Ms. Gay refinanced her home mortgage loan with Ameriquest again on September 2, 2003 ("September 2, 2003 loan").

59.     By refinancing with Ameriquest, Ms. Gay suffered significant hidden financial harm, including capitalization of points and closing costs and exposure to substantial new and additional closing costs.  These hidden costs of refinancing were well known and highly profitable to Ameriquest.

60.     Ms. Gay completed the loan application for the September 2, 2003 loan over the phone.  Based on her discussions with Ameriquest's loan officer, Ms. Gay she understood that her refinancing loan would be at a rate of 7.25%.

61.     The final CCCDA disclosures given to Ms. Gay at the September 2, 2003 closing stated that the Annual Percentage Rate applicable to the loan would be 9.012% and that the monthly payments would be $2,283.68. Ameriquest did not provide any notice of the change in terms to Ms. Gay prior to the loan closing.

62.     A true and correct copy of the CCCDA disclosures provided to Ms. Gay in connection with the September 2, 2003 refinancing is attached to the original complaint as Exhibit G.

63.     The September 2, 2003 closing took place at Ms. Gay's workplace during business hours. Ms. Gay and a closing agent were present.

64.     The closing was completed in less than one hour.

65.     A true and correct copy of the Settlement Statement provided to Ms. Gay in connection with the September 2, 2003 refinancing is attached to the original complaint as Exhibit H.

66.     A true and correct copy of the loan note in the September 2, 2003 loan is attached to the original complaint as Exhibit I.

67.     At closing, Ms. Gay once again expressed concern, this time calling her Ameriquest loan officer, regarding the fact that the APR was greater than that orally disclosed prior to closing.

68.    Although the loan closing took place on September 2, 2003, the Settlement Statement indicates a closing date of September 9, 2003.

69.    The September 2, 2003 loan Settlement Statement shows a loan discount fee of 3.900% ($11,583.00) to Ameriquest Mortgage Company. [See Exhibit H: Line 802]

70.    Ms. Gay believes and therefore avers that she was not provided with a "discount" of any kind on the rate in the transaction.

71.    Ms. Gay was never offered an alternative loan with a higher rate that did not involve payment of discount points. Therefore, she had no opportunity to determine whether the "discount" would be advantageous to her.

72.    The September 2, 2003 loan contains a "one-way" variable rate provision under which the rate in the transaction could increase from the initial rate disclosed in the loan note, but could not decrease below that rate.

73.    Ms. Gay did not understand the variable rate associated with her loan at the time of the September, 2 2003 loan transaction.

74.    The September 2, 2003 loan Settlement Statement shows that disbursements to Ameriquest were made to pay off the March 14, 2003 Ameriquest loan in the amounts of $16,774.61 and $150,000.00, respectively. [See Exhibit H: Lines 1501 and 1511]

75.    Ms. Gay is having significant problems affording the payments on the September 2, 2003 loan.

76.    At the time this complaint was filed, Ms. Gay was five months in arrears on her monthly mortgage payments to Ameriquest.

77.    Ms. Gay believes and therefore avers that acceleration of the debt and foreclosure to recover the amounts now due are imminent.

78.    The CCCDA requires creditors to provide borrowers with accurate information regarding the effects of rescinding a loan transaction. G.L. c. 140D § 10; 209 C.M.R. 32.23(2). Since canceling an initial transaction and canceling a refinancing transaction have different effects, the creditor must provide the borrower with notice that accurately

reflects that difference. Specifically, a creditor must provide the borrower with a notice that conforms with the model forms provided in Appendix H to 12 C.F.R. § 226.23, or substantially similar notice. G.L. c. 140D §§ 10, 18; 209 C.M.R. 32.23(2)(b).

79.    Since Ms. Gay was refinancing an Ameriquest loan with Ameriquest in the September 2, 2003 transaction, she should have received a disclosure that described the effects of canceling a refinance transaction. See 12 C.F.R. § 226.23(b)(2), Appendix H, Model Form H-9.

80.    Instead Ameriquest provided Ms. Gay with a form that explained her right to cancel an initial transaction. See 12 C.F.R. § 226.23(b)(2), Appendix H, Model Form H-8

81.    A true and correct copy of the Notice of Right to Cancel provided to Ms. Gay in connection with the September 2, 2003 refinancing is attached to the original complaint as Exhibit J.

82.    As a result, Ameriquest failed to accurately disclose to Ms. Gay the effect that canceling the refinance transaction would have on her home mortgage.

83.    On November 1, 2004 Ms. Gay rescinded the refinance loan as was her right pursuant to G.L. c. 140D, §10 and the regulation promulgated thereunder, 209 C.M.R. 32.23.

84.    A true and correct copy of Ms. Gay's November 1, 2004 Notice of rescission related to the refinance loan is attached to the original complaint as Exhibit K.

85.    Ms. Gay would like to refinance with another lender on better terms, but has not fully explored that option because of the prepayment penalty associated with her Ameriquest loan.

86.    Ms. Gay also now also understands that the thousands of dollars in points and closing costs that she paid in connection with each loan has acted or could act as an additional *de facto* prepayment penalty.  She understands that since the points and closing costs are treated as earned when the loan is made, they drive up the effective rate on the original loan if the loan is repaid in a shorter period than its expected term.  In addition,

by refinancing the points on a previous occasion, Ms. Gay has been required to pay interest on the points in connection with the refinanced loan.

### Facts Applicable to the Wakefields' Loan Transactions

87.     The Wakefields are unsophisticated consumers with little experience in mortgage financing. They own a home at 303 Marion Road, Wareham, MA  02571.

88.     The Wakefields purchased their Wareham residence in June 1999 for an initial purchase price of approximately one hundred ten thousand dollars ($110,000). Since then, they have refinanced several times and have made numerous repairs and improvements to the property. A recent appraisal indicates that the Wareham residence has a current fair market value of approximately three hundred fifteen thousand dollars ($315,000).

89.     On April 17, 2003, the Wakefields refinanced their home mortgage loan with an entity known as Argent Mortgage Company ("Argent loan").

90.     A true and correct copy of the Settlement Statement provided to the Wakefields in connection with the Argent loan is attached to the original complaint as Exhibit L.

91.     On information and belief, Argent is the sister company of Ameriquest, both of which are subsidiaries of Ameriquest Capital Corporation.

92.     Under the terms of the Argent loan, the Wakefields paid a loan origination fee of 2.00% ($3,825.00). [See Exhibit L: Line 801]

93.     On January 15, 2004, the Wakefields refinanced their Argent loan with a loan from Ameriquest. The Wareham residence was collateral for this loan ("January 15, 2004 loan").

94.     By refinancing with Ameriquest, the Wakefields suffered significant hidden financial harm, including capitalization of points and closing costs and exposure to substantial new and additional closing costs. These costs of refinancing were well known and highly profitable to Ameriquest.

95.    The preliminary CCCDA disclosures given to the Wakefields and dated January 2, 2004, stated that the Annual Percentage Rate applicable to the loan would be 9.736% and that the monthly payments would be $1,809.89.

96.    A true and correct copy of the CCCDA preliminary disclosures made to the Wakefields in connection with the January 15, 2004 refinancing is attached to the original complaint as Exhibit M.

97.    Based on the preliminary disclosures, the Wakefields believed they were to receive a loan on those terms.

98.    The final CCCDA disclosures given to the Wakefields at the January 15, 2004 closing stated that the Annual Percentage Rate to the applicable loan would be 12.102% and that the monthly payments would be $2,446.27. Ameriquest did not provide any notice of the change in terms to the Wakefields prior to the loan closing.

99.    A true and correct copy of the CCCDA final disclosures made to the Wakefields in connection with the January 15, 2004 refinancing is attached to the original complaint as Exhibit N.

100.    Upon learning of the change in terms, the Wakefields told their loan officer that they could not afford a $2,446.27 monthly payment.

101.    The loan officer assured them that they would only have to make one $2,446.27 payment on March 1, 2003, after which they could refinance at a lower rate to lower their monthly payments. The loan officer also stated that by refinancing with Ameriquest, the Wakefields would avoid paying a prepayment penalty.

102.    A true and correct copy of the Wakefield's February 23, 2004 payment of $2,446.27  is attached to the original complaint as Exhibit O.

103.    The January 15, 2004 loan closing took place at the Wakefield's home with the Wakefields and a closing agent present. The entire loan closing was completed in less than one hour.

104.    A true and correct copy of the Settlement Statement provided to the Wakefields in connection with the January 15, 2004 refinancing is attached to the original complaint as Exhibit P.

105.    A true and correct copy of the loan note in the January 15, 2004 loan is attached to the original complaint as Exhibit Q.

106.    Although the Wakefields closed the loan on January 15, 2004, the Settlement Statement indicates a closing date of January 23, 2004.

107.    The January 15, 2004 loan contains a one-way variable rate provision under which the rate in the transaction could increase from the initial rate disclosed in the loan note, but could not decrease below that rate.

108.    The Wakefields did not understand the variable rate associated with their loan until many months after the transaction.

109.    The January 15, 2004 loan Settlement Statement shows that a $192,555.96 disbursement was made to Ameriquest to pay off the Wakefield's prior loan. [See Exhibit P: Line 1501]

110.    On April 2, 2004, the Wakefields refinanced their January 15, 2004 Ameriquest loan with Ameriquest. The Wareham residence was collateral for this loan ("April 2, 2004 loan").

111.    The Wakefields completed the application for the April 2, 2004 loan by phone.

112.    The preliminary CCCDA disclosures given to the Wakefields and dated February 24, 2004, stated that the Annual Percentage Rate applicable to the loan would be 8.860% and that the monthly payments would be $1,637.96.

113.    A true and correct copy of the CCCDA preliminary disclosures made to the Wakefields in connection with the April 2, 2004 refinancing is attached to the original complaint as Exhibit R.

114.    The final CCCDA disclosures given to the Wakefields at the April 2, 2004 closing stated that the Annual Percentage Rate to the applicable loan would be 8.75% and that the

monthly payments would be $1,966.82. Ameriquest did not provide any notice of the change in terms to the Wakefields prior to the loan closing.

115.    A true and correct copy of the CCCDA final disclosures made to the Wakefields in connection with the April 2, 2004 refinancing is attached to the original complaint as Exhibit S.

116.    The April 2, 2004 loan closing took place at the Wakefield's home with the Wakefields and a closing agent present. The loan closing was completed less in than one hour.

117.    A true and correct copy of the Settlement Statement provided to the Wakefields in connection with the April 2, 2004 refinancing is attached to the original complaint as Exhibit T.

118.    A true and correct copy of the loan note in the April 2, 2004 loan is attached to the original complaint as Exhibit U.

119.    Although the Wakefields closed the loan on April 2, 2004, the HUD-1 Settlement Statement indicates a closing date of April 9, 2004.

120.    The April 2, 2004 loan Settlement Statement shows that a loan discount fee of 3.990% ($10,445.82) was paid to Ameriquest Mortgage Company. [See Exhibit T: Line 802]

121.    The Wakefields believe and therefore aver that they were not provided with a discount of any kind on the rate in the transaction.

122.    The Wakefields were never offered an alternative loan with a higher rate that did not involve payment of discount points. Therefore, they never had an opportunity to evaluate whether the discount would be advantageous to them.

123.    The April 2, 2004 loan contains a one-way variable rate provision under which the rate in the transaction could increase from the initial rate disclosed in the loan note, but could not decrease below that rate.

124.    The April 2, 2004 loan Settlement Statement shows that a $242,057.42 disbursement was to be made to Ameriquest to pay off the January 15, 2004 Ameriquest loan. [See Exhibit T: Line 1501].

125.    Following the loan closing, on April 15, 2004, Ameriquest sent the Wakefields a "Statement of Credit Denial," stating: "We do not grant credit to any applicant on the terms and conditions you have requested."

126.    A true and correct copy of the Statement of Credit Denial that Ameriquest sent to Wakefields on April 15, 2004 is attached to the original complaint as Exhibit V.

127.    Upon receiving the "Statement of Credit Denial," Mr. Wakefield called his loan officer to inquire about the status of the April 2, 2004 loan. During that call, the loan officer told Mr. Wakefied that the April 2, 2004 loan had been cancelled because there had been "fraud in the application and the appraisal."

128.    The information that the Wakefields submitted by telephone in connection with their April 2, 2004 loan application was accurate.

129.    Following his conversation with the loan officer regarding the cancellation of the April 15, 2004 loan, the Wakefields retained an attorney, Lee Berger, to represent them in the matter of Ameriquest's cancellation of the April 2, 2004 loan.

130.    In an August 13, 2004 letter to Mr. Berger, a representative of Ameriquest Mortgage Company, Donald Larkin, wrote that the January 15, 2004 loan had been cancelled due to "what [Ameriquest] perceived to be, false income information that was submitted in connection with the subject loan information. Consequently, Ameriquest Loan Number 0066656760 [the January 15, 2004 loan] is still in effect and the terms, obligations and duties related thereto remain unchanged."

131.    A true and correct copy of the August 13, 2004 letter from Ameriquest representative, Donald Larkin to the Wakefields' attorney Lee M. Berger confirming Ameriquest's cancellation of the April 2, 2004 refinancing is attached to the original complaint as Exhibit W.

132.    The Wakefields have been unable to afford the payments on the January 15, 2004 loan.

133.    At the time this complaint was filed, the Wakefields were seven months in arrears on their monthly mortgage payments to Ameriquest.

134.    On October 21, 2004, Ameriquest, through its attorneys Korde & Associates, P.C., sent the Wakefields a Deficiency Notice to notify them of Ameriquest's intention to foreclose on or about December 13, 2004.

135.    A true and correct copy of the October 21, 2004 Deficiency Notice is attached to the original complaint as Exhibit X.

136.    The CCCDA requires creditors to provide borrowers with accurate information regarding the effects of rescinding a loan transaction. G.L. c. 140D § 10; 209 C.M.R. 32.23(2). Since canceling an initial transaction and canceling a refinancing transaction have different effects, the creditor must provide the borrower with notice that accurately reflects that difference. Specifically, a creditor must provide the borrower with a notice that conforms with the model forms provided in Appendix H to 12 C.F.R. § 226.23, or substantially similar notice. G.L. c. 140D §§ 10, 18; 209 C.M.R. 32.23(2)(b).

137.    Since the Wakefields were refinancing Ameriquest loans with Ameriquest in both the January 15, 2004 and April 2, 2004 loan transactions, they should have received a disclosure that described the effects of canceling a refinance transaction. See 12 C.F.R. § 226.23(b)(2), Appendix H, Model Form H-9.

138.    A true and correct copy of the Notice of Right to Cancel provided to the Wakefields in connection with the January 15, 2004 refinancing is attached to the original complaint as Exhibit Y.

139.    A true and correct copy of the Notice of Right to Cancel provided to the Wakefields in connection with the April 2, 2004 refinancing is attached to the original complaint as Exhibit Z.

140.    Instead, in both loan transactions, Ameriquest provided the Wakefields with a form that explained their right to cancel an initial transaction. See 12 C.F.R. § 226.23(b)(2), Appendix H, Model Form H-8.

141.    As a result, Ameriquest failed to accurately disclose to the Wakefields the actual effect that such a cancellation would have on that transaction.

142.    On October 27, 2004 the Wakefields rescinded the refinance loan as was their right pursuant to G.L. c. 140D, §10 and the regulation promulgated thereunder, 209 C.M.R. 32.23.

143.    A true and correct copy of the Wakefields' October 27, 2004 notice of rescission is attached to the original complaint as Exhibit AA.

144.    The Wakefields would like to refinance with another lender on better terms, but have been unable to do so because of the prepayment penalty associated with the January 15, 2004 loan.

145.    The Wakefields also now understand that the thousands of dollars in points and closing costs that they paid in connection with prior loans have acted or could act as an additional *de facto* prepayment penalty. They understand that since the points and closing costs are treated as earned when the loan is made, they drive up the effective rate on the original loan if the loan is repaid in a shorter period that its expected term. In addition, by refinancing the points paid in earlier loans, the Wakefields have been required to pay interest on the points in connection with the refinanced loan.

***Facts Applicable To All Plaintiffs***

146.    By letter dated November, 1, 2004, the Plaintiffs, by counsel, demanded relief from Ameriquest pursuant to G.L. c. 93A, on behalf of themselves and a class of similarly situated individuals.  A true and correct copy of that letter is attached hereto and marked Exhibit BB.

147.    Ameriquest refused to provide the requested relief pursuant to G.L. c. 93A and failed to make a reasonable offer of settlement.

## GENERAL ALLEGATIONS

148.   Ameriquest regularly uses bait and switch sales tactics to induce Massachusetts homeowners to finance their residences with Ameriquest on unfavorable terms.

149.   Ameriquest's home loans in Massachusetts are fully secured by homeowners' equity and are therefore made with little or no financial risk to Ameriquest.

150.   Ameriquest regularly fails to provide homeowners with timely and accurate written disclosures of loan terms as mandated by law.

151.   Ameriquest regularly fails to provide homeowners with timely and accurate written change in terms notices as mandated by law.

152.   Ameriquest regularly fails to provide homeowners who are refinancing Ameriquest loans with accurate notice of their right to cancel the transaction.

153.   When a homeowner complains that he or she is not being given a loan on promised terms, Ameriquest's loan officers routinely promise early refinancing on better terms.

154.   Ameriquest regularly charges so-called "discount points" without providing a discount therefor.

155.   Ameriquest regularly fails to offer consumers an alternative loan without "discount points" so that consumers can meaningfully evaluate whether the supposed rate discount is sufficient to offset the cost of the "discount points."

156.   Ameriquest routinely imposes prepayment penalties in the maximum amount allowed by law and then uses the fact of the penalty as a sales technique designed to discourage borrowers from seeking or obtaining better loan terms available from other lenders.

157.   Ameriquest routinely encourages early refinancing of its own loans in order to capitalize points paid on the previous loan and to create an opportunity to charge a new set of points and closing costs.

158.    Ameriquest understands the financial benefit to it of early refinancing of loans containing significant points and fees and hides the financial disadvantage of those refinance loans to its customers.

159.    Ameriquest routinely includes confusing variable rate terms in its loans that are designed to protect Ameriquest if interest rates increase without allowing its customers to benefit if interest rates decline below the rate in effect at the time the loan is made.

160.    An effect of Ameriquest's practices is to trap borrowers into a pattern of financing and refinancing with Ameriquest on terms that are highly financially advantageous to Ameriquest and highly disadvantageous to its customers.

161.    By its practices, Ameriquest strips equity that would otherwise belong to Massachusetts homeowners.

## V.    CLASS DEFINITIONS AND CLASS ISSUES

162.    Plaintiffs bring this action on behalf of themselves and three classes of all other persons similarly situated, pursuant to Mass. R. Civ. P. 23.

163.    Class I (the "deceptive loan terms" class) is represented by all Plaintiffs and consists of all residents of Massachusetts:

      a.   who entered into non-purchase money mortgage loan agreements with Ameriquest, on or after November 2, 2000; and

      b.   who were offered one interest rate in preliminary disclosures but received another rate at closing; and/or

      c.   who paid fees itemized by Ameriquest as "loan discount fees."

164.    Class II (the Adverse Action Class) is represented by all Plaintiffs and consists of all residents of Massachusetts:

      a.   who, on or after November 2, 2002, submitted a completed credit application to Ameriquest for a home mortgage;

      b.  who were offered one interest rate in preliminary disclosures but who received a higher rate at closing; and

      c.  who were not issued a written notice of adverse action.

165.    Class III (the CCCDA Notice of Right to Cancel class) is represented by the Wakefields and Ms. Gay, and consists of all residents of Massachusetts:

      a.  who, on or after November 2, 2000, refinanced an Ameriquest non-purchase money mortgage loan with Ameriquest; and

      a.  who received a notice of right to cancel which inaccurately described the nature of the right to cancel a refinanced transaction.

164.    There are questions of law and fact which are common to all members of each class, which questions predominate over any question affecting only individual class members. The principal common issues are:

*with respect to Class I:*

      a.  Whether Ameriquest offered borrowers mortgages on terms which it could not or did not intend to provide at closing in order to switch borrowers from the mortgage product first offered to a different, higher cost mortgage loan, in violation of 940 C.M.R. §§ 8.04(4) and 8.06(1) and c. 93A;

      b.  Whether Ameriquest violated 940 C.M.R. § 8.06(1) and c. 93A by using promises of prompt refinancings at more favorable terms to induce borrowers to close loans;

      c.  Whether Ameriquest charged borrowers "loan discount fees" without providing discounts for such payment in violation of 940 C.M.R. §§ 3.04, 3.05, and 3.13 and c. 93A;

      d.  Whether Ameriquest failed to disclose the "loan discount fees" in violation of G.L. c. 183 § 63;

      e.  Whether Ameriquest failed to offer borrowers an alternative loan without the "loan discount fees" for the purposes of allowing borrowers to make an informed decision about whether the payment of discount points would be cost effective in violation of 940 C.M.R. §§ 3.04, 3.05, 3.13, 6.05 and c. 93A;

       f.      Whether Ameriquest failed to make the preliminary mortgage lender disclosures required by the Attorney General's Consumer Protection regulations at 940 C.M.R. § 8.05(2) within the time required by 940 C.M.R. § 8.05(6) or, in the alternative as mandated by G.L. c. 184 § 17D which requires disclosure of settlement costs and related information in the manner mandated by 209 C.M.R. 38.04;

       g.      Whether Ameriquest failed to make disclosures mandated by 209 C.M.R. §§ 32.18; and

       h.      Whether Ameriquest failed to make disclosures mandated by 209 C.M.R. §§ 32.19(2);

*with respect to Class II:*

       a.      Whether Ameriquest violated the FCRA, 15 U.S.C. § 1681m, and the ECOA, 15 U.S.C. § 1691(d), by failing to give a notice of adverse action when it failed to provide credit on the terms originally offered to the Plaintiffs and instead provided credit at less advantageous terms.

*with respect to Class III:*

       a.      Whether Ameriquest violated the CCCDA by failing to provide proper notice of the Class Members' right of rescission;

       b.      Whether Class Members have a right to actual and statutory damages, pursuant to the CCCDA, c. 140D § 32 based on the misdisclosures; and

       c.      Whether Class Members have a right to cancel their transactions on the basis of the misdisclosure.

164.    The only individual questions concern the identification of members of each class and the computation of relief to be afforded each class member and can be determined by a ministerial examination of the relevant files.  Notice can be provided to the class by various means of communication, as identified in the Defendants' computerized databases of customers.

165.    Plaintiffs' claims are typical of the claims of class members.  All are based on the same legal and remedial theories.

166.    Plaintiffs will fairly and adequately protect the interests of all class members in the prosecution of this action and in the administration of all matters relating to claims stated herein. They are similarly situated with, and have suffered similar injuries as, the members of the class they seek to represent. Plaintiffs have retained counsel experienced in handling class action suits involving unfair business practices and consumer law. Neither the named Plaintiffs nor their counsel have any interest which might cause them not to vigorously pursue this action.

167.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy, in that:

      a.    the losses suffered by the class members are such that prosecution of individual actions is impractical or economically unfeasible;

      b.    by contrast, the illegal profits obtained by the Defendant as a result of their unlawful practices are substantial;

      c.    the form of proof required is such that prosecution of individual actions is impractical or economically infeasible;

      d.    in the absence of the class action device, Plaintiffs and Class Members would be left without a remedy for the wrongful acts alleged, and the Defendants would be unjustly enriched;

      e.    the prosecution of separate lawsuits by individual members of the class would create the risk of inconsistent adjudications with respect to individual class members, which would establish incompatible standards of conduct for the Defendants, making concentration of the litigation concerning this matter in this Court desirable;

      f.    the claims of the representative Plaintiffs are typical of the claims of the class; and

g.    no unusual difficulties are likely to be encountered in the management of this action as a class action.

168.    The class is so numerous as to make it impracticable to join all members of the class as plaintiffs. Based upon the investigation of counsel, the number of class members of each class is estimated to be in excess of 500 persons.

## VI.    CAUSES OF ACTION

### COUNT I: VIOLATION OF CHAPTER 93A, ON BEHALF OF ALL NAMED PLAINTIFFS AND BOTH CLASSES

169.    Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

169.    Ameriquest has violated G.L. c. 93A § 2 with respect to each Plaintiff and each class member by utilizing terms and practices that were unfair, deceptive, and/or unconscionable. The violations the Defendant engaged in included, without limitation:

a.    Employing a bait and switch strategy by offering borrowers mortgages on favorable terms prior to closing and then offering a different mortgage loan product at closing in violation of 940 C.M.R. §§ 8.04(4) and 8.06(1) and c. 93A § 2;

b.    Promising to refinance borrowers' mortgages on more favorable terms to induce them to close loans in violation of 940 C.M.R. § 8.06(1) and c. 93A § 2;

c.    Implying that borrowers are being given a loan "discount" but failing to provide any such discount in violation of 940 C.M.R. §§ 3.04, 3.05, 3.13, and 6.05 and c. 93A § 2;

d.    Making loans on terms that were unfair and deceptive in light of their hidden advantages to the Defendant and their hidden costs to the Plaintiffs, including, without limitation, using unjustified and undisclosed points as a means to create a hidden advantage in

refinancing the loan in violation of 940 C.M.R. §§ 3.04, 3.05, 3.13, and 6.05, M.G.L. c. 183 § 63 and c. 93A § 2;

e.   Using prepayment penalties to trap borrowers into foregoing better loan terms from other lenders and/or to encourage borrowers to refinance on disadvantageous terms with Ameriquest;

f.   Providing confusing variable rate provisions in its loans designed to protect Ameriquest if rates increase from those in place when the loan is made without providing a benefit to borrowers when rates decline;

g.   Failing to make disclosures that comply with 940 C.M.R. §8.05(2) within the manner required by 940 C.M.R. § 8.05(6) or, in the alternative as mandated by G.L. c. 184 § 17D which required disclosure of settlement costs and related information in the manner mandated by 209 C.M.R. 38.04;

h.   Failing to make disclosures that comply with and 209 C.M.R. § 32.18;

i.   Failing to make disclosures that comply with and 209 C.M.R. § 32.19(2); and

j.   Failing to accurately disclose borrowers' rights to rescind their loans in violation of G.L. 140D § 10(a) and 209 C.M.R. § 32.23(2).

170.   Ameriquest's  conduct was willful or knowing within the meaning of M.G.L. c. 93A, §2.

171.   The Plaintiffs were injured and suffered damages by virtue of Ameriquest's violations.

172.   Ameriquest's refusal to grant relief upon demand was in bad faith, with knowledge or reason to know that the acts or practices complained of violated c. 93A, §2.

### COUNT II: CLAIMS FOR UNCONSCIONABILITY AND/OR ILLEGALITY ON BEHALF OF ALL NAMED PLAINTIFFS AND MEMBERS OF CLASS I

173.     Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

174.     Contract terms that violate the Division of Banks regulations, 209 C.M.R. 32.00, et seq., and/or the Attorney General's regulation, 940 C.M.R. § 3.01 et seq., 6.01 et seq., 8.01 et seq. are void or voidable for illegality and unenforceable.

175.     Contract terms that violate the Division of Banks regulations and/or the Attorney General's regulations are unconscionable and unenforceable.

176.     Said contract terms are void or voidable as a matter of public policy.

177.     The Plaintiffs and each member of Class I are entitled to relief from unconscionable and/or illegal contract terms including but not limited to cancellation and/or refund of unjustified points and cancellation/and or refund of prepayment penalties.

### COUNT III: BREACH OF CONTRACT ON BEHALF OF ALL NAMED PLAINTIFFS AND MEMBERS OF CLASS I

178.     Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

179.     The Defendant engaged in a pattern or practice of offering the Plaintiffs different terms in its oral and written preliminary disclosures than the ones it offered at closing.

180.     To the extent that Defendant offered terms to the Plaintiffs prior to closing, the Defendant formed contracts with the Plaintiffs to provide those promised terms.

181.     Promised terms included, without limitation: lower interest rates, lower monthly payments, lower settlement costs, and no prepayment penalty.

182.     By delivering different terms at closing than the ones initially promised, the Defendant breached its contracts with the Plaintiffs.

183.    The Defendant's conduct caused the Plaintiffs and members of Class I irreparable harm including, without limitation, increasing the amount of monthly payments owed to unaffordable levels thereby putting them at imminent risk of foreclosure, as well as by discouraging the Plaintiffs from refinancing at more affordable rates through its imposition of undisclosed/unjustified loan discount fees in conjunction with prepayment penalties.

184.    The Defendant's conduct increased the cost of the loan to each Plaintiff and the members of Class I.

185.    Each Plaintiff and each member of Class I is entitled to damages and equitable remedies for the Defendant's breach of contract.

### COUNT IV: BREACH OF CONTRACT ON BEHALF OF DAVID AND JANET WAKEFIELD, INDIVIDUALLY

186.    Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

187.    The Wakefields entered into a loan transaction with Ameriquest on April 2, 2004.

188.    Under the terms of April 2, 2004 loan transaction, Ameriquest was to pay off the January 15, 2004 loan, the Wakefields' property taxes, and debts the Wakefields had with several other creditors.

189.    Under the terms April 2, 2004 loan, the Wakefields' Annual Percentage Rate and monthly payment would have been significantly reduced by comparison with the January 15, 2004 loan.

190.    Under the terms of the April 2, 2004 loan, the Wakefields would not have had to make a monthly payment to Ameriquest until June 2004.

191.    Ameriquest purports to have "cancelled" the April 2, 2004 after loan documents were executed.

192.    Said "cancellation" was without legal cause or excuse.

193.    Ameriquest's cancellation of the April 2, 2004 caused the Wakefields irreparable harm because it had the effect of reinstating the January 15,2004 loan, the terms of which the Wakefields could not and cannot afford. By increasing the monthly payment amounts as well as the arrears owed, Ameriquest's cancellation of the April 2, 2004 drastically increased the likelihood that the Wakefields' family home would be foreclosed upon.

194.    Furthermore, because the January 15, 2004 loan contains a prepayment penalty, the Wakefields cannot afford to refinance with another lender.

195.    The Wakefields are therefore entitled to damages and equitable remedies for the Defendant's breach of the April 2, 2004 loan contract.

## COUNT V: INTENTIONAL MISREPRESENTATION ON BEHALF OF ALL NAMED PLAINTIFFS AND MEMBERS OF CLASS I

196.    Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

197.    Defendant made misrepresentations to the Plaintiffs and members of Class I, which the Plaintiffs relied upon to their detriment.

198.    Defendant's misrepresentations included, without limitation:

    a.    making preliminary oral and written disclosures pertaining to the interest rate, monthly payments, settlement charges and other loan terms which differed significantly from the final loan terms offered;

    b.    promising a discounted rate in connection with payment of "discount points" without providing said discount; and

    c.    making assurances of prompt refinancing at better terms.

199.    Defendant made these misrepresentations to induce Plaintiffs and Members of Class I to enter into refinancing agreements with it.

200.    Plaintiffs and Members of Class I were induced to enter into refinancing agreements with the Defendant and suffered damages as a result.

201.    The Defendant's practices caused the Plaintiffs and members of Class I harm including, without limitation, increasing the amount of monthly payments owed to an unaffordable level thereby putting Plaintiffs at imminent risk of foreclosure, and preventing Plaintiffs from refinancing with other lenders to obtain more favorable terms through its imposition of undisclosed/unjustified points and prepayment penalties.

202.    Each plaintiff and each member of Class I is entitled to damages and equitable remedies for intentional misrepresentation.

## COUNT VI: UNJUST ENRICHMENT ON BEHALF OF ALL NAMED PLAINTIFFS AND MEMBERS OF CLASS I

203.    Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

204.    The Defendants have been unjustly enriched at the expense of each plaintiff and each member of Class I.

205.    Each plaintiff and each member of Class I is therefore entitled to equitable remedies for unjust enrichment including, without limitation, restitution and reformation of contract.

## COUNT VII - DECLARATORY JUDGMENT ON BEHALF OF ALL NAMED PLAINTIFFS AND MEMBERS OF CLASS I

206.    Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

207.    Ameriquest's actions have caused the Plaintiffs and the members of Class I actual prejudice. They ask this court to enter declaratory relief concerning the propriety of Defendant's practices relating to refinancing home mortgage loans.

## COUNT VIII - PRELIMINARY AND PERMANENT INJUNCTION ON BEHALF OF ALL NAMED PLAINTIFFS AND MEMBERS OF CLASS I

208.    Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

209.    Ameriquest's improper practices, including, without limitation, it use of bait and switch tactics, and its failure to provide Plaintiffs with adequate disclosures of adverse

action, loan terms and rescission terms have caused Plaintiffs and class members to enter into disadvantageous and unaffordable loans. Moreover, Defendant's imposition of undisclosed/unjustified points and prepayment penalties prevent the Plaintiffs and class members from refinancing loans with other lenders at more favorable terms.

210.    Ameriquest's improper refinancing practices cause irreparable harm including, without limitation:

> i)    Raising monthly payment amounts to unaffordable levels and thereby placing Plaintiffs and class members at risk of foreclosure;

> ii)    Causing class members who do refinance their homes to pay interest on the unjustified points; and

> iii)    Causing class members who refinance with other lenders to pay excessive prepayment penalties.

211.    Absent injunctive relief, the Defendant may continue to violate the law and injure other persons who are seeking to refinance their home mortgage loans in the future.

## COUNT IX: VIOLATION OF THE FAIR CREDIT REPORTING ACT, 15 U.S.C § 1681m(a), ON BEHALF OF ALL NAMED PLAINTIFFS AND CLASS II

212.    Plaintiffs reallege and incorporate the preceding paragraphs.

213.    Ameriquest is a user of consumer reports from consumer reporting agencies, in connection with the extension of credit to consumers, as those terms are defined at 15 U.S.C. § 1681a.

214.    Ameriquest's failure to provide credit on the terms in initially promised to each of the Plaintiffs and class members, and to instead offer credit at less favorable more costly terms, constituted an adverse action, pursuant to 15 U.S.C. § 1681a(k).

215.     The adverse action taken by Ameriquest was based wholly or partly on information contained in a consumer report, or alternatively was based on information obtained from a person other than a consumer reporting agency, bearing upon the credit

worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living of the Plaintiffs and class members.

216.    Ameriquest failed to provide notices of adverse action to each of the Plaintiffs and class members as required by 15 U.S.C. § 1681m(a).

217.    In the alternative, Ameriquest violated the FCRA by failing to provide adverse action notices which provided an accurate or meaningful description of the basis for such adverse taken, or which otherwise fail to comply with the Fair Credit Reporting Act, 15 U.S.C. §1681m(a).

218.    Ameriquest's failure to comply with 15 U.S.C. § 1681m(a) was willful.

219.    In the alternative, Ameriquest's failure to comply with 15 U.S.C. § 1681m(a) was negligent.

220.    The Plaintiffs and class members suffered damages as a result of Ameriquest's failure.

221.    Ameriquest's violations of 15 U.S.C. § 1681m also constitute violations of G.L. c. 93A, pursuant to 940 C.M.R. 3.16, and are unfair and deceptive.

## COUNT X: VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT, 15 U.S.C. § 1691(d), ON BEHALF OF ALL NAMED PLAINTIFFS AND CLASS II

222.    Plaintiffs reallege and incorporate the preceding paragraphs.

223.    Ameriquest is a creditor, as that term is defined at 15 U.S.C. § 1691a(e).

224.    Each of the Plaintiffs and class members made a credit application with Ameriquest for credit in the form of a home mortgage, and are therefore applicants as that term is defined at 15 U.S.C. § 1691a(b).

225.    Ameriquest's failure to provide credit on the terms in initially promised to each of the Plaintiffs and requested by the Plaintiffs, and to instead offer credit at less favorable more costly terms, constituted an adverse action, pursuant to 15 U.S.C. § 1691d(6).

226.    Ameriquest's failure to notify the Plaintiffs and class members in writing within thirty days of its adverse actions, violated Section 1691(d) of the Equal Credit Opportunity Act, 15 U.S.C. § 1691(d).

227.    The Plaintiffs and class members suffered damages as a result of Ameriquest's conduct.

228.    The Plaintiffs and class members are entitled to equitable relief for Ameriquest's violations of the ECOA, pursuant to 15 U.S.C. § 1691e(c).

229.    Ameriquest's violations of 15 U.S.C. § 1691d also constitute violations of G.L. c. 93A, pursuant to 940 C.M.R. 3.16, and are unfair and deceptive.

### COUNT XI: CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES FOR FAILURE TO COMPLY WITH THE REQUIREMENTS OF THE CCCDA ON BEHALF OF LYNN GAY, THE WAKEFIELDS AND CLASS III

230.    Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

231.    Class III is represented by Plaintiffs David and Janet Wakefield, and Lynn Gay.

232.    At all times relevant hereto Ameriquest was a creditor within the meaning of the CCCDA, M.G.L. c. 140D, §1.

233.    Because the transactions described herein are covered by CCCDA, Ameriquest was required to provide the Plaintiffs with accurate notice of their right to rescind their refinancing transactions. M.G.L. c. 140D § 10; 209 C.M.R. 32.23(2).

234.    To satisfy the right of rescission disclosure requirements of M.G.L. c. 140D § 10, the creditor must provide the borrower with notice that conforms with the model forms in Appendix H of Regulation Z, as appropriate, or substantially similar notice. M.G.L. c. 140D §§ 10, 18; 209 C.M.R. 32.23(2)(b).

235.    The notice of right of rescission that Ameriquest provided to the Plaintiffs was model form H-8, the General Rescission Model Form. See 12 C.F.R. § 226.23, App. H.

236.    Since the Plaintiffs were refinancing with the same creditor, Ameriquest should have provided them with model form H-9—the rescission notice required when the borrower is refinancing with the same creditor. See 12 C.F.R. § 226.23, App. H.

237.    The misdisclosures in connection with each transaction, as aforesaid, were material pursuant to the CCCDA, G.L. c. 140D §1 and 209 C.M.R. §32.23(2)(a)(4).

238.    By providing the incorrect notice of right of rescission to the Plaintiffs, Ameriquest misinformed the Wakefields, Lynn Gay and the members of Class III about the effects of rescission thereby violating the CCCDA. G.L. c. 140D §10; 209 C.M.R. 32.23(2)(a)(4).

239.    Each member of Class III is therefore entitled to a declaration that they have the right to rescind their transactions and to notice sufficient to exercise the right. G.L. c. 140D, §10 (a), (f); 209 C.M.R. 32.23(1);

240.    Each member of Class III is therefore entitled to a declaration that any Class Member who chooses to rescind is entitled to cancellation of finance charges in connection with their transaction and to a determination that the defendants' property interests in that class members' real estate is void pursuant to G.L. c. 140D § 10(b);

241.    Each member of Class III is therefore entitled to statutory and actual damages pursuant to G.L. c. 140D § 32.

242.    Ameriquest's violations of G.L. c. 140D § 32 also constitute violations of c. 93A, pursuant to 940 C.M.R. 3.16, and are unfair and deceptive.

## COUNT XII: CLAIM FOR DECLARATORY AND INJUNCTVE RELIEF TO ENFORCE RESCISSION ON BEHALF OF LYNN GAY AND THE WAKEFIELDS, INDIVIDUALLY

243.    Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

244.    Lynn Gay and the Wakefields refinanced Ameriquest loans with Ameriquest, and Ameriquest failed to provided them with notice of their right to cancel which accurately

disclosed the effect of rescinding a refinance transaction, thereby violating the CCCDA. G.L. c. 140D §10(a); 209 C.M.R. 32.23(2)(a)(4).

245.    Lynn Gay and the Wakefields are therefore entitled to a declaration that their rescission of the their loans was valid, and, as a result that the loans are void pursuant to G.L. c. 140D §10(b); 209 C.M.R. 32.23(1)(c).

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief against Defendant Ameriquest:

*On behalf of Class I:*

a.  Damages, including actual damages, statutory damages, and multiple damages, and equitable relief , for Defendant's violations of c. 93A;

b.  for such relief from unconscionable and/or illegal contract terms including but not limited to cancellation and/or refund of unjustified points and cancellation/and or refund of prepayment penalties;

c.  damages and equitable relief for the Defendant's breach of contract;

d.  damages and equitable remedies for intentional misrepresentation;

e.  damages and equitable remedies for unjust enrichment including, without limitation, restitution and reformation of contract; and

f.  a declaration that the Defendant's refinancing practices, including, without limitation, its use of bait and switch advertising, its imposition of undisclosed/unjustified "loan discount fees" in conjunction with prepayment penalties and its failure to provide Plaintiffs with adequate disclosures of loan and rescission terms are improper;

g.  preliminary and permanent injunctive relief to prevent the Defendant from continuing to violate the law and injuring other persons who are seeking to refinance their home mortgage loans in the future;

h.  an award of reasonable attorney's fee and costs;

i.  such other relief at law or equity as this Court may deem just and proper;

*On behalf of Class II:*

j.  Actual damages, of not less than $100 and not more than $1,000 per willful violation of the FCRA committed against each class member, whichever is greater; pursuant to 15 U.S.C. § 1681n(a)(1)(A) and (B),

k.  Punitive damages, for Defendant's willful violations of the FCRA, pursuant to 15 U.S.C. § 1681n(a)(2), in an amount as the Court may allow;

l.  Actual damages per negligent violation of the FCRA, pursuant to 15 U.S.C. § 1681o(a);

m.  Actual and punitive damages for Defendant's violations of the ECOA, pursuant to 15 U.S.C. § 1691(e):

n.  equitable relief to prevent the Defendant from continuing to violate the ECOA, pursuant to 15 U.S.C. § 1691e(c);

o.  damages, including actual damages, statutory damages, and multiple damages, and equitable relief, for Defendant's violations of c. 93A

p.  an award of reasonable attorney's fee and costs, pursuant to 15 U.S.C. 1691e(d) and 15 U.S.C. 1681n(a), and/or § 1681o(a);

q.  such other relief at law or equity as this Court may deem just and proper;

*On behalf of Class III*

r.  a declaration that Class Members are entitled to rescind their transaction and notice sufficient to exercise the right G.L. c. 140D, §10 (a), (f) and 209 C.M.R. 32.23;

s.  a declaration that any Class Member who chooses to rescind is entitled to cancellation of finance charges in connection with their transaction and to a determination that the defendants' property interests in that class members' real estate is void pursuant to G.L. c. 140D § 10(b);

t.  statutory and actual damages pursuant to G.L. c. 140D § 32;

u.  actual, statutory, and multiple damages pursuant to G.L. c. 93A § 9.

v.   an award of reasonable attorney's fee and costs;

w.  such other relief at law or equity as this Court may deem just and proper;

*On behalf of Plaintiffs David and Janet Wakefield:*

x.  damages and equitable relief for the Defendant's breach of the April 2, 2004 loan contract;

*On behalf of Plaintiffs Lynn Gay and David and Janet Wakefield:*

y.  a declaration that their rescission was valid;

z.  a declaration that their mortgages are void as a result of the rescission; and

aa. a declaration that they are not liable for any finance or other charge associated with the rescinded loans.

## JURY DEMAND

Plaintiffs demand trial by jury.

Respectfully Submitted,
Isabelle and David Murphy et. al.
By their attorneys,

Dated this 16th day of February, 2005.

/s/ Gary Klein
Gary Klein BBO # 560769
John Roddy BBO # 424240
Elizabeth Ryan BBO # 549632
Shennan Kavanagh BBO # 655174
Roddy, Klein & Ryan
727 Atlantic Ave., 2nd floor
Boston, MA  02111
Tel. 617-357-5500 x 15
Fax. 617-357-5030
klein@roddykleinryan.com

# RODDY KLEIN & RYAN

### Attorneys at Law

---

727 Atlantic Ave., 2nd Floor
Boston, Massachusetts 02111

Gary Klein

Tel. (617) 357-5500 x 15
Fax (617) 357-5030
klein@roddykleinryan.com

November 3, 2004

*By Certified Mail, Return Receipt
Requested No. 7000 1670 0000 7575 3374*

Mr. Wayne Lee
Chief Executive Officer
Ameriquest Mortgage Company
1100 Town & Country Road
Orange, CA 92868

> *Re: Isabelle and David Murphy, Lynn Gay, and David and Janet Wakefield, and all
> other similarly situated individuals - Demand for Relief Pursuant to Mass. Gen.
> Laws, Chapter 93A §9*

Dear Mr. Lee:

Please consider this a demand for relief pursuant to Massachusetts General
Laws, Chapter 93A, made on behalf of our clients, Isabelle and David Murphy, Lynn
Gay, David and Janet Wakefield, and the class of Massachusetts borrowers which
they seek to represent, as described in Civil Action No. 04-####, currently pending
in Norfolk Superior Court. Ameriquest used a pattern of deceit, misrepresentation
and other stratagems to induce our clients and others like them to enter into
residential mortgage loans with unfair financial benefits to Ameriquest and hidden
costs to our clients. In committing these unfair and deceptive acts and practices,
Ameriquest violated the consumer protection statute G.L. c. 93A (hereinafter "93A"),
the regulations enacted thereunder (940 C.M.R. §3.01 *et seq*, 6.01 *et seq* and 8.01 *et
seq*), the Massachusetts Consumer Credit Cost Disclosure Act (hereinafter
"CCCDA"), G.L. c. 140D together with that law's implementing regulations (209
C.M.R. § 32.1 *et seq*) and other applicable laws.

Ameriquest – 93A
October 25, 2004
Page 2

The following summaries described these violations of law, and provide
Ameriquest with an opportunity to settle this matter:

### Isabelle and David Murphy

Isabelle and David Murphy ("the Murphys") are unsophisticated consumers
with little experience in mortgage financing. They own a home at 13 Crescent Street,
Plympton, Massachusetts. The Murphys applied to refinance their home mortgage
loan with Ameriquest in April 2004. Based on their discussions with Ameriquest, the
Murphys understood that they were applying for a 5.75% fixed rate loan with no
points. When the Murphys asked their loan officer, Jason Kerr, why the estimated
closing costs were so high, and, specifically, what the "loan discount fee" of over
$8,000.00 represented, he assured them it was "just to make the numbers work."

The Murphys were unaware that the loan closing was to take place until they
received a call from Mr. Kerr, the loan officer, telling Ms. Murphy that he and an
attorney, Nicholas Barrett, were on their way to the Plympton residence. The closing
was completed in less than one hour. The final disclosures given to the Murphys at
the April 22, 2004 loan closing stated that the Annual Percentage Rate applicable to
the loan would be 6.529% and that the monthly payments would be $1,497.92 for the
first two years and $1,576.70 for the remaining 28 years. At the closing, the Murphys
expressed concern over the fact that the loan was an adjustable rate loan rather than
a fixed rate loan, and that the loan terms included a prepayment penalty. In
response, Mr. Kerr assured the Murphys that they could refinance within four to six
months of the closing and obtain a lower, fixed-rate mortgage. Mr. Kerr also stated
that if the Murphys refinanced with Ameriquest, they would not be subject to a
prepayment penalty.

The April 22, 2004 loan Settlement Statement shows that a loan discount fee
of 3.326% ($8,537.18) was paid to Ameriquest Mortgage Company. The Murphys
believe that they were not provided with a "discount" of any kind on the rate in the
transaction. The Murphys were never offered an alternative loan with a higher rate
that did not involve payment of discount points. Therefore, they had no opportunity
to evaluate whether the "discount" would be advantageous to them. The loan
contains a "one-way" variable rate provision under which the rate in the transaction
could increase from the initial rate disclosed in the loan note, but could not decrease
below that rate. The Murphys were not given sufficient information to understand
the variable rate associated with their loan and did not understand the complex
provisions for a variable rate until many months after their transaction.

The Murphys are having significant problems affording the payments on
April 22, 2004 loan. The Murphys have explored the possibility of refinancing the

Ameriquest – 93A
October 25, 2004
Page 3

loan to obtain a lower interest rate but have been frustrated in doing so by the cost of Ameriquest's prepayment penalty. The Murphys also now understand that the thousands of dollars in points and closing costs that they paid in connection with the loan would act as an additional *de facto* prepayment penalty if they refinance early, even if that refinancing is with Ameriquest. Since the points and closing costs are treated as earned when the loan is made, they drive up the effective rate on the original loan if the loan is repaid in a shorter period than its expected term. In addition, by refinancing the points, the Murphys would be required to pay interest on the points in connection with the refinanced loan.

### *Lynn Gay*

Lynn Gay is an unsophisticated consumer with little experience in mortgage financing. She owns a home at 43 Oak Street, Bridgewater, Massachusetts. On March 14, 2003, Ms. Gay refinanced her home mortgage loan with Ameriquest. Ms. Gay completed the application for the March 14, 2003 loan over the phone. Based on her discussions with Ameriquest, Ms. Gay understood that she was applying for a loan with a rate of 7.5%.

The March 14, 2003 closing took place at Ms. Gay's workplace during business hours. Ms. Gay and a closing agent were present. The closing was completed in less than one hour. The final disclosures given to Ms. Gay at the March 14, 2003 closing stated that the Annual Percentage Rate applicable to the loan would be 9.259% and that the monthly payments would be $2,058.80. At closing, Ms. Gay expressed concern regarding the change in terms from the preliminary discussions; the APR and monthly payment amount had both increased and the settlement charges had doubled. Ms. Gay was told by the closing agent that he was not a representative of Ameriquest and that he therefore could not answer questions about the loan terms.

The March 14, 2003 loan Settlement Statement shows a loan discount fee of 3.800% ($9,944.60) to Ameriquest Mortgage Company. Ms. Gay believes that she was not provided with a "discount" of any kind on the rate in the transaction. Ms. Gay was never offered an alternative loan with a higher rate that did not involve payment of discount points. Therefore, she never had an opportunity to evaluate whether the "discount" would be advantageous to her.

The March 14, 2003 loan contains a "one-way" variable rate provision under which the rate in the transaction could increase from the initial rate disclosed in the loan note, but could not decrease below that rate. Ms. Gay was not given sufficient information to understand the variable rate associated with her loan and did not understand the complex provisions for a variable rate until many months after her transaction.

Following consummation of the March 14, 2003 loan, Ms. Gay received a telephone call from an Ameriquest loan officer, during which he offered to refinance her home mortgage at a lower rate. Ms. Gay refinanced her home mortgage loan with Ameriquest again on September 2, 2003 ("September 2, 2003 loan"). By refinancing with Ameriquest, Ms. Gay suffered significant hidden financial harm, including capitalization of points and closing costs and exposure to substantial new and additional closing costs. These hidden costs of refinancing were well known and highly profitable to Ameriquest.

Ms. Gay completed the loan application for the September 2, 2003 loan over the phone. Based on her discussions with Ameriquest's loan officer, Ms. Gay she understood that her refinancing loan would be at a rate of 7.25%.

The September 2, 2003 closing took place at Ms. Gay's workplace during business hours. Ms. Gay and a closing agent were present. The closing was completed in less than one hour. The final disclosures given to Ms. Gay at the September 2, 2003 closing stated that the Annual Percentage Rate applicable to the loan would be 9.012% and that the monthly payments would be $2,283.68. At closing, Ms. Gay once again expressed concern, this time calling her Ameriquest loan officer, regarding the fact that the APR was greater than that orally disclosed prior to closing.

The September 2, 2003 loan Settlement Statement shows a loan discount fee of 3.900% ($11,583.00) to Ameriquest Mortgage Company. Ms. Gay believes and therefore avers that she was not provided with a "discount" of any kind on the rate in the transaction. Ms. Gay was never offered an alternative loan with a higher rate that did not involve payment of discount points for the purposes of allowing her to choose whether the "discount" would be advantageous to her.

The September 2, 2003 loan contains a "one-way" variable rate provision under which the rate in the transaction could increase from the initial rate disclosed in the loan note, but could not decrease below that rate. Ms. Gay did not understand the complex provisions for a variable rate until many months after the September, 2 2003 loan transaction.

The September 2, 2003 loan Settlement Statement shows that disbursements to Ameriquest were made to pay off the March 14, 2003 Ameriquest loan in the amounts of $16,774.61 and $150,000.00, respectively. The CCCDA requires lenders to provide borrowers with notice of their right to cancel which accurately explains the effects of rescinding a loan transaction. G.L. c. 140D § 10(a); 209 C.M.R. 32.23(2). Specifically, a creditor must provide the borrower with a notice that conforms with the model forms provided in Appendix H to 12 C.F.R. § 226.23, or substantially similar notice. G.L. c. 140D §§ 10(a), 18; 209 C.M.R. 32.23(2)(b).

Ameriquest – 93A
October 25, 2004
Page 5

Since Ms. Gay was refinancing an Ameriquest loan with Ameriquest in the September 2, 2003 transaction, she should have received a disclosure that described the effects of canceling a refinance transaction. See 12 C.F.R. § 226.23(b)(2), Appendix H, Model Form H-9. Instead Ameriquest provided Ms. Gay with a form that explained her right to cancel an initial transaction. See 12 C.F.R. § 226.23(b)(2), Appendix H, Model Form H-8. As a result, Ameriquest failed to accurately disclose to Ms. Gay the effect that canceling the refinance transaction would have on her home mortgage.

Ms. Gay would like to refinance with another lender on better terms, but has not fully explored that option because of the prepayment penalty associated with her Ameriquest loan. Ms. Gay also now also understands that the thousands of dollars in points and closing costs that she paid in connection with each loan has acted or could act as an additional *de facto* prepayment penalty. She understands that since the points and closing costs are treated as earned when the loan is made, they drive up the effective rate on the original loan if the loan is repaid in a shorter period than its expected term. In addition, by refinancing the points on a previous occasion, Ms. Gay has been required to pay interest on the points in connection with the refinanced loan.

### David and Janet Wakefield

David and Janet Wakefield ("the Wakefields") are unsophisticated consumers with little experience in mortgage financing. They own a home at 303 Marion Road, Wareham, Massachusetts. On April 17, 2003, the Wakefields refinanced their home mortgage loan with Argent Mortgage Company ("Argent loan"). Under the terms of the Argent loan, the Wakefields paid a loan origination fee of 2.00% ($3,825.00).

On January 15, 2004, the Wakefields refinanced their Argent loan with a loan from Ameriquest. The January 15, 2004 loan Settlement Statement shows that a $192,555.96 disbursement was made to Ameriquest to pay off the Agent loan. By refinancing with Ameriquest, the Wakefields suffered significant hidden financial harm, including capitalization of points and closing costs and exposure to substantial new and additional closing costs. These costs of refinancing were well known and highly profitable to Ameriquest.

The preliminary disclosures given to the Wakefields and dated January 2, 2004, stated that the Annual Percentage Rate applicable to the loan would be 9.736% and that the monthly payments would be $1,809.89. Based on the preliminary disclosures, the Wakefields believed they were to receive a loan on those terms. The final disclosures given to the Wakefields at the January 15, 2004 closing stated that the Annual Percentage Rate to the applicable loan would be 12.102% and that the monthly payments would be $2,446.27. Upon learning of the change in terms, the Wakefields told their loan officer that they could not afford a $2,446.27 monthly

Ameriquest – 93A
October 25, 2004
Page 6

payment. The loan officer assured them that they would only have to make one $2,446.27 payment on March 1, 2003, after which they could refinance at a lower rate to lower their monthly payments. The loan officer also stated that by refinancing with Ameriquest, the Wakefields would avoid paying a prepayment penalty.

The January 15, 2004 loan closing took place at the Wakefield's home with the Wakefields and a closing agent present. The entire loan closing was completed in less than one hour. The January 15, 2004 loan contains a one-way variable rate provision under which the rate in the transaction could increase from the initial rate were not given sufficient information to understand the variable rate associated with their loan and did not understand the complex provisions for a variable rate until many months after their transaction.

On April 2, 2004, the Wakefields refinanced their January 15, 2004 Ameriquest loan with Ameriquest. The Wareham residence was collateral for this loan ("April 2, 2004 loan"). The Wakefields completed the application for the April 2, 2004 loan by phone. The preliminary disclosures given to the Wakefields and dated February 24, 2004, stated that the Annual Percentage Rate applicable to the loan would be 8.860% and that the monthly payments would be $1,637.96

The April 2, 2004 loan closing took place at the Wakefield's home with the Wakefields and a closing agent present. The loan closing was completed less in than one hour. The final disclosures given to the Wakefields at the April 2, 2004 closing stated that the Annual Percentage Rate to the applicable loan would be 8.75% and that the monthly payments would be $1,966.82. The April 2, 2004 loan Settlement Statement shows that a $242,057.42 disbursement was to be made to Ameriquest to pay off the January 15, 2004 Ameriquest loan.

The April 2, 2004 loan Settlement Statement also shows that a loan discount fee of 3.990% ($10,445.82) was paid to Ameriquest Mortgage Company. The Wakefields believe that they were not provided with a discount of any kind on the rate in the transaction. The Wakefields were never offered an alternative loan with a higher rate that did not involve payment of discount points. Therefore, they never had an opportunity to evaluate whether the discount would be advantageous to them. The April 2, 2004 loan contains a one-way variable rate provision under which the rate in the transaction could increase from the initial rate disclosed in the loan note, but could not decrease below that rate.

Following the April 15, 200 loan closing, Ameriquest sent the Wakefields a "Statement of Credit Denial," stating: "We do not grant credit to any applicant on the terms and conditions you have requested." Upon receiving the "Statement of Credit Denial," Mr. Wakefield called his loan officer to inquire about the status of the April 2, 2004 loan and was informed that the April 2, 2004 loan had been cancelled because there had been "fraud in the application and the appraisal." The

Ameriquest – 93A
October 25, 2004
Page 7

information that the Wakefields submitted by telephone in connection with their April 2, 2004 loan application was accurate.

Upon learning that the April 15, 2004 loan had been cancelled, the Wakefields retained an attorney, Lee Berger to represent them in the matter of Ameriquest's cancellation of the April 2, 2004 loan. In an August 13, 2004 letter to Mr. Berger, a representative of Ameriquest Mortgage Company, Donald Larkin, wrote that the January 15, 2004 loan had been cancelled due to "what [Ameriquest] perceived to be, false income information that was submitted in connection with the subject loan information. Consequently, Ameriquest Loan Number 0066656760 [the January 15, 2004 loan] is still in effect and the terms, obligations and duties related thereto remain unchanged."

The Wakefields have been unable to afford the payments on the January 15, 2004 loan. At the time this letter was sent, the Wakefields were seven months in arrears on their monthly mortgage payments to Ameriquest. On October 21, 2004, Ameriquest, through its attorneys Korde & Associates, P.C., sent the Wakefields a Deficiency Notice to notify them of Ameriquest's intention to foreclose on or about December 13, 2004.

As set forth above, the CCCDA requires creditors to provide borrowers with accurate information regarding the effects of rescinding a loan transaction. Since the Wakefields were refinancing Ameriquest loans with Ameriquest in both the January 15, 2004 and April 2, 2004 loan transactions, they should have received a disclosure that described the effects of canceling a refinance transaction. Instead, in both loan transactions, Ameriquest provided the Wakefields with a form that explained their right to cancel an initial transaction. See 12 C.F.R. § 226.23(b)(2), Appendix H, Model Form H-8. As a result, Ameriquest failed to accurately disclose to the Wakefields the actual effect that such a cancellation would have on that transaction. On October 27, 2004 the Wakefields rescinded the refinance loan as was their right pursuant to G.L. c. 140D, §10 and the regulation promulgated thereunder, 209 C.M.R. 32.23

The Wakefields would like to refinance with another lender on better terms, but have been unable to do so because of the prepayment penalty associated with the January 15, 2004 loan. The Wakefields also now understand that the thousands of dollars in points and closing costs that they paid in connection with prior loans have acted or could act as an additional *de facto* prepayment penalty. They understand that since the points and closing costs are treated as earned when the loan is made, they drive up the effective rate on the original loan if the loan is repaid in a shorter period that its expected term. In addition, by refinancing the points paid in earlier loans, the Wakefields have been required to pay interest on the points in connection with the refinanced loan.

Ameriquest – 93A
October 25, 2004
Page 8

## Violations Of Law

Ameriquest has violated G.L. c. 93A § 2 with respect to each plaintiff and each class member by utilizing terms and practices that were unfair, deceptive, and/or unconscionable. The violations the Defendant engaged in included, without limitation:

    a.    Employing a bait and switch strategy by offering borrowers mortgages on favorable terms prior to closing and then offering a different mortgage loan product at closing in violation of 940 C.M.R. §§ 8.04(4) and 8.06(1) and c. 93A;

    b.    Promising to refinance borrowers' mortgages on more favorable terms to induce them to close loans in violation of 940 C.M.R. § 8.06(1) and c. 93A;

    c.    Implying but failing to provide borrowers with a "discount" in violation of 940 C.M.R. §§ 3.04, 3.05, 3.13, and 6.05 and c. 93A;

    d.    Failing to provide borrowers with necessary information to evaluate whether payments of "discount points" would be financially advantageous in violation of 940 C.M.R. §§ 3.05, 3.13, and 6.05 and c. 93A § 2;

    e.    Making loans on terms that were unfair and deceptive in light of their hidden advantages to the Defendant and their hidden costs to the Plaintiffs, including, without limitation, using unjustified and undisclosed points as a means to create a hidden advantage in refinancing the loan in violation of 940 C.M.R. §§ 3.04, 3.05, 3.13, and 6.05, M.G.L. c. 183 § 63 and c. 93A;

    f.    Using prepayment penalties to trap borrowers into foregoing better loan terms from other lenders and/or to encourage borrowers to refinance on disadvantageous terms with Ameriquest;

    g.    Providing confusing variable rate provisions in its loans designed to protect Ameriquest if rates increase from those in place when the loan is made without providing a benefit to borrowers when rates decline;

    h.    Failing to make the preliminary mortgage lender disclosures required by the Attorney General's Consumer Protection regulations at 940 C.M.R. § 8.05(2) in the manner required by 940 C.M.R. § 8.05(6) or, in the alternative, as mandated by G.L. c. 184 § 17Dwhich requires disclosure of settlement costs and related information;

    i.    Failing to make disclosures mandated by 209 C.M.R. §§ 32.18;

    j.    Failing to make disclosures mandated by 209 C.M.R. §§ 32.19; and

      k.     Failing to accurately disclose borrowers' rights to rescind their loans in violation of G.L. 140D § 10(a) and 209 C.M.R. § 32.23(2).

## Damages and Demand For Relief

The Murphys, Ms. Gay, the Wakefields and other similarly situated individuals were damaged and continue to be damaged by Ameriquest's home mortgage refinancing practices in that they have either been placed at risk of foreclosure or they have been prevented from refinancing with other lenders on more favorable terms due to prepayment penalties and points they have paid in connection with their Ameriquest loans. Accordingly, by this correspondence, on their behalf we demand that Ameriquest:

      a.     disclose to all affected borrowers the option of rescinding their loan contracts or reforming them to expunge the illegal terms;

      b.     cancel and/or refund unjustified points;

      c.     cancel and/or refund prepayment penalties;

      d.     pay actual and statutory damages pursuant to c. 93A § 9 and G.L 140D §§ 32(a)(1) and 32(a)(2)(b) ; and

      e.     provide an assurance that it will take all steps necessary to insure that all borrowers so entitled receive proper disclosures of loan and rescission terms in accordance with applicable law from this date forward.

M.G.L. c. 93A, § 9 provides Ameriquest with the opportunity to make a reasonable written settlement offer within thirty days of its receipt of this letter. Should litigation under c. 93A ensue, Ameriquest may become liable for up to three times actual damages, plus attorney's fees and costs.

In this regard, I direct your attention to the Supreme Judicial Court's view of the policy behind c. 93A's settlement encouraging directive.

Indeed, the conduct proscribed by the Statute *is as much the failure to make a reasonable settlement offer* as it is the substantive violation of c. 93A. Multiple damages are "the appropriate punishment" for forcing plaintiffs to litigate clearly valid claims. <u>International Fidelity Ins. Co. v. Wilson</u>, 443 NE 2d 1308, 1318 (1983)(emphasis added).

Ameriquest – 93A
October 25, 2004
Page 10

I look forward to hearing from Ameriquest or its attorneys so that we may work toward a prompt and equitable settlement of this matter.

Yours very truly,

Gary Klein

GK:pc
cc:
Isabelle and David Murphy
Lynn Gay
David and Janet Wakefield

Ameriquest – 93A
October 25, 2004
Page 10

     I look forward to hearing from Ameriquest or its attorneys so that we may work toward a prompt and equitable settlement of this matter.

               Yours very truly,

               Gary Klein

GK:pc
cc:
Isabelle and David Murphy
Lynn Gay
David and Janet Wakefield