## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **ISABELLE M. MURPHY,**<br>**DAVID R. MURPHY,**<br>**LYNN GAY,**<br>**DAVID M. WAKEFIELD, and**<br>**JANET WAKEFIELD**<br><br>**Individually and on behalf of all others**<br>**Similarly situated**<br><br><br>**Plaintiffs,**<br><br>**v.**<br><br>**AMERIQUEST MORTGAGE**<br>**COMPANY**<br><br>**Defendant.** | **C.A. No. 04-cv-12651RWZ** |

## MOTION FOR LEAVE TO AMEND CLASS ACTION COMPLAINT AND FOR LEAVE TO ADD NEW PLAINTIFFS

Pursuant to Fed. R. Civ. P. 15(a) and 20(a), Plaintiffs, Isabelle M. Murphy, David R. Murphy, Lynn Gay, David M. Wakefield, and Janet Wakefield ("Plaintiffs") hereby move for leave to file a second amended complaint and to seek permission to add three new individuals, Harriet Holder and Frank and Martha White as party-plaintiffs and potential class representatives in this matter. In support of the requested relief, the Plaintiffs submit the proposed amended complaint (attached as Exhibit A), a memorandum of law and the following averments:

1. This case was commenced by the filing of a Class Action Complaint in Norfolk Superior Court on November 5, 2004.

2.      The case was subsequently removed to the U.S. District Court for the District of Massachusetts on December 21, 2004.

3.      On February 16, 2005, Plaintiffs filed a first amended complaint.

4.      The defendant filed an answer to Plaintiffs' first amended complaint on March 7, 2005.

5.      The Plaintiffs now seek to amend to add three individuals as party-plaintiffs and to make minor changes to their factual allegations and their claims based on information obtained from Ameriquest in automatic disclosures pursuant to Rule 26(a).

6.      The individuals whom the plaintiffs seek to add as additional plaintiffs present factual issues that are similar or identical to those of the plaintiffs named in the first amended complaint.

7.      The proposed second amended complaint adds no new or additional claims.  As this matter was already a putative class action, the amendment to include additional plaintiffs does not substantially alter the defendant's potential liability.

8.      The individuals whom the plaintiffs seek to add did not approach plaintiffs' counsel for representation until after the first amended complaint was filed.

9.      Frank and Martha White ("the Whites") are individual homeowners who jointly refinanced their home mortgage loan with Ameriquest on May 23, 2003 and again on December 17, 2003.

10.     Their factual allegations are included in the proposed amended complaint at paragraphs 148-191.

11.     Harriet Holder ("Ms. Holder") is an individual homeowner who refinanced her home mortgage loan with Ameriquest Mortgage Company ("Ameriquest") on November 24, 2003 and again on May 12, 2004.

12.     Her factual allegations are included in the proposed amended complaint at paragraphs 192-237.

13.     The claims of the Whites and Ms. Holder are related to the transactions and occurrences that are the subject matter of this lawsuit.

14.     The claims and allegations of the Whites and Ms. Holder present questions common in law and fact to those of the current plaintiffs and the class.

15.     A copy of the proposed amended complaint is attached hereto as Exhibit A.

WHEREFORE, and for the reasons stated in the accompanying memorandum of law, Plaintiffs respectfully request that court grant Plaintiffs' leave to amend the complaint pursuant to Rule 15(a) and to join Harriet Holder and Frank and Martha White as additional plaintiffs pursuant to Rule 20(a).

Respectfully Submitted,
Isabelle and David Murphy et. al.
By their attorneys,


/s/ Gary Klein
Gary Klein BBO # 560769
John Roddy BBO # 424240
Elizabeth Ryan BBO # 549632
Shennan Kavanagh BBO # 655174
Roddy, Klein & Ryan
727 Atlantic Ave., 2nd floor
Boston, MA  02111
Tel. 617-357-5500 x 15
Fax. 617-357-5030
klein@roddykleinryan.com

Dated: July 1, 2005

3

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **ISABELLE M. MURPHY,** ) | |
| **DAVID R. MURPHY,** ) | |
| **LYNN GAY,** ) | |
| **DAVID M. WAKEFIELD** ) | |
| **JANET WAKEFIELD,** ) | |
| **FRANK WHITE,** ) | |
| **MARTHA WHITE, and** ) | |
| **HARRIET HOLDER** ) | **C.A. No. 04-cv-12651RWZ** |
| ) | |
| **Individually and on behalf of all others** ) | |
| **Similarly situated** ) | |
| ) | **SECOND AMENDED** |
| ) | **COMPLAINT** |
| ) | **SEEKING DAMAGES** |
| **Plaintiffs,** ) | **AND EQUITABLE RELIEF** |
| ) | **INCLUDING INJUNCTIVE** |
| **v.** ) | **RELIEF TO PREVENT** |
| ) | **FORECLOSURE** |
| **AMERIQUEST MORTGAGE** ) | |
| **COMPANY** ) | |
| ) | |
| **Defendant.** ) | |

## I. PRELIMINARY STATEMENT

1.      This is an action brought by Massachusetts homeowners against a lender,
Ameriquest Mortgage Company ("Ameriquest").  Ameriquest used a pattern of deceit,
misrepresentation and other stratagems to induce the Plaintiffs to enter into residential
mortgage loans with unfair financial benefits to Ameriquest and hidden costs to the
Plaintiffs.  In doing so, Ameriquest violated both state and federal consumer protection
statutes, including M. G.L. c. 93A (hereinafter "c. 93A"), together with that law's
implementing regulations, and the common law.

2.     Each of the Plaintiffs entered into a loan with Ameriquest that is fully secured by equity in their residences.  The loans are characterized by high points and fees or high interest rates.  In each transaction, Ameriquest engaged in bait and switch tactics or similar deception, by which Ameriquest misrepresented or failed to fully disclose important aspects of the loan terms until closing.  Each Plaintiff ultimately received a loan which, to their surprise, contained one or more of the following disadvantageous terms:

- A confusing variable interest rate structure in which the original note rate could only increase, but not decrease;

- A large number of "discount points" constituting thousands of dollars added to the principal of the loan even though Ameriquest provided no "discount" in the transactions;

- A prepayment penalty in the maximum amount allowed by law, thereby discouraging the Plaintiffs from refinancing on better terms with other lenders; and

- Other duplicative costs and closing fees in amounts designed to penalize borrowers who sought refinancing from Ameriquest  or others on better terms.

3.     When Plaintiffs inquired about why they were not receiving their loans on promised terms, they were uniformly promised early refinancing on more favorable terms.

4.     The consequence of Ameriquest's practices, taken as a whole, is to allow Ameriquest to profit by leaving borrowers with a three-way Hobson's choice.  Either the borrower can 1) choose to remain in a loan with unacceptable terms, 2) find another lender offering better terms and pay Ameriquest a substantial and unjustified prepayment penalty, or 3) refinance with Ameriquest and thereby provide Ameriquest with an opportunity to capitalize the points and closing costs from the first loan while charging another set of points and/or closing costs in an equal or larger amount.  By failing to disclose to the Plaintiffs prior to the loan closing that they would not receive loans on the

terms originally promised, Ameriquest violated both the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681m(a), and the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691(d).

5.      In addition, upon refinancing Ameriquest violated Massachusetts' truth in lending act, the Consumer Credit Cost Disclosure Act (hereinafter "CCCDA"), G.L. c. 140D together with that law's implementing regulations, 209 C.M.R. § 32.1 *et seq.* by failing to give Plaintiffs and others information required by G.L. c. 140D, §10 concerning the right to cancel a refinanced loan.  A violation of the CCCDA is also a violation of c.93A.

6.      Plaintiffs seek monetary, declaratory and injunctive relief on their own behalf and for a class of similarly situated Massachusetts homeowners.


## II.  JURISDICTION AND VENUE

7.      This action was originally filed in Superior Court, Norfolk County, which had jurisdiction over this matter and this Defendant pursuant to G.L. c. 223A, §3, c. 212, §4 and c. 214, §1.

8.      The action was subsequently removed by the Defendant to this court pursuant to 12 U.S.C. §§ 1441, *et seq.*, and on the grounds that this court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Venue lies in this district pursuant to 28 U.S.C. 1391(a).

9.      By this amendment, the Court will also have jurisdiction of this matter pursuant to 15 U.S.C. §§ 1681p, 1691e, and 28 U.S.C. §§ 1331, 1337(a).


## III. PARTIES

10.     Plaintiffs Isabelle M. Murphy and David R. Murphy ("the Murphys") are individuals who reside at 13 Crescent Street, Plympton, MA 02367 (the "Plympton residence").

11.     Plaintiff Lynn Gay ("Ms. Gay") is an individual who resides at 43 Oak Street, Bridgewater, MA 02324 (the "Bridgewater residence").

12.     Plaintiffs David M. Wakefield and Janet Wakefield ("the Wakefields") are individuals who reside at 303 Marion Road, Wareham, MA 02571 (the "Wareham residence").

13.     Plaintiffs Frank White and Martha White ("the Whites") are individuals who reside at 8 Ruskindale Road, Mattapan, MA 02126  (the "White's residence").

14.     Plaintiff Harriet Holder ("Ms. Holder") is an individual who resides at 86 Standard Street, Mattapan, MA 02126 (the "Holder residence").

15.     Defendant Ameriquest Mortgage Company ("Ameriquest") is a Delaware corporation whose principal place of business is at 1100 Town & Country Road, Orange, CA 92000.

16.     Ameriquest does business from various locations in Massachusetts, including, without limitation, 25 Braintree Hill Park, Suite 304, Braintree, MA 02184 in Norfolk County.

17.     Ameriquest's business includes making and refinancing consumer loans secured by residential property.

18.     At all times relevant to this complaint, Ameriquest regularly extended consumer credit payable by written agreement in more than four installments or for which a finance charge is imposed.


## IV.    FACTUAL ALLEGATIONS

### *Facts Applicable to the Murphys' Loan Transaction*

19.     The Murphys are unsophisticated consumers with little experience in mortgage financing.  They own a home at 13 Crescent Street, Plympton, MA 02367.

20.     The Murphys purchased their home in July 2003 for two hundred forty-two thousand dollars ($242,000) and live there with their 3 children, ages 8 months, 8 and 8. The Plympton residence has a current fair market value of at least two hundred eighty-six thousand dollars ($286,000).

21.     The Murphys' initial home mortgage loan was a 30-year 5% fixed-rate loan with Wells Fargo (the "Wells Fargo" loan). The Murphys considered the Wells Fargo loan to be on advantageous terms.  They made all of the payments required by the Wells Fargo loan.

22.     The Murphys applied to Ameriquest to refinance the Wells Fargo loan in order to consolidate some of their other debts. Based on their discussions with Ameriquest, the Murphys understood that they were applying for a fixed rate loan with no points.  They understood that the rate would be 5.75% and that the estimated total settlement charges in excess of $10,000.00 were for fees associated with closing the loan.

23.     When the Murphys asked their loan officer, Jason Kerr, why the estimated closing costs were so high, and, specifically, what the "loan discount fee" of over $8,000.00 represented, he assured them it was "just to make the numbers work."

24.     The final CCCDA disclosures given to the Murphys at the April 22, 2004 loan closing stated that the Annual Percentage Rate applicable to the loan would be 6.529% and that the monthly payments would be $1,497.92 for the first two years and  $1,576.70 for the remaining 28 years. Ameriquest had not provided any notice of the change in terms to the Murphys prior to the loan closing.  At the time of loan closing, Ameriquest instead provided a notice purporting to be a "Borrower's Acknowledgment of Final Loan Terms" that was inaccurate for reasons including, but not limited to, misstating the terms

of the original loan application and thereby implying that the Murphys were receiving better terms than they had applied for, when in fact the terms were worse than the Murphys had been promised.

25.    A true and correct copy of the CCCDA disclosures made to the Murphys in connection with the April 22, 2004 refinancing is attached to the original complaint as Exhibit A.

26.    The Murphys were unaware that the loan closing was to take place until they received a call from Mr. Kerr telling Ms. Murphy that he and an attorney, Nicholas Barrett, were on their way to the Plympton residence.

27.    The closing was completed in less than one hour.

28.    A true and correct copy of the Settlement Statement provided to the Murphys in connection with the April 22, 2004 refinancing is attached to the original complaint as Exhibit B.

29.    A true and correct copy of the loan note in the transaction is attached to the original complaint as Exhibit C.

30.    At the closing, the Murphys expressed concern over the fact that the loan was an adjustable rate loan rather than a fixed rate loan, and that the loan terms included a prepayment penalty.

31.    Mr. Kerr then assured the Murphys that they could refinance within four to six months of the closing and obtain a lower, fixed-rate mortgage. Mr. Kerr also stated that if the Murphys refinanced with Ameriquest, they would not be subject to a prepayment penalty.

32.    Although the loan closing took place on April 22, 2004, the Settlement Statement indicates a closing date of April 29, 2004.

33.    The April 22, 2004 loan Settlement Statement shows that a "loan discount fee" of 3.326% ($8,537.18) was paid to Ameriquest Mortgage Company. [See Exhibit B: Line 802]

34.    The Murphys believe and therefore aver that they were not provided with a "discount" of any kind on the rate in the transaction.

35.    The Murphys were never offered an alternative loan with a higher rate that did not involve payment of discount points. Therefore, they had no opportunity to evaluate whether the "discount" would be advantageous to them.

36.    The loan contains a "one-way" variable rate provision under which the rate in the transaction could increase from the initial rate disclosed in the loan note, but could not decrease below that rate.

37.    The Murphys did not understand the variable rate associated with their loan until many months after their transaction.

38.    The Murphys are having significant problems affording the payments on April 22, 2004 loan. The Murphys would like to refinance with another lender on better terms, but have not explored that option because of the prepayment penalty associated with the Ameriquest loan.

39.    The Murphys also now understand that the thousands of dollars in points and closing costs that they paid in connection with the loan would act as an additional *de facto* prepayment penalty if they refinance early, even if that refinancing is with Ameriquest.  Since the points and closing costs are treated as earned when the loan is made, they drive up the effective rate on the original loan if the loan is repaid in a shorter period than its expected term.  In addition, by refinancing the points, the Murphys would be required to pay interest on the points in connection with the refinanced loan.

*Facts Applicable to Lynn Gay's Loan Transactions*

40.     Lynn Gay is an unsophisticated consumer with little experience in mortgage financing.  She owns a home at 43 Oak Street, Bridgewater, MA 02324.

41.     Ms. Gay purchased her home in October 1999 for one hundred seventy-five thousand dollars ($175,000) and lives there with her husband and their four daughters, ages 9, 12, 15 and 15.  She has refinanced her home mortgage loan twice and has made numerous repairs and improvements to the property. A recent appraisal indicates that the Bridgewater residence has a current fair market value of approximately three hundred eighty thousand dollars ($380,000).

42.     On March 14, 2003, Ms. Gay refinanced her home mortgage loan with Ameriquest. The Bridgewater residence was collateral for this loan ("March 14, 2003 loan").

43.     Ms. Gay completed the application for the March 14, 2003 loan over the phone.

44.     Based on her discussions with Ameriquest, Ms. Gay understood that she was applying for a loan with a rate of 7.5%.

45.     The final CCCDA disclosures given to Ms. Gay at the March 14, 2003 closing stated that the Annual Percentage Rate applicable to the loan would be 9.259% and that the monthly payments would be $2,058.80. Ameriquest did not provide any notice of the change in terms to Ms. Gay prior to the loan closing.  At the time of loan closing, Ameriquest instead provided a notice purporting to be a "Borrower's Acknowledgement of Final Loan Terms" that was inaccurate for reasons including, but not limited to, misstating the terms of the original loan application and thereby implying that Ms. Gay

was receiving better terms than she had applied for, when in fact the terms were worse than she had been promised.

46.     A true and correct copy of the CCCDA disclosures provided to Ms. Gay in connection with the March 14, 2003 loan is attached to the original complaint as Exhibit D.

47.     The March 14, 2003 closing took place at Ms. Gay's workplace during business hours. Ms. Gay and a closing agent were present.

48.     The closing was completed in less than one hour.

49.     A true and correct copy of the Settlement Statement provided to Ms. Gay in connection with the March 14, 2003 refinancing is attached to the original complaint as Exhibit E.

50.     A true and correct copy of the loan note in the March 14, 2003 loan is attached to the original complaint as Exhibit F.

51.     At closing, Ms. Gay expressed concern regarding the change in terms from the preliminary discussions; the APR and monthly payment amount had both increased and the settlement charges had doubled.

52.     Ms. Gay was told by the closing agent that he was not a representative of Ameriquest and that he therefore could not answer questions about the loan terms.

53.     Although the loan closing took place on March 14, 2004, the Settlement Statement indicates a closing date of March 21, 2003.

54.     The March 14, 2003 loan Settlement Statement shows a loan discount fee of 3.800% ($9,944.60) to Ameriquest Mortgage Company. [See Exhibit E: Line 802]

55.     Ms. Gay believes and therefore avers that she was not provided with a "discount" of any kind on the rate in the transaction.

56.    Ms. Gay was never offered an alternative loan with a higher rate that did not involve payment of discount points. Therefore, she had no opportunity to evaluate whether the "discount" would be advantageous to her.

57.    The March 14, 2003 loan contains a "one-way" variable rate provision under which the rate in the transaction could increase from the initial rate disclosed in the loan note, but could not decrease below that rate.

58.    Ms. Gay did not understand the variable rate associated with her loan until many months after the transaction.

59.    Following consummation of the March 14, 2003 loan, Ms. Gay received a telephone call from an Ameriquest loan officer, during which he offered to refinance her home mortgage at a lower rate.

60.    Ms. Gay refinanced her home mortgage loan with Ameriquest again on September 2, 2003 ("September 2, 2003 loan").

61.    By refinancing with Ameriquest, Ms. Gay suffered significant hidden financial harm, including capitalization of points and closing costs and exposure to substantial new and additional closing costs.  These hidden costs of refinancing were well known and highly profitable to Ameriquest.

62.    Ms. Gay completed the loan application for the September 2, 2003 loan over the phone.  Based on her discussions with Ameriquest's loan officer, Ms. Gay understood that her refinancing loan would be at a rate of 7.25%.

63.    The final CCCDA disclosures given to Ms. Gay at the September 2, 2003 closing stated that the Annual Percentage Rate applicable to the loan would be 9.012% and that the monthly payments would be $2,283.68. Ameriquest did not provide any notice of the change in terms to Ms. Gay prior to the loan closing. At the time of loan closing, Ameriquest instead provided a notice purporting to be a "Borrower's Acknowledgement

of Final Loan Terms" that was inaccurate for reasons including, but not limited to, misstating the terms of the original loan application and thereby implying that Ms. Gay was receiving better terms than she had applied for, when in fact the terms were worse than she had been promised.

64.     A true and correct copy of the CCCDA disclosures provided to Ms. Gay in connection with the September 2, 2003 refinancing is attached to the original complaint as Exhibit G.

65.     The September 2, 2003 closing took place at Ms. Gay's workplace during business hours. Ms. Gay and a closing agent were present.

66.     The closing was completed in less than one hour.

67.     A true and correct copy of the Settlement Statement provided to Ms. Gay in connection with the September 2, 2003 refinancing is attached to the original complaint as Exhibit H.

68.     A true and correct copy of the loan note in the September 2, 2003 loan is attached to the original complaint as Exhibit I.

69.     At closing, Ms. Gay once again expressed concern, this time calling her Ameriquest loan officer, regarding the fact that the APR was greater than that orally disclosed prior to closing.

70.     Although the loan closing took place on September 2, 2003, the Settlement Statement indicates a closing date of September 9, 2003.

71.     The September 2, 2003 loan Settlement Statement shows a loan discount fee of 3.900% ($11,583.00)  to Ameriquest Mortgage Company. [See Exhibit H: Line 802]

72.     Ms. Gay believes and therefore avers that she was not provided with a "discount" of any kind on the rate in the transaction.

73.     Ms. Gay was never offered an alternative loan with a higher rate that did not involve payment of discount points. Therefore, she had no opportunity to determine whether the "discount" would be advantageous to her.

74.     The September 2, 2003 loan contains a "one-way" variable rate provision under which the rate in the transaction could increase from the initial rate disclosed in the loan note, but could not decrease below that rate.

75.     Ms. Gay did not understand the variable rate associated with her loan at the time of the September, 2 2003 loan transaction.

76.     The September 2, 2003 loan Settlement Statement shows that disbursements to Ameriquest were made to pay off the March 14, 2003 Ameriquest loan in the amounts of $16,774.61 and $150,000.00, respectively. [See Exhibit H: Lines 1501 and 1511]

77.     Ms. Gay is having significant problems affording the payments on the September 2, 2003 loan.

78.     At the time this complaint was filed, Ms. Gay was five months in arrears on her monthly mortgage payments to Ameriquest.

79.     Ms. Gay believes and therefore avers that acceleration of the debt and foreclosure to recover the amounts now due are imminent.

80.     The CCCDA requires creditors to provide borrowers with accurate information regarding the effects of rescinding a loan transaction. G.L. c. 140D § 10; 209 C.M.R. 32.23(2). Since canceling an initial transaction and canceling a refinancing transaction have different effects, the creditor must provide the borrower with notice that accurately reflects that difference. Specifically, a creditor must provide the borrower with a notice that conforms with the model forms provided in Appendix H to 12 C.F.R. § 226.23, or substantially similar notice. G.L. c. 140D §§ 10, 18; 209 C.M.R. 32.23(2)(b).

81.     Since Ms. Gay was refinancing an Ameriquest loan with Ameriquest in the September 2, 2003 transaction, she should have received a disclosure that described the

effects of canceling a refinance transaction. See 12 C.F.R. § 226.23(b)(2), Appendix H, Model Form H-9.

82.    Instead Ameriquest provided Ms. Gay with a form that explained her right to cancel an initial transaction. See 12 C.F.R. § 226.23(b)(2), Appendix H, Model Form H-8

83.    A true and correct copy of the Notice of Right to Cancel provided to Ms. Gay in connection with the September 2, 2003 refinancing is attached to the original complaint as Exhibit J.

84.    As a result, Ameriquest failed to accurately disclose to Ms. Gay the effect that canceling the refinance transaction would have on her home mortgage.

85.    On November 1, 2004 Ms. Gay rescinded the refinance loan as was her right pursuant to G.L. c. 140D, §10 and the regulation promulgated thereunder, 209 C.M.R. 32.23.

86.    A true and correct copy of Ms. Gay's November 1, 2004 Notice of rescission related to the refinance loan is attached to the original complaint as Exhibit K.

87.    Ms. Gay would like to refinance with another lender on better terms, but has not fully explored that option because of the prepayment penalty associated with her Ameriquest loan.

88.    Ms. Gay also now also understands that the thousands of dollars in points and closing costs that she paid in connection with each loan has acted or could act as an additional *de facto* prepayment penalty.  She understands that since the points and closing costs are treated as earned when the loan is made, they drive up the effective rate on the original loan if the loan is repaid in a shorter period than its expected term.  In addition, by refinancing the points on a previous occasion, Ms. Gay has been required to pay interest on the points in connection with the refinanced loan.

*Facts Applicable to the Wakefields' Loan Transactions*

89.    The Wakefields are unsophisticated consumers with little experience in mortgage financing. They own a home at 303 Marion Road, Wareham, MA  02571.

90.    The Wakefields purchased their Wareham residence in June 1999 for an initial purchase price of approximately one hundred ten thousand dollars ($110,000). Since then, they have refinanced several times and have made numerous repairs and improvements to the property. A recent appraisal indicates that the Wareham residence has a current fair market value of approximately three hundred fifteen thousand dollars ($315,000).

91.    On April 17, 2003, the Wakefields refinanced their home mortgage loan with an entity known as Argent Mortgage Company ("Argent loan").

92.    A true and correct copy of the Settlement Statement provided to the Wakefields in connection with the Argent loan is attached to the original complaint as Exhibit L.

93.    On information and belief, Argent is the sister company of Ameriquest, both of which are subsidiaries of Ameriquest Capital Corporation.

94.    Under the terms of the Argent loan, the Wakefields paid a loan origination fee of 2.00% ($3,825.00). [See Exhibit L: Line 801]

95.    On January 15, 2004, the Wakefields refinanced their Argent loan with a loan from Ameriquest. The Wareham residence was collateral for this loan ("January 15, 2004 loan").

96.    By refinancing with Ameriquest, the Wakefields suffered significant hidden financial harm, including capitalization of points and closing costs and exposure to substantial new and additional closing costs. These costs of refinancing were well known and highly profitable to Ameriquest.

97.    The preliminary CCCDA disclosures given to the Wakefields and dated January 2, 2004, stated that the Annual Percentage Rate applicable to the loan would be 9.736% and that the monthly payments would be $1,809.89.

98.    A true and correct copy of the CCCDA preliminary disclosures made to the Wakefields in connection with the January 15, 2004 refinancing is attached to the original complaint as <u>Exhibit M</u>.

99.    Based on the preliminary disclosures, the Wakefields believed they were to receive a loan on those terms.

100.    The final CCCDA disclosures given to the Wakefields at the January 15, 2004 closing stated that the Annual Percentage Rate to the applicable loan would be 12.102% and that the monthly payments would be $2,446.27. Ameriquest did not provide any notice of the change in terms to the Wakefields prior to the loan closing. At the time of loan closing, Ameriquest instead provided a notice purporting to be a "Borrower's Acknowledgment of Final Loan Terms" that was inaccurate for reasons including, but not limited to, misstating the terms of the original loan application and thereby implying that the Wakefields were receiving better terms than they had applied for, when in fact the terms were worse than the Wakefields had been promised.

101.    A true and correct copy of the CCCDA final disclosures made to the Wakefields in connection with the January 15, 2004 refinancing is attached to the original complaint as <u>Exhibit N</u>.

102.    Upon learning of the change in terms, the Wakefields told their loan officer that they could not afford a $2,446.27 monthly payment.

103.    The loan officer assured them that they would only have to make one $2,446.27 payment on March 1, 2003, after which they could refinance at a lower rate to lower their monthly payments. The loan officer also stated that by refinancing with Ameriquest, the Wakefields would avoid paying a prepayment penalty.

104.    A true and correct copy of the Wakefield's February 23, 2004 payment of $2,446.27  is attached to the original complaint as <u>Exhibit O</u>.

105.    The January 15, 2004 loan closing took place at the Wakefield's home with the Wakefields and a closing agent present. The entire loan closing was completed in less than one hour.

106.    A true and correct copy of the Settlement Statement provided to the Wakefields in connection with the January 15, 2004 refinancing is attached to the original complaint as <u>Exhibit P</u>.

107.    A true and correct copy of the loan note in the January 15, 2004 loan is attached to the original complaint as <u>Exhibit Q</u>.

108.    Although the Wakefields closed the loan on January 15, 2004, the Settlement Statement indicates a closing date of January 23, 2004.

109.    The January 15, 2004 loan contains a one-way variable rate provision under which the rate in the transaction could increase from the initial rate disclosed in the loan note, but could not decrease below that rate.

110.    The Wakefields did not understand the variable rate associated with their loan until many months after the transaction.

111.    The January 15, 2004 loan Settlement Statement shows that a $192,555.96 disbursement was made to Ameriquest to pay off the Wakefield's prior loan. [See Exhibit P: Line 1501]

112.    On April 2, 2004, the Wakefields refinanced their January 15, 2004 Ameriquest loan with Ameriquest. The Wareham residence was collateral for this loan ("April 2, 2004 loan").

113.    The Wakefields completed the application for the April 2, 2004 loan by phone.

114.    The preliminary CCCDA disclosures given to the Wakefields and dated February 24, 2004, stated that the Annual Percentage Rate applicable to the loan would be 8.860% and that the monthly payments would be $1,637.96.

115.    A true and correct copy of the CCCDA preliminary disclosures made to the Wakefields in connection with the April 2, 2004 refinancing is attached to the original complaint as <u>Exhibit R</u>.

116.    The final CCCDA disclosures given to the Wakefields at the April 2, 2004 closing stated that the Annual Percentage Rate to the applicable loan would be 8.75% and that the monthly payments would be $1,966.82. Ameriquest did not provide any notice of the change in terms to the Wakefields prior to the loan closing. At the time of loan closing, Ameriquest instead provided a notice purporting to be a "Borrower's Acknowledgment of Final Loan Terms" that was inaccurate for reasons including, but not limited to, misstating the terms of the original loan application and thereby implying that the Wakefields were receiving better terms than they had applied for, when in fact the terms were worse than the Wakefields had been promised.

117.    A true and correct copy of the CCCDA final disclosures made to the Wakefields in connection with the April 2, 2004 refinancing is attached to the original complaint as <u>Exhibit S</u>.

118.    The April 2, 2004 loan closing took place at the Wakefield's home with the Wakefields and a closing agent present. The loan closing was completed less in than one hour.

119.    A true and correct copy of the Settlement Statement provided to the Wakefields in connection with the April 2, 2004 refinancing is attached to the original complaint as <u>Exhibit T</u>.

120.    A true and correct copy of the loan note in the April 2, 2004 loan is attached to the original complaint as <u>Exhibit U</u>.

121.    Although the Wakefields closed the loan on April 2, 2004, the HUD-1 Settlement Statement indicates a closing date of April 9, 2004.

122.    The April 2, 2004 loan Settlement Statement shows that a loan discount fee of 3.990% ($10,445.82) was paid to Ameriquest Mortgage Company. [See Exhibit T: Line 802]

123.    The Wakefields believe and therefore aver that they were not provided with a discount of any kind on the rate in the transaction.

124.    The Wakefields were never offered an alternative loan with a higher rate that did not involve payment of discount points. Therefore, they never had an opportunity to evaluate whether the discount would be advantageous to them.

125.    The April 2, 2004 loan contains a one-way variable rate provision under which the rate in the transaction could increase from the initial rate disclosed in the loan note, but could not decrease below that rate.

126.    The April 2, 2004 loan Settlement Statement shows that a $242,057.42 disbursement was to be made to Ameriquest to pay off the January 15, 2004 Ameriquest loan. [See Exhibit T: Line 1501].

127.    Following the loan closing, on April 15, 2004, Ameriquest sent the Wakefields a "Statement of Credit Denial," stating: "We do not grant credit to any applicant on the terms and conditions you have requested."

128.    A true and correct copy of the Statement of Credit Denial that Ameriquest sent to Wakefields on April 15, 2004 is attached to the original complaint as Exhibit V.

129.    Upon receiving the "Statement of Credit Denial," Mr. Wakefield called his loan officer to inquire about the status of the April 2, 2004 loan. During that call, the loan officer told Mr. Wakefied that the April 2, 2004 loan had been cancelled because there had been "fraud in the application and the appraisal."

130.    The information that the Wakefields submitted by telephone in connection with their April 2, 2004 loan application was accurate.

131.    Following his conversation with the loan officer regarding the cancellation of the April 15, 2004 loan, the Wakefields retained an attorney, Lee Berger, to represent them in the matter of Ameriquest's cancellation of the April 2, 2004 loan.

132.    In an August 13, 2004 letter to Mr. Berger, a representative of Ameriquest Mortgage Company, Donald Larkin, wrote that the January 15, 2004 loan had been cancelled due to "what [Ameriquest] perceived to be, false income information that was submitted in connection with the subject loan information. Consequently, Ameriquest Loan Number 0066656760 [the January 15, 2004 loan] is still in effect and the terms, obligations and duties related thereto remain unchanged."

133.    A true and correct copy of the August 13, 2004 letter from Ameriquest representative, Donald Larkin to the Wakefields' attorney Lee M. Berger confirming Ameriquest's cancellation of the April 2, 2004 refinancing is attached to the original complaint as Exhibit W.

134.    The Wakefields have been unable to afford the payments on the January 15, 2004 loan.

135.    At the time this complaint was filed, the Wakefields were seven months in arrears on their monthly mortgage payments to Ameriquest.

136.    On October 21, 2004, Ameriquest, through its attorneys Korde & Associates, P.C., sent the Wakefields a Deficiency Notice to notify them of Ameriquest's intention to foreclose on or about December 13, 2004.

137.    A true and correct copy of the October 21, 2004 Deficiency Notice is attached to the original complaint as Exhibit X.

138.    The CCCDA requires creditors to provide borrowers with accurate information regarding the effects of rescinding a loan transaction. G.L. c. 140D § 10;  209 C.M.R. 32.23(2). Since canceling an initial transaction and canceling a refinancing transaction have different effects, the creditor must provide the borrower with notice that accurately reflects that difference. Specifically, a creditor must provide the borrower with a notice

that conforms with the model forms provided in Appendix H to 12 C.F.R. § 226.23, or substantially similar notice. G.L. c. 140D §§ 10, 18; 209 C.M.R. 32.23(2)(b).

139.    Since the Wakefields were refinancing Ameriquest loans with Ameriquest in both the January 15, 2004 and April 2, 2004 loan transactions, they should have received a disclosure that described the effects of canceling a refinance transaction. See 12 C.F.R. § 226.23(b)(2), Appendix H, Model Form H-9.

140.    A true and correct copy of the Notice of Right to Cancel provided to the Wakefields in connection with the January 15, 2004 refinancing is attached to the original complaint as Exhibit Y.

141.    A true and correct copy of the Notice of Right to Cancel provided to the Wakefields in connection with the April 2, 2004 refinancing is attached to the original complaint as Exhibit Z.

142.    Instead, in both loan transactions, Ameriquest provided the Wakefields with a form that explained their right to cancel an initial transaction. See 12 C.F.R. § 226.23(b)(2), Appendix H, Model Form H-8.

143.    As a result, Ameriquest failed to accurately disclose to the Wakefields the actual effect that such a cancellation would have on that transaction.

144.    On October 27, 2004 the Wakefields rescinded the refinance loan as was their right pursuant to G.L. c. 140D, §10 and the regulation promulgated thereunder, 209 C.M.R. 32.23.

145.    A true and correct copy of the Wakefields' October 27, 2004 notice of rescission is attached to the original complaint as Exhibit AA.

146.    The Wakefields would like to refinance with another lender on better terms, but have been unable to do so because of the prepayment penalty associated with the January 15, 2004 loan.

147.    The Wakefields also now understand that the thousands of dollars in points and closing costs that they paid in connection with prior loans have acted or could act as an

additional *de facto* prepayment penalty. They understand that since the points and closing costs are treated as earned when the loan is made, they drive up the effective rate on the original loan if the loan is repaid in a shorter period that its expected term. In addition, by refinancing the points paid in earlier loans, the Wakefields have been required to pay interest on the points in connection with the refinanced loan.

### Facts Applicable to Frank and Martha White's Loan Transaction

148.    Frank and Martha White are unsophisticated consumers with little experience in mortgage financing.  They own a home at 8 Ruskindale Road, Mattapan, MA 02126.

149.    The Whites purchased their home in 1998 for approximately one hundred and twenty-five thousand dollars ($125,000). The home currently has a fair market value of approximately three hundred fifty thousand dollars ($350,000).

150.    On May 23, 2003, the Whites refinanced their home mortgage loan with Ameriquest.  The Whites' residence was collateral for this loan ("May 23, 2003 loan").

151.    Based on their discussions with Ameriquest, the Whites understood that they would receive a loan with a fixed rate and low closing costs.

152.    However, the loan documents presented at closing indicated that the loan would be at a variable rate with substantial closing costs. Ameriquest did not provide notice of the change in terms to the Whites prior to the loan closing.  At the time of loan closing, Ameriquest instead provided a notice purporting to be a "Borrower's Acknowledgment of Final Loan Terms" that was inaccurate for reasons including, but not limited to, misstating the terms of the original loan application and thereby implying that the Whites were receiving better terms than they had applied for, when in fact the terms were worse than the Whites had been promised.

153.    When Martha White asked an Ameriquest loan officer why they did not get a fixed rate loan with low closing costs as promised, the Whites were told that Ameriquest could refinance at better terms utilizing newly available loan products.

154.    A true and correct copy of the CCCDA disclosures provided to the Whites in connection with the May 23, 2003 loan is attached to this amended complaint as <u>Exhibit BB.</u>

155.    A true and correct copy of the Settlement Statement provided to the Whites in connection with the May 23, 2003 loan is attached to this amended complaint as <u>Exhibit CC.</u>

156.    Upon information and belief, the Whites received the same form of the loan notes attached hereto as <u>Exhibit KK</u> and <u>Exhibit NN</u> in connection with the May 23, 2003 loan.

157.    Although the loan closing took place on May 23, 2003, the Settlement Statement indicates a closing date of May 30, 2003.

158.    The May 23, 2003 loan Settlement Statement shows a loan discount fee of 3.50% ($8,400.00) to Ameriquest Mortgage Company. [See Exhibit CC: Line 802]

159.    The Whites believe and therefore aver that they were not provided with a "discount" of any kind on the rate in the transaction.

160.    The Whites were never offered an alternative loan with a higher rate that did not involve payment of discount points. Therefore, they had no opportunity to evaluate whether the "discount" would be advantageous to them.

161.    The May 23, 2003 loan contains a "one-way" variable rate provision under which the rate in the transaction could increase from the initial rate disclosed in the loan note, but could not decrease below that rate.

162.    The Whites did not understand the variable rate associated with their loan until many months after the transaction.

163.    Shortly after consummation of the May 23, 2003 loan, the Whites received a telephone call from an Ameriquest loan officer, during which Ameriquest offered to refinance their home mortgage on better terms.

164.    The Whites refinanced their home mortgage loan with Ameriquest on December 19, 2003 (the "December 19, 2003 loan").

165.    By refinancing with Ameriquest, the Whites suffered significant hidden financial harm, including capitalization of points and closing costs and exposure to substantial new and additional closing costs.  These hidden costs of refinancing were well known and highly profitable to Ameriquest.

166.    The Whites completed the loan application for the December 19, 2003 loan over the phone.  Based on their discussions with Ameriquest's loan officer, the Whites believed that the December 19, 2003 would not include additional points and would involve a fixed rate.

167.    The final CCCDA disclosures given to the Whites at the December 19, 2003 closing provided for substantial points and a fixed rate.  Ameriquest did not provide notice of the change in terms to the Whites prior to the loan closing. At the time of loan closing, Ameriquest instead provided a notice purporting to be a "Borrower's Acknowledgment of Final Loan Terms" that was inaccurate for reasons including, but not limited to, misstating the terms of the original loan application and thereby implying that the Whites were receiving better terms than they had applied for, when in fact the terms were worse than the Whites had been promised.

168.    A true and correct copy of the CCCDA disclosures provided to the Whites in connection with the December 19, 2003 refinancing is attached to this amended complaint as Exhibit DD.

169.    The December 19, 2003 closing took place at the Whites' home.  The Whites and an attorney acting as closing agent were present.  The attorney presented the Whites with dozens of documents to sign and encouraged the Whites to sign without reading.

170.    The closing was completed in less than one hour.  The attorney referred all questions about loan terms to Ameriquest, including questions about what the Whites had been promised.

171.    A true and correct copy of the Settlement Statement provided to the Whites in connection with the December 19, 2003 refinancing is attached to this amended complaint as Exhibit EE.

172.    A true and correct copy of the loan note in the December 19, 2003 loan is attached to this amended as Exhibit FF.

173.    Although the loan closing took place on December 19, 2003, the Settlement Statement indicates a closing date of December 26, 2004.

174.    The December 19, 2003 loan Settlement Statement shows a loan discount fee of 4.00% ($11,120.00) to Ameriquest Mortgage Company. [See Exhibit FF: Line 802]

175.    The Whites believe and therefore aver that they were not provided with a "discount" of any kind on the rate in the transaction.

176.    The Whites were never offered an alternative loan with a higher rate that did not involve payment of discount points. Therefore, they had no opportunity to determine whether the "discount" would be advantageous to them.

177.    Total settlement charges on the December 19, 2003 loan were $14,596.16 and all of the finance charges on the earlier loan were capitalized.

178.    In exchange, the Whites received less than $22,000 in additional proceeds of the loan.

179.    The December 19, 2003 loan Settlement Statement shows that a disbursement to Ameriquest was made to pay off the May 23, 2003 Ameriquest loan in the amount of $242,303.62 – more than the original face amount of that loan.  [See Exhibit FF: Lines 1501 and 1511]

180.    The Whites believe and therefore aver that this is more than the amount they owed Ameriquest as of December 19, 2003.

181.    The Whites are having significant problems affording the payments on the December 19, 2003 loan and have received various notices associated with foreclosure.

182.    The CCCDA requires creditors to provide borrowers with accurate information regarding the effects of rescinding a loan transaction. G.L. c. 140D § 10; 209 C.M.R. 32.23(2). Since canceling an initial transaction and canceling a refinancing transaction have different effects, the creditor must provide the borrower with notice that accurately reflects that difference. Specifically, a creditor must provide the borrower with a notice that conforms with the model forms provided in Appendix H to 12 C.F.R. § 226.23, or substantially similar notice. G.L. c. 140D §§ 10, 18; 209 C.M.R. 32.23(2)(b).

183.    Since the Whites were refinancing an Ameriquest loan with Ameriquest in the December 19, 2003 transaction, they should have received a disclosure that described the effects of canceling a refinance transaction. See 12 C.F.R. § 226.23(b)(2), Appendix H, Model Form H-9.

184.    Instead Ameriquest provided the Whites with a form that explained their right to cancel an initial transaction. See 12 C.F.R. § 226.23(b)(2), Appendix H, Model Form H-8

185.    A true and correct copy of the Notice of Right to Cancel provided to the Whites in connection with the December 19, 2003 refinancing is attached to this amended complaint as Exhibit GG.

186.    As a result, Ameriquest failed to accurately disclose to the Whites the effect that canceling the refinance transaction would have on their home mortgage.

187.    In addition, Ameriquest failed to provide the Whites with a form that had the deadline for cancellation filled in.

188.    On February 11, 2005 the Whites rescinded the refinance loan as was their right pursuant to G.L. c. 140D, §10 and the regulation promulgated thereunder, 209 C.M.R. 32.23.

189.    A true and correct copy of the Whites' March 3, 2005 notice of rescission related to the refinance loan is attached to this amended complaint as Exhibit HH.

190.    The Whites would like to refinance with another lender on better terms, but have not fully explored that option because of the prepayment penalty associated with their Ameriquest loan.

191.    The Whites also now understand that the thousands of dollars in points and closing costs that they paid in connection with each loan has acted or could act as an additional de facto prepayment penalty.  They understand that since the points and closing costs are treated as earned when the loan is made, they drive up the effective rate on the original loan if the loan is repaid in a shorter period than its expected term.  In addition, by refinancing the points on a previous occasion, the Whites have been required to pay interest on the points in connection with the refinanced loan.

***Facts Applicable to Harriet Holder's Loan Transactions***

192.    Harriet Holder is an unsophisticated consumer with little experience in mortgage financing.  She owns a home at 86 Standard Street, Mattapan, MA 02126.

193.    Ms. Holder purchased her home in 2001 for approximately two hundred and forty thousand dollars ($240,000) and lives there with her daughter and her mother.  A recent appraisal indicates that the Holder residence has a fair market value of approximately four hundred twenty-five thousand dollars ($425,000).

194.    On November 24, 2003, Ms. Holder refinanced her home mortgage loan with Ameriquest.  The Holder residence was collateral for this loan ("November 24, 2003 loan").

195.    Based on her discussions with Ameriquest, Ms. Holder understood that she was applying for a loan with a fixed rate and no points.

196.    However, the loan documents presented at closing indicated that the loan would be at a variable rate with substantial points. Ameriquest did not provide any notice of the change in terms to Ms. Holder prior to the loan closing. At the time of loan closing, Ameriquest instead provided a notice purporting to be a "Borrower's Acknowledgment of Final Loan Terms" that was inaccurate for reasons including, but not limited to, misstating the terms of the original loan application and thereby implying that Ms. Holder was receiving better terms than she had applied for, when in fact the terms were worse than she had been promised.

197.    When Ms. Holder asked why she did not get a fixed rate loan without points as promised, Ms. Holder was told that the change in terms actually benefited her because it would allow Ameriquest to refinance sooner at a lower fixed rate.

198.    A true and correct copy of the CCCDA disclosures provided to Ms. Holder in connection with the November 24, 2003 loan is attached to this amended complaint as Exhibit  II.

199.    A true and correct copy of the Settlement Statement provided to Ms. Holder in connection with the November 24, 2003 loan is attached to this amended complaint as Exhibit JJ.

200.    A true and correct copy of the loan note in the November 24, 2003 loan is attached to this amended complaint as Exhibit KK.

201.    Although the loan closing took place on November 24, 2003, the Settlement Statement indicates a closing date of December 1, 2003.

202.    The November 24, 2003 loan Settlement Statement shows a loan discount fee of 2.00% ($5,760.00) to Ameriquest Mortgage Company. [See Exhibit JJ: Line 802]

203.    Ms. Holder believes and therefore avers that she was not provided with a "discount" of any kind on the rate in the transaction.

204.    Ms. Holder was never offered an alternative loan with a higher rate that did not involve payment of discount points. Therefore, she had no opportunity to evaluate whether the "discount" would be advantageous to her.

205.    The November 24, 2003 loan contains a "one-way" variable rate provision under which the rate in the transaction could increase from the initial rate disclosed in the loan note, but could not decrease below that rate.

206.    Ms. Holder did not understand the variable rate associated with her loan until many months after the transaction.

207.    Shortly after consummation of the November 24, 2003 loan, Ms. Holder received a telephone call from an Ameriquest loan officer in California, during which Ameriquest offered to refinance her home mortgage at a lower rate. The loan officer stated that Ameriquest had "made a mistake" on the November 24, 2003 loan and stated that Ameriquest could offer better terms on a refinancing.

208.    Ms. Holder refinanced her home mortgage loan with Ameriquest on May 12, 2004 (the "May 12, 2004 loan").

28

209.    By refinancing with Ameriquest, Ms. Holder suffered significant hidden financial harm, including capitalization of points and closing costs and exposure to substantial new and additional closing costs.  These hidden costs of refinancing were well known and highly profitable to Ameriquest.

210.    Ms. Holder completed the loan application for the May 12, 2004 loan over the phone.  Based on her discussions with Ameriquest's loan officer, Ms. Holder believed that the May 12, 2004 would not include points and would involve a fixed rate.

211.    The final CCCDA disclosures given to Ms. Holder at the May 12, 2004 closing provided for substantial points and a variable rate. At the time of loan closing, Ameriquest instead provided a notice purporting to be a "Borrower's Acknowledgment of Final Loan Terms" that was inaccurate for reasons including, but not limited to, misstating the terms of the original loan application and thereby implying that Ms. Holder was receiving better terms than she had applied for, when in fact the terms were worse than she had been promised.

212.    A true and correct copy of the CCCDA disclosures provided to Ms. Holder in connection with the May 12, 2004 refinancing is attached to this amended complaint as Exhibit LL.

213.    The May 12, 2004 closing took place at Ms. Holder's home.  Ms. Holder and an attorney acting as closing agent were present.  The attorney presented Ms. Holder with dozens of documents to sign and encouraged Ms. Holder to sign without reading.

214.    The closing was completed in less than one hour.  The attorney referred all questions about loan terms to Ameriquest.

215.    The attorney did not provide copies of any loan documents to Ms. Holder at the time of the loan closing, but instead mailed them to Ms. Holder the next day.  Ms. Holder did not receive copes of any loan documents before May 14, 2004.

216.    A true and correct copy of the Settlement Statement provided to Ms. Holder in connection with the May 12, 2004 refinancing is attached to this amended complaint as Exhibit MM.

217.    A true and correct copy of the loan note in the May 12, 2004 loan is attached to this amended as Exhibit NN.

218.    Although the loan closing took place on May 12, 2004, the Settlement Statement indicates a closing date of May 19, 2004.

219.    The May 12, 2004 loan Settlement Statement shows a loan discount fee of 4.050% ($12,717.00) to Ameriquest Mortgage Company. [See Exhibit MM: Line 802]

220.    Ms. Holder believes and therefore avers that she was not provided with a "discount" of any kind on the rate in the transaction.

221.    Ms. Holder was never offered an alternative loan with a higher rate that did not involve payment of discount points. Therefore, she had no opportunity to determine whether the "discount" would be advantageous to her.

222.    Total settlement charges on the May 12, 2004 loan were $17,779.45 and all of the finance charges on the earlier loan were capitalized.  In exchange, Ms. Holder received less than $21,000 in additional proceeds of the loan.

223.    The May 12, 2004 loan contains a "one-way" variable rate provision under which the rate in the transaction could increase from the initial rate disclosed in the loan note, but could not decrease below that rate.

224.    Ms. Holder did not understand the variable rate associated with her loan at the time of the May 12, 2004 loan transaction.

225.    The May 12, 2004 loan Settlement Statement shows that a disbursement to Ameriquest was made to pay off the November 24, 2003 Ameriquest loan in the amount of $275,392. [See Exhibit MM: Lines 1501 and 1511] Ms. Holder believes and therefore avers that this is more than the amount she owed Ameriquest as of May 12, 2004.

226.    Ms. Holder is having significant problems affording the payments on the May 12, 2004 loan and has received various notices associated with foreclosure.

227.    The CCCDA requires creditors to provide borrowers with accurate information regarding the effects of rescinding a loan transaction. G.L. c. 140D § 10; 209 C.M.R. 32.23(2). Since canceling an initial transaction and canceling a refinancing transaction have different effects, the creditor must provide the borrower with notice that accurately reflects that difference. Specifically, a creditor must provide the borrower with a notice that conforms with the model forms provided in Appendix H to 12 C.F.R. § 226.23, or substantially similar notice. G.L. c. 140D §§ 10, 18; 209 C.M.R. 32.23(2)(b).

228.    Since Ms. Holder was refinancing an Ameriquest loan with Ameriquest in the May 12, 2004 transaction, she should have received a disclosure that described the effects of canceling a refinance transaction. See 12 C.F.R. § 226.23(b)(2), Appendix H, Model Form H-9.

229.    Instead Ameriquest provided Ms. Holder with a form that explained her right to cancel an initial transaction. See 12 C.F.R. § 226.23(b)(2), Appendix H, Model Form H-8

230.    A true and correct copy of the Notice of Right to Cancel provided to Ms. Holder in connection with the May 12, 2004 refinancing is attached to this amended complaint as Exhibit OO.

231.    As a result, Ameriquest failed to accurately disclose to Ms. Holder the effect that canceling the refinance transaction would have on her home mortgage.

232.    In addition, Ameriquest failed to provide Ms. Holder with a form that had the deadline for cancellation filled in.

233.    Ameriquest also failed to timely deliver the notice of right to cancel, by failing to leave two copies of the notice with Ms. Holder as required by regulation.  Instead, the closing agent mailed the notice to Ms. Holder so that it arrived several days after the loan was consummated.

234.    On February 11, 2005 Ms. Holder rescinded the refinance loan as was her right pursuant to G.L. c. 140D, §10 and the regulation promulgated thereunder, 209 C.M.R. 32.23.

235.    A true and correct copy of Ms. Holder's February 11, 2005 notice of rescission related to the refinance loan is attached to this amended complaint as <u>Exhibit PP.</u>

236.    Ms. Holder would like to refinance with another lender on better terms, but has not fully explored that option because of the prepayment penalty associated with her Ameriquest loan.

237.    Ms. Holder also now understands that the thousands of dollars in points and closing costs that she paid in connection with each loan has acted or could act as an additional de facto prepayment penalty.  She understands that since the points and closing costs are treated as earned when the loan is made, they drive up the effective rate on the original loan if the loan is repaid in a shorter period than its expected term.  In addition, by refinancing the points on a previous occasion, Ms. Holder has been required to pay interest on the points in connection with the refinanced loan.

**_Facts Applicable To Claims Under G.L. c. 93A._**

238.    By letter dated November, 1, 2004, the Plaintiffs Murphy, Gay and Wakefield, by counsel, demanded relief from Ameriquest pursuant to G.L. c. 93A, on behalf of themselves and a class of similarly situated individuals.  A true and correct copy of that letter is attached hereto and marked <u>Exhibit QQ.</u>

239.    By letter dated March 24, 2004, the Plaintiffs White and Holder, by counsel, demanded relief from Ameriquest pursuant to G.L. c. 93A, on behalf of themselves and a class of similarly situated individuals.  A true and correct copy of that letter is attached hereto and marked <u>Exhibit RR.</u>

240.    In each case, Ameriquest refused to provide the requested relief pursuant to G.L. c. 93A and failed to make a reasonable offer of settlement.

32

## GENERAL ALLEGATIONS

241.    Ameriquest regularly uses bait and switch sales tactics to induce Massachusetts homeowners to finance their residences with Ameriquest on unfavorable terms.

242.    Ameriquest's home loans in Massachusetts are fully secured by homeowners' equity and are therefore made with little or no financial risk to Ameriquest.

243.    Ameriquest regularly fails to provide homeowners with timely and accurate written disclosures of loan terms as mandated by law.

244.    Ameriquest regularly fails to provide homeowners with timely and accurate written change in terms notices as mandated by law, substituting instead a document labeled "Borrower's Acknowledgment of Final Loan Terms" containing purported terms of the original application different from those which the borrower had actually applied for.

245.    Ameriquest regularly fails to provide homeowners who are refinancing Ameriquest loans with accurate notice of their right to cancel the transaction.

246.    When a homeowner complains that he or she is not being given a loan on promised terms, Ameriquest's loan officers routinely promise early refinancing on better terms.

247.    Ameriquest regularly charges so-called "discount points" without providing a discount therefor.

248.    Ameriquest regularly fails to offer consumers an alternative loan without "discount points" so that consumers can meaningfully evaluate whether the supposed rate discount is sufficient to offset the cost of the "discount points."

249.    Ameriquest routinely imposes prepayment penalties in the maximum amount allowed by law and then uses the fact of the penalty as a sales technique designed to discourage borrowers from seeking or obtaining better loan terms available from other lenders.

250.    Ameriquest routinely encourages early refinancing of its own loans in order to capitalize points paid on the previous loan and to create an opportunity to charge a new set of points and closing costs.

251.    Ameriquest understands the financial benefit to it of early refinancing of loans containing significant points and fees and hides the financial disadvantage of those refinance loans to its customers.

252.    Ameriquest routinely includes confusing variable rate terms in its loans that are designed to protect Ameriquest if interest rates increase without allowing its customers to benefit if interest rates decline below the rate in effect at the time the loan is made.

253.    An effect of Ameriquest's practices is to trap borrowers into a pattern of financing and refinancing with Ameriquest on terms that are highly financially advantageous to Ameriquest and highly disadvantageous to its customers.

254.    By its practices, Ameriquest strips equity that would otherwise belong to Massachusetts homeowners.

## V.    CLASS DEFINITIONS AND CLASS ISSUES

255.    Plaintiffs bring this action on behalf of themselves and three classes of all other persons similarly situated, pursuant to Mass. R. Civ. P. 23.

256.    Class I (the "deceptive loan terms" class) is represented by all Plaintiffs and consists of all residents of Massachusetts:

      a.   who entered into non-purchase money mortgage loan agreements with Ameriquest, on or after November 2, 2000; and

      b.   who were offered one set of terms in preliminary disclosures but received another rate at closing; and/or

257.    Class II (the "Adverse Action" class) is represented by all Plaintiffs and consists of all residents of Massachusetts:

    a.  who, on or after November 2, 2002, submitted a completed credit application to Ameriquest for a home mortgage;

    b.  who were offered one interest rate in preliminary disclosures but who received a higher rate at closing; and

    c.  who were not issued a written notice of adverse action.

258.   Class III (the "CCCDA Notice of Right to Cancel" class) is represented by the Wakefields, Ms. Gay, the Whites, and Ms. Holder and consists of all residents of Massachusetts:

    a.  who, on or after November 2, 2000, refinanced an Ameriquest non-purchase money mortgage loan with Ameriquest; and

    b.  who received an incomplete or incorrect form of notice of right to cancel.

259.   There are questions of law and fact which are common to all members of each class, which questions predominate over any question affecting only individual class members. The principal common issues are:

*with respect to Class I:*

    a.  Whether Ameriquest offered borrowers mortgages on terms which it could not or did not intend to provide at closing in order to switch borrowers from the mortgage product first offered to a different, higher cost mortgage loan, in violation of 940 C.M.R. §§ 8.04(4) and 8.06(1) and c. 93A;

    b.  Whether Ameriquest violated 940 C.M.R. § 8.06(1) and c. 93A by using promises of prompt refinancings at more favorable terms to induce borrowers to close loans;

    c.  Whether Ameriquest charged borrowers "loan discount fees" without providing discounts for such payment in violation of 940 C.M.R. §§ 3.04, 3.05, and 3.13 and c. 93A;

    d.  Whether Ameriquest failed to disclose the "loan discount fees" in violation of G.L. c. 183 § 63;

    e.  Whether Ameriquest failed to offer borrowers an alternative loan without the "loan discount fees" for the purposes of allowing borrowers to make an informed decision about whether the payment of discount points would be cost effective in violation of 940 C.M.R. §§ 3.04, 3.05, 3.13, 6.05 and c. 93A;

     f.     Whether Ameriquest failed to make the preliminary
mortgage lender disclosures required by the Attorney
General's Consumer Protection regulations at 940 C.M.R. §
8.05(2) within the time required by 940 C.M.R. § 8.05(6)
or, in the alternative as mandated by G.L. c. 184 § 17D
which requires disclosure of settlement costs and related
information in the manner mandated by 209 C.M.R. 38.04;

     g.     Whether Ameriquest failed to make disclosures mandated
by 209 C.M.R. §§ 32.18; and

     h.     Whether Ameriquest failed to make disclosures mandated
by 209 C.M.R. §§ 32.19(2);

*with respect to Class II:*

     a.     Whether Ameriquest violated the FCRA, 15 U.S.C. §
1681m, and the ECOA, 15 U.S.C. § 1691(d), by failing to
give a notice of adverse action when it failed to provide
credit on the terms originally offered to the Plaintiffs and
instead provided credit at less advantageous terms.

*with respect to Class III:*

     a.     Whether Ameriquest violated the CCCDA by failing to provide
proper notice of the Class Members' right of rescission;

     b.     Whether Class Members have a right to actual and statutory
damages, pursuant to the CCCDA, c. 140D § 32 based on the
misdisclosures; and

     c.     Whether Class Members have a right to cancel their transactions
on the basis of the misdisclosure.

260.    The only individual questions concern the identification of members of each class

and the computation of relief to be afforded each class member and can be determined by

a ministerial examination of the relevant files.  Notice can be provided to the class by

various means of communication, as identified in the Defendants' computerized

databases of customers.

261.    Plaintiffs' claims are typical of the claims of class members.  All are based on the same legal and remedial theories.

262.    Plaintiffs will fairly and adequately protect the interests of all class members in the prosecution of this action and in the administration of all matters relating to claims stated herein. They are similarly situated with, and have suffered similar injuries as, the members of the class they seek to represent. Plaintiffs have retained counsel experienced in handling class action suits involving unfair business practices and consumer law. Neither the named Plaintiffs nor their counsel have any interest which might cause them not to vigorously pursue this action.

263.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy, in that:

      a.    the losses suffered by the class members are such that prosecution of individual actions is impractical or economically unfeasible;

      b.    by contrast, the illegal profits obtained by the Defendant as a result of their unlawful practices are substantial;

      c.    the form of proof required is such that prosecution of individual actions is impractical or economically infeasible;

      d.    in the absence of the class action device, Plaintiffs and Class Members would be left without a remedy for the wrongful acts alleged, and the Defendants would be unjustly enriched;

      e.    the prosecution of separate lawsuits by individual members of the class would create the risk of inconsistent adjudications with respect to individual class members, which would establish incompatible standards of conduct for the Defendants, making concentration of the litigation concerning this matter in this Court desirable;

      f.    the claims of the representative Plaintiffs are typical of the claims of the class; and

> g.   no unusual difficulties are likely to be encountered in the management of this action as a class action.

264.   The class is so numerous as to make it impracticable to join all members of the class as plaintiffs. Based upon the investigation of counsel, the number of class members of each class is estimated to be in excess of 500 persons.

## VI.   CAUSES OF ACTION

### COUNT I: VIOLATION OF CHAPTER 93A, ON BEHALF OF ALL NAMED PLAINTIFFS AND BOTH CLASSES

265.   Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

266.   Ameriquest has violated G.L. c. 93A § 2 with respect to each Plaintiff and each class member by utilizing terms and practices that were unfair, deceptive, and/or unconscionable. The violations the Defendant engaged in included, without limitation:

> a.   Employing a bait and switch strategy by offering borrowers mortgages on favorable terms prior to closing and then offering a different mortgage loan product at closing in violation of 940 C.M.R. §§ 8.04(4) and 8.06(1) and c. 93A § 2;
>
> b.   Promising to refinance borrowers' mortgages on more favorable terms to induce them to close loans in violation of 940 C.M.R. § 8.06(1) and c. 93A § 2;
>
> c.   Implying that borrowers are being given a loan "discount" but failing to provide any such discount in violation of 940 C.M.R. §§ 3.04, 3.05, 3.13, and 6.05 and c. 93A § 2;
>
> d.   Making loans on terms that were unfair and deceptive in light of their hidden advantages to the Defendant and their hidden costs to the Plaintiffs, including, without limitation, using unjustified and undisclosed points as a means to create a hidden advantage in refinancing the loan in violation of 940 C.M.R. §§ 3.04, 3.05, 3.13, and 6.05, M.G.L. c. 183 § 63 and c. 93A § 2;
>
> e.   Using prepayment penalties to trap borrowers into foregoing better loan terms from other lenders and/or to encourage borrowers to refinance on disadvantageous terms with Ameriquest;

f.   Providing confusing variable rate provisions in its loans designed to protect Ameriquest if rates increase from those in place when the loan is made without providing a benefit to borrowers when rates decline;

g.   Failing to make disclosures that comply with 940 C.M.R. §8.05(2) within the manner required by 940 C.M.R. § 8.05(6) or, in the alternative as mandated by G.L. c. 184 § 17D which required disclosure of settlement costs and related information in the manner mandated by 209 C.M.R. 38.04;

h.   Failing to make disclosures that comply with and 209 C.M.R. § 32.18;

i.   Failing to make disclosures that comply with and 209 C.M.R. § 32.19(2); and

j.   Failing to accurately disclose borrowers' rights to rescind their loans in violation of G.L. 140D § 10(a) and 209 C.M.R. § 32.23(2).

267.   Ameriquest's  conduct was willful or knowing within the meaning of M.G.L. c. 93A, §2.

268.   The Plaintiffs were injured and suffered damages by virtue of Ameriquest's violations.

269.   Ameriquest's refusal to grant relief upon demand was in bad faith, with knowledge or reason to know that the acts or practices complained of violated c. 93A, §2.

## COUNT II: CLAIMS FOR UNCONSCIONABILITY AND/OR ILLEGALITY ON BEHALF OF ALL NAMED PLAINTIFFS AND MEMBERS OF CLASS I

270.   Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

271.   Contract terms that violate the Division of Banks regulations, 209 C.M.R. 32.00, et seq., and/or the Attorney General's regulation, 940 C.M.R. § 3.01 et seq., 6.01 et seq., 8.01 et seq. are void or voidable for illegality and unenforceable.

272.   Contract terms that violate the Division of Banks regulations and/or the Attorney General's regulations are unconscionable and unenforceable.

273.   Said contract terms are void or voidable as a matter of public policy.

274.    The Plaintiffs and each member of Class I are entitled to relief from unconscionable and/or illegal contract terms including but not limited to cancellation and/or refund of unjustified points and cancellation/and or refund of prepayment penalties.

### COUNT III: BREACH OF CONTRACT ON BEHALF OF ALL NAMED PLAINTIFFS AND MEMBERS OF CLASS I

275.    Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

276.    The Defendant engaged in a pattern or practice of offering the Plaintiffs different terms in its oral and written preliminary disclosures than the ones it offered at closing.

277.    To the extent that Defendant offered terms to the Plaintiffs prior to closing, the Defendant formed contracts with the Plaintiffs to provide those promised terms.

278.    Promised terms included, without limitation: lower interest rates, lower monthly payments, lower settlement costs, and no prepayment penalty.

279.    By delivering different terms at closing than the ones initially promised, the Defendant breached its contracts with the Plaintiffs.

280.    The Defendant's conduct caused the Plaintiffs and members of Class I irreparable harm including, without limitation, increasing the amount of monthly payments owed to unaffordable levels thereby putting them at imminent risk of foreclosure, as well as by discouraging the Plaintiffs from refinancing at more affordable rates through its imposition of undisclosed/unjustified loan discount fees in conjunction with prepayment penalties.

281.    The Defendant's conduct increased the cost of the loan to each Plaintiff and the members of Class I.

282.    Each Plaintiff and each member of Class I is entitled to damages and equitable remedies for the Defendant's breach of contract.

## COUNT IV: BREACH OF CONTRACT ON BEHALF OF DAVID AND JANET WAKEFIELD, INDIVIDUALLY

283.    Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

284.    The Wakefields entered into a loan transaction with Ameriquest on April 2, 2004.

285.    Under the terms of April 2, 2004 loan transaction, Ameriquest was to pay off the January 15, 2004 loan, the Wakefields' property taxes, and debts the Wakefields had with several other creditors.

286.    Under the terms April 2, 2004 loan, the Wakefields' Annual Percentage Rate and monthly payment would have been significantly reduced by comparison with the January 15, 2004 loan.

287.    Under the terms of the April 2, 2004 loan, the Wakefields would not have had to make a monthly payment to Ameriquest until June 2004.

288.    Ameriquest purports to have "cancelled" the April 2, 2004 after loan documents were executed.

289.    Said "cancellation" was without legal cause or excuse.

290.    Ameriquest's cancellation of the April 2, 2004 caused the Wakefields irreparable harm because it had the effect of reinstating the January 15,2004 loan, the terms of which the Wakefields could not and cannot afford. By increasing the monthly payment amounts as well as the arrears owed, Ameriquest's cancellation of the April 2, 2004 drastically increased the likelihood that the Wakefields' family home would be foreclosed upon.

291.    Furthermore, because the January 15, 2004 loan contains a prepayment penalty, the Wakefields cannot afford to refinance with another lender.

292.    The Wakefields are therefore entitled to damages and equitable remedies for the Defendant's breach of the April 2, 2004 loan contract.

## COUNT V: INTENTIONAL MISREPRESENTATION ON BEHALF OF ALL NAMED PLAINTIFFS AND MEMBERS OF CLASS I

293.    Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

294.    Defendant made misrepresentations to the Plaintiffs and members of Class I, which the Plaintiffs relied upon to their detriment.

295.    Defendant's misrepresentations included, without limitation:

a.    making preliminary oral and written disclosures pertaining to the interest rate, monthly payments, settlement charges and other loan terms which differed significantly from the final loan terms offered;

b.    promising a discounted rate in connection with payment of "discount points" without providing said discount; and

c.    making assurances of prompt refinancing at better terms.

296.    Defendant made these misrepresentations to induce Plaintiffs and Members of Class I to enter into refinancing agreements with it.

297.    Plaintiffs and Members of Class I were induced to enter into refinancing agreements with the Defendant and suffered damages as a result.

298.    The Defendant's practices caused the Plaintiffs and members of Class I harm including, without limitation, increasing the amount of monthly payments owed to an unaffordable level thereby putting Plaintiffs at imminent risk of foreclosure, and preventing Plaintiffs from refinancing with other lenders to obtain more favorable terms through its imposition of undisclosed/unjustified points and prepayment penalties.

299.    Each plaintiff and each member of Class I is entitled to damages and equitable remedies for intentional misrepresentation.

## COUNT VI: UNJUST ENRICHMENT ON BEHALF OF ALL NAMED PLAINTIFFS AND MEMBERS OF CLASS I

300.    Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

301.    The Defendants have been unjustly enriched at the expense of each plaintiff and each member of Class I.

302.    Each plaintiff and each member of Class I is therefore entitled to equitable remedies for unjust enrichment including, without limitation, restitution and reformation of contract.

## COUNT VII - DECLARATORY JUDGMENT ON BEHALF OF ALL NAMED PLAINTIFFS AND MEMBERS OF CLASS I

303.    Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

304.    Ameriquest's actions have caused the Plaintiffs and the members of Class I actual prejudice. They ask this court to enter declaratory relief concerning the propriety of Defendant's practices relating to refinancing home mortgage loans.

## COUNT VIII - PRELIMINARY AND PERMANENT INJUNCTION ON BEHALF OF ALL NAMED PLAINTIFFS AND MEMBERS OF CLASS I

305.    Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

306.    Ameriquest's improper practices, including, without limitation, it use of bait and switch tactics, and its failure to provide Plaintiffs with adequate disclosures of adverse action, loan terms and rescission terms have caused Plaintiffs and class members to enter into disadvantageous and unaffordable loans. Moreover, Defendant's imposition of undisclosed/unjustified points and prepayment penalties prevent the Plaintiffs and class members from refinancing loans with other lenders at more favorable terms.

307.    Ameriquest's improper refinancing practices cause irreparable harm including, without limitation:

       i)      Raising monthly payment amounts to unaffordable levels and thereby placing Plaintiffs and class members at risk of foreclosure;

      ii)     Causing class members who do refinance their homes to pay interest on the unjustified points; and

    iii)     Causing class members who refinance with other lenders to pay excessive prepayment penalties.

308.    Absent injunctive relief, the Defendant may continue to violate the law and injure other persons who are seeking to refinance their home mortgage loans in the future.

### COUNT IX: VIOLATION OF THE FAIR CREDIT REPORTING ACT, 15 U.S.C § 1681m(a), ON BEHALF OF ALL NAMED PLAINTIFFS AND CLASS II

309.    Plaintiffs reallege and incorporate the preceding paragraphs.

310.    Ameriquest is a user of consumer reports from consumer reporting agencies, in connection with the extension of credit to consumers, as those terms are defined at 15 U.S.C. § 1681a.

311.    Ameriquest's failure to provide credit on the terms in initially promised to each of the Plaintiffs and class members, and to instead offer credit at less favorable more costly terms, constituted an adverse action, pursuant to 15 U.S.C. § 1681a(k).

312.    The adverse action taken by Ameriquest was based wholly or partly on information contained in a consumer report, or alternatively was based on information obtained from a person other than a consumer reporting agency, bearing upon the credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living of the Plaintiffs and class members.

313.    Ameriquest failed to provide notices of adverse action to each of the Plaintiffs and class members as required by 15 U.S.C. § 1681m(a).

314.    In the alternative, Ameriquest violated the FCRA by failing to provide adverse action notices which provided an accurate or meaningful description of the basis for such adverse taken, or which otherwise fail to comply with the Fair Credit Reporting Act, 15 U.S.C. §1681m(a).

315.    Ameriquest's failure to comply with 15 U.S.C. § 1681m(a) was willful.

316.    In the alternative, Ameriquest's failure to comply with 15 U.S.C. § 1681m(a) was negligent.

317.    The Plaintiffs and class members suffered damages as a result of Ameriquest's failure.

318.    Ameriquest's violations of 15 U.S.C. § 1681m also constitute violations of G.L. c. 93A, pursuant to 940 C.M.R. 3.16, and are unfair and deceptive.

## COUNT X: VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT, 15 U.S.C. § 1691(d), ON BEHALF OF ALL NAMED PLAINTIFFS AND CLASS II

319.    Plaintiffs reallege and incorporate the preceding paragraphs.

320.    Ameriquest is a creditor, as that term is defined at 15 U.S.C. § 1691a(e).

321.    Each of the Plaintiffs and class members made a credit application with Ameriquest for credit in the form of a home mortgage, and are therefore applicants as that term is defined at 15 U.S.C. § 1691a(b).

322.    Ameriquest's failure to provide credit on the terms in initially promised to each of the Plaintiffs and requested by the Plaintiffs, and to instead offer credit at less favorable more costly terms, constituted an adverse action, pursuant to 15 U.S.C. § 1691d(6).

323.    Ameriquest's failure to notify the Plaintiffs and class members in writing within thirty days of its adverse actions, violated Section 1691(d) of the Equal Credit Opportunity Act, 15 U.S.C. § 1691(d).

324.    The Plaintiffs and class members suffered damages as a result of Ameriquest's conduct.

325.    The Plaintiffs and class members are entitled to equitable relief for Ameriquest's violations of the ECOA, pursuant to 15 U.S.C. § 1691e(c).

326.    Ameriquest's violations of 15 U.S.C. § 1691d also constitute violations of G.L. c. 93A, pursuant to 940 C.M.R. 3.16, and are unfair and deceptive.

### COUNT XI: CLAIM FOR DECLARATORYAND INJUNCTIVE
### RELIEF AND DAMAGES FOR FAILURE TO COMPLY WITH THE
### REQUIREMENTS OF THE CCCDA ON BEHALF OF LYNN GAY,
### THE WAKEFIELDS, THE WHITES, HARRIET HOLDER AND CLASS III

327.    Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

328.    Class III is represented by Plaintiffs David and Janet Wakefield,  Lynn Gay,
Frank and Martha White and Harriet Holder.

329.    At all times relevant hereto Ameriquest was a creditor within the meaning of the
CCCDA, M.G.L. c. 140D, §1.

330.    Because the transactions described herein are covered by CCCDA, Ameriquest
was required to provide the Plaintiffs with accurate notice of their right to rescind their
refinancing transactions. M.G.L. c. 140D § 10; 209 C.M.R. 32.23(2).

331.    To satisfy the right of rescission disclosure requirements of M.G.L. c. 140D § 10,
the creditor must provide the borrower with notice that conforms with the model forms in
Appendix H of Regulation Z, as appropriate, or substantially similar notice. M.G.L. c.
140D §§ 10, 18; 209 C.M.R. 32.23(2)(b).

332.    The notice of right of rescission that Ameriquest provided to the Plaintiffs
Wakefield, Gay, White, and Holder was model form H-8, the General Rescission Model
Form. See 12 C.F.R. § 226.23, App. H.

333.    Since the Plaintiffs were refinancing with the same creditor, Ameriquest should
have provided them with model form H-9—the rescission notice required when the
borrower is refinancing with the same creditor. See 12 C.F.R. § 226.23, App. H.

334.    The Notice of Right to Cancel provided to Frank and Martha White and to Harriet
Holder was not completed with mandated information.  More specifically, the Notice did
not include the date the rescission period expires as required by M.G.L. c. 140D § 10;
209 C.M.R. 32.23(2)(a)(v) and 12 C.F.R. § 226.23, App. H.

335.    The misdisclosures in connection with each transaction, as aforesaid, were
material pursuant to the CCCDA, G.L. c. 140D §1 and 209 C.M.R. §32.23(2)(a)(4).

336.    By providing the incorrect notice of right of rescission to the Plaintiffs, Ameriquest misinformed the Wakefields, Lynn Gay, the Whites, Harriet Holder and the members of Class III about the effects of rescission and/or the deadline for exercising the right to rescind thereby violating the CCCDA. G.L. c. 140D §10; 209 C.M.R. 32.23(2)(a)(4).

337.    Each member of Class III is therefore entitled to a declaration that they have the right to rescind their transactions and to notice sufficient to exercise the right. G.L. c. 140D, §10 (a), (f); 209 C.M.R. 32.23(1);

338.    Each member of Class III is therefore entitled to a declaration that any Class Member who chooses to rescind is entitled to cancellation of finance charges in connection with their transaction and to a determination that the defendants' property interests in that class members' real estate is void pursuant to G.L. c. 140D § 10(b);

339.    Each member of Class III is therefore entitled to statutory and actual damages pursuant to G.L. c. 140D § 32.

340.    Ameriquest's violations of G.L. c. 140D § 32 also constitute violations of c. 93A, pursuant to 940 C.M.R. 3.16, and are unfair and deceptive.

### COUNT XII: CLAIM FOR DECLARATORY AND INJUNCTVE RELIEF AND DAMAGES TO ENFORCE RESCISSION ON BEHALF OF LYNN GAY, THE WAKEFIELDS, THE WHITES, AND HARRIET HOLDER INDIVIDUALLY

341.    Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

342.     Lynn Gay, the Wakefields, the Whites and Harriet Holder refinanced Ameriquest loans with Ameriquest, and Ameriquest failed to provided them with notice of their right to cancel which accurately disclosed the effect of rescinding a refinance transaction, thereby violating the CCCDA. G.L. c. 140D §10(a); 209 C.M.R. 32.23(2)(a)(4).

343.    The Whites and Harriet Holder were given Notices of Right to Cancel which were not completed with mandated information about the date the rescission period would

expire, thereby violating M.G.L. c. 140D § 10; 209 C.M.R. 32.23(2)(a)(v) and 12 C.F.R. § 226.23, App. H.

344.    The Notice of Right to Cancel was not timely delivered to Harriet Holder at the time of consummation of her loan.

345.    Ameriquest failed to act as required by G.L. c. 140D, § 10(b) and 209 C.M.R. 32.23(4) in response to each plaintiffs' valid demand for rescission.

346.    Lynn Gay, the Wakefields, the Whites and Harriet Holder are therefore entitled to a declaration that the rescission of the their loans was valid, and, as a result that the loans are void pursuant to G.L. c. 140D §10(b); 209 C.M.R. 32.23(1)(c) as well as damages for Ameriquests' failure to honor their valid rescissions, pursuant to G.L. c. 140D, §32.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief against Defendant Ameriquest:

*On behalf of Class I:*

  a.  Damages, including actual damages, statutory damages, and multiple damages, and equitable relief , for Defendant's violations of c. 93A;

  b.  for such relief from unconscionable and/or illegal contract terms including but not limited to cancellation and/or refund of unjustified points and cancellation/and or refund of prepayment penalties;

  c.  damages and equitable relief for the Defendant's breach of contract;

  d.  damages and equitable remedies for intentional misrepresentation;

  e.  damages and equitable remedies for unjust enrichment including, without limitation, restitution and reformation of contract; and

  f.  a declaration that the Defendant's refinancing practices, including, without limitation, its use of bait and switch advertising, its imposition of undisclosed/unjustified "loan discount fees" in conjunction with prepayment penalties and its failure to provide Plaintiffs with adequate disclosures of loan and rescission terms are improper;

g. preliminary and permanent injunctive relief to prevent the Defendant from continuing to violate the law and injuring other persons who are seeking to refinance their home mortgage loans in the future;

h. an award of reasonable attorney's fee and costs;

i. such other relief at law or equity as this Court may deem just and proper;

*On behalf of Class II:*

j. Actual damages, of not less than $100 and not more than $1,000 per willful violation of the FCRA committed against each class member, whichever is greater; pursuant to 15 U.S.C. § 1681n(a)(1)(A) and (B);

k. Punitive damages, for Defendant's willful violations of the FCRA, pursuant to 15 U.S.C. § 1681n(a)(2), in an amount as the Court may allow;

l. Actual damages per negligent violation of the FCRA, pursuant to 15 U.S.C. § 1681o(a);

m. Actual and punitive damages for Defendant's violations of the ECOA, pursuant to 15 U.S.C. § 1691(e);

n. equitable relief to prevent the Defendant from continuing to violate the ECOA, pursuant to 15 U.S.C. § 1691e(c);

o. damages, including actual damages, statutory damages, and multiple damages, and equitable relief, for Defendant's violations of c. 93A;

p. an award of reasonable attorney's fee and costs, pursuant to 15 U.S.C. 1691e(d) and 15 U.S.C. 1681n(a), and/or § 1681o(a);

q. such other relief at law or equity as this Court may deem just and proper;

*On behalf of Class III:*

r. a declaration that Class Members are entitled to rescind their transaction and notice sufficient to exercise the right G.L. c. 140D, §10 (a), (f) and 209 C.M.R. 32.23;

s. a declaration that any Class Member who chooses to rescind is entitled to cancellation of finance charges in connection with their transaction and to a determination that the defendants' property interests in that class members' real estate is void pursuant to G.L. c. 140D § 10(b);

t.  statutory and actual damages pursuant to G.L. c. 140D § 32;

u.  actual, statutory, and multiple damages pursuant to G.L. c. 93A § 9;

v.  an award of reasonable attorney's fee and costs;

w.  such other relief at law or equity as this Court may deem just and proper;

*On behalf of Plaintiffs David and Janet Wakefield:*

x.  damages and equitable relief for the Defendant's breach of the April 2, 2004 loan contract;

*On behalf of Plaintiffs Lynn Gay, David and Janet Wakefield, Frank and Martha White and Harriet Holder:*

y.  a declaration that their rescission was valid;

z.  a declaration that their mortgages are void as a result of the rescission;

aa. a declaration that they are not liable for any finance or other charge associated with the rescinded loans;

bb. statutory damages for Ameriquest's failure to honor their valid rescissions pursuant to 140D, § 32;

cc. costs and attorneys fees; and

dd. such other relief at law or equity as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury.

Respectfully Submitted,
Isabelle and David Murphy et. al.
By their attorneys,

Dated this 1st day of July, 2005.

/s/ Gary Klein
Gary Klein BBO # 560769
John Roddy BBO # 424240
Elizabeth Ryan BBO # 549632
Shennan Kavanagh BBO # 655174
Roddy, Klein & Ryan
727 Atlantic Ave., 2nd floor
Boston, MA  02111
Tel. 617-357-5500 x 15
Fax. 617-357-5030
klein@roddykleinryan.com

*EXHIBIT BB*

## TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

Mortgage Lenders License - License Number ML0702
LENDER: Ameriquest Mortgage Company
1750 Howe Avenue, # 610B
Sacramento, CA 95825
(916)649-6427

Preliminary [ ]    Final [X]

Broker License:

Borrowers: FRANK L WHITE    MARTHA A WHITE

Type of Loan: ADJUSTABLE RATE
Date: May 23, 2003

Address:        8 RUSKINDALE RD
City/State/Zip:  MATTAPAN, MA 02126

Loan Number: 0048138267 - 5668

Property:    8 RUSKINDALE RD, MATTAPAN, MA  02126

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.952 % | $ 374,480.86 | $ 229,635.36 | $ 604,116.22 |

YOUR PAYMENT SCHEDULE WILL BE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE BEGINNING |
|---|---|---|---|---|---|
| 359 | $1,678.12 | 07/01/2003 | | | |
| 1 | $1,671.14 | 06/01/2033 | | | |

**VARIABLE RATE FEATURE:**
[X] Your loan has a variable rate feature.  Disclosures about the variable rate feature have been provided to you earlier.

**SECURITY:**    You are giving a security interest in the property located at: 8 RUSKINDALE RD, MATTAPAN, MA  02126

**ASSUMPTION:**    Someone buying this property [X] cannot assume the remaining balance due under original terms.
[ ] may assume, subject to lender's conditions, the remaining balance due under original terms.

**PROPERTY INSURANCE:**    You may obtain property insurance from anyone you want that is acceptable to Ameriquest Mortgage Company

**LATE CHARGES:**    If a payment is late, you will be charged  3.000%  of the overdue principal and interest payment. .

**PREPAYMENT:**    If you pay off your loan early, you
[X] may    [ ] will not    have to pay a penalty.
**See your contract documents for any additional information regarding non-payment, default, required repayment in full before the scheduled date, and prepayment refunds and penalties.**

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_____    _____    _____    _____
Borrower  FRANK L WHITE        Date    Borrower  MARTHA A WHITE        Date

_____    _____    _____    _____
Borrower            Date    Borrower            Date

TILi (Rev. 7/01)

### Original

05/24/2003 7:55:42 A'

*EXHIBIT CC*

Optional Form for
Transactions without Seller
WLI

U.S. Department of Housing
and Urban Development

OMB Approval No. 2502-0491

| Name & Address of Borrower: | | Name & Address of Lender: |
|---|---|---|
| FRANK L WHITE    MARTHA A WHITE | | Ameriquest Mortgage Company |
| | | 1750 Howe Avenue, # 610B |
| 8 RUSKINDALE RD    MATTAPAN, MA 02126 | | Sacramento, CA 95825 |

| Property Location: (if different from above) | Settlement Agent: |
|---|---|
| 8 RUSKINDALE RD, MATTAPAN, MA  02126 | DANIEL NIGRO |
| | Place of Settlement: 315 HAMILTON STREET |
| | Worcester, MA 01604 |

**L.  Settlement Charges**

| Loan Number: | Settlement Date: Estimated |
|---|---|
| 0048138267 - 5668 | 05/30/2003 |

| **800.  Items Payable in Connection with Loan** | | **M.   Disbursement to Others** | |
|---|---|---|---|
| 801. Loan origination fee    % to | | | |
| 802. Loan discount  3.500  %  to  Ameriquest Mortgage Company | $8,400.00 | **1501.** | |
| 803. Appraisal fee to JOSEPH IZZO | $300.00 | AMERIQUEST | $203,421.77 |
| 804. Credit report to | | **1502.** | |
| 805. Inspection fee to | | FRD MOTOR CR                    (W) | $13,966.00 |
| 806. | | **1503.** | |
| 807. | | | |
| 808. Yield Spread Premium to | | **1504.** | |
| 809. | | | |
| 810. Tax Related Service Fee to  Ameriquest Mortgage | $35.00 | **1505.** | |
| 811. Flood Search Fee to  Ameriquest Mortgage Company | $16.00 | | |
| 812. Lenders Processing Fee to  Ameriquest Mortgage | $626.00 | **1506.** | |
| 813.Admin to Ameriquest Mortgage Company | $239.00 | | |
| 814. Doc. Prep. Fee to | | **1507.** | |
| 815. Credit Report Fee to | | | |
| 816. Origination Fee    % to | | **1508.** | |
| 817. Application Fee to  Ameriquest Mortgage Company | | | |
| 818. Underwriting Fee to | $360.00 | **1509.** | |
| 819. Service Provider Fee to | | | |
| 820. Processing Fee to | | **1510.** | |
| 821. Underwriting Fee to | | | |
| 822. Appraisal Fee to | | **1511.** | |
| **900.  Items Required by Lender to be Paid in Advance** | | | |
| 901. Interest from 05/30/2003  to  06/01/2003  @  $49.32  per day | $98.64 | **1512.** | |
| 902. Mortgage insurance premium for          months to | | | |
| 903. Hazard ins prem  to | | **1513.** | |
| 904. Flood ins prem  to | | | |
| **1000.  Reserves Deposited with Lender** | | **1514.** | |
| 1001. Hazard insurance    months @ $     per month | | | |
| 1002. Mortgage insurance    months @ $    per month | | **1515.** | |
| 1003. Earthquake ins    months @ $    per month | | | |
| 1004. County prop. taxes    months @ $    per month | | **1520. TOTAL DISBURSED** (enter on line 1603) | |
| 1005. Annual assess.    months @ $    per month | | | |
| 1006. Flood   months @ $    per month | | | $217,387.77 |
| 1007. Windstorm Ins    months @ $     per month | | | |
| 1008. | | | |
| **1100. Title Charges** | | | |
| 1101. Settlement or closing fee to  DANIEL NIGRO | $250.00 | | |
| 1102. Abstract or title search to  DANIEL NIGRO | $350.00 | | |
| 1103. Title examination to | | | |
| 1104. Title insurance binder to | | Total Wire:    $26,503.59 | |
| 1105. Document preparation to | | | |
| 1106. Notary fees to | | | |
| 1107. Attorney's fees to | | | |
| 1108. Title insurance to  DANIEL NIGRO | $1,000.00 | | |
| 1109. Lender's coverage        $ | | | |
| 1110. Owner's coverage        $ | | | |
| 1111. Settlement/Disbursement fee to | | | |
| 1112. Escrow Fee to DANIEL NIGRO | $295.00 | | |
| **1200. Government Recording and Transfer Charges** | | | |
| 1201. Recording fees | $145.00 | | |
| 1202. City/county tax/stamps | | **N.  NET SETTLEMENT** | |
| 1203. State tax/ stamps | | | |
| 1204. State specific fee | | **1600. Loan Amount** | |
| 1205. State specific fee | | | 240,000.00 |
| **1300. Additional Settlement Charges** | | **1601. Plus Cash/Check from Borrower** | |
| 1301. Demand to | | | |
| 1302. Pest Inspection to | | **1602. Minus Total Settlement Charges** (line 1400) | $12,159.64 |
| 1303. Survey Fee | | | |
| 1304. | | **1603. Minus Total Disbursements to Others** (line 1520) | $217,387.77 |
| 1305. Reconveyance Fee to | | | |
| 1306. | | **1604. Equals Disbursements to Borrower** (after expiration of any applicable rescission period) | |
| 1307. Apprsl/Prop Val Fee to | | | |
| 1308. Courier Fee | $45.00 | | $10,452.59 |
| **1400. Total Settlement Charges** (enter on line 1602) | $12,159.64 | | |

Borrower(s) Signature(s):

X

| Approved for Funding By: | Approved: | Branch:  Sacramento, CA 95825 |
|---|---|---|
| | | Mortgage Lenders License - License Number ML0702 |

**EXHIBIT DD**

# TRUTH-IN-LENDING DISCLOSURE STATEMENT
## (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

Mortgage Lenders License - License Number ML0702
LENDER:Ameriquest Mortgage Company
    10600 White Rock Road, Suite 200-03
    Rancho Cordova, CA 95670
    (916)853-4703

☐ Preliminary    ☒ Final

Broker License:

Borrowers:Frank L White    Martha A White

Type of Loan:  FIXED RATE
Date:  December 17, 2003

Address:    8 Ruskindale Road
City/State/Zip:  MATTAPAN,MA 02126

Loan Number:  0064186083 - 5644

Property:    8 Ruskindale Road, MATTAPAN, MA 02126

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 6.811 % | $ 357,976.27 | $ 264,753.84 | $ 622,730.11 |

**YOUR PAYMENT SCHEDULE WILL BE:**

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 359 | $1,729.82 | 02/01/2004 | | | |
| 1 | $1,724.73 | 01/01/2034 | | | |

**VARIABLE RATE FEATURE:**

☐  Your loan has a variable rate feature . Disclosures about the variable rate feature have been provided to you earlier.

**SECURITY:**  You are giving a security interest in the property located at: 8 Ruskindale Road, MATTAPAN, MA 02126

**ASSUMPTION:**  Someone buying this property ☒ cannot assume the remaining balance due under original terms.
☐ may assume, subject to lender's conditions, the remaining balance due under original terms.

**PROPERTY INSURANCE:**  You may obtain property insurance from anyone you want that is acceptable to Ameriquest Mortgage Company

**LATE CHARGES:**  If a payment is late, you will be charged 3.000% of the overdue principal and interest payment .

**PREPAYMENT:**  If you pay off your loan early, you
☒ may    ☐ will not    have to pay a penalty.
See your contract documents for any additional information regarding non-payment, default, required repayment in full before the scheduled date, and prepayment refunds and penalties.

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_____
BorrowerFrank L White    Date

_____
BorrowerMartha A White    Date

_____
Borrower    Date

_____
Borrower    Date

TIL1 (Rev. 7/01)
000000841860830305750101

## ORIGINAL COPY

12/17/2003 5:11:30 PM

**EXHIBIT EE**

ttlement Statement    U.S. Department of Housing    OMB Approval No. 2502-0265
ptional Form for    and Urban Development
ansactions without Sellers    WLI

| Name & Address of Borrower: | Name & Address of Lender: |
| --- | --- |
| ame & Address of Borrower:<br>ank L White    Martha A White | Ameriquest Mortgage Company<br>10600 White Rock Road, Suite 200-03<br>Rancho Cordova, CA 95670 |
| Ruskindale Road    MATTAPAN,MA 02126 | Settlement Agent: MORTGAGE INFORMATION SERVICES |
| roperty Location: (if different from above)<br>Ruskindale Road, MATTAPAN, MA  02126 | Place of Settlement: CENTRALIZED PROCESSING CLEVELAND, OH  44128 |

| **Settlement Charges** | | Loan Number:<br>0064186083 - 5644 | Settlement Date:Estimated<br>12/26/2003 |
| --- | --- | --- | --- |

| 00. Items Payable In Connection with Loan | | |
| --- | --- | --- |
| '1. Loan origination fee    % to | | |
| 2. Loan discount  4.000  % to  Ameriquest Mortgage Company | $11,120.00 | **M.    Disbursement to Others** |
| 3. Apprsl/Prop Val to ALPHA APPRAISAL COMPANY | $325.00 | 1501.<br>Ameriquest Mtg/0048138267    $242,303.62 |
| 4. Credit report to | | |
| 5. Inspection fee to | | 1502.<br>Boston Water Sewer Comm    $742.41 |
| 6. | | |
| 7. | | 1503.<br>Boston Water Sewer Comm    $928.17 |
| 8. Yield Spread Premium to | | |
| 9. | | 1504. |
| 0. Tax Related Service Fee to | $35.00 | |
| 1. Flood Search Fee to  Ameriquest Mortgage Company | $16.00 | 1505. |
| 2. Lenders Processing Fee to  Ameriquest Mortgage | $626.00 | |
| 3.Admin to Ameriquest Mortgage Company | $239.00 | 1506. |
| 4. Doc. Prep. Fee to | | |
| 5. Credit Report Fee to | | 1507. |
| 6.  Origination Fee    % to | | |
| 7. Application Fee to  Ameriquest Mortgage Company | $360.00 | 1508. |
| 8. Underwriting Fee to | | |
| 9. Service Provider Fee to | | 1509. |
| 0. Processing Fee  to | | |
| 1. Underwriting Fee to | | 1510. |
| 2. Appraisal Fee to | | |
| 00. Items Required by Lender to be Paid in Advance | | 1511. |
| 01. Interest from 12/26/2003  to 01/01/2004  @  $48.36  per day | $290.16 | |
| 02. Mortgage insurance premium for    months to | | 1512. |
| 03. Hazard ins prem  to | $0.00 | |
| 04. Flood Ins prem  to | | 1513. |
| 000. Reserves Deposited with Lender | | |
| 001. Hazard insurance    months @ $    per month | | 1514. |
| 002. Mortgage insurance    months @ $    per month | | |
| 003. Earthquake Ins    months @ $    per month | | 1515. |
| 004. County prop. taxes    months @ $    per month | | |
| 005. Annual assess.    months @ $    per month | | 1520. TOTAL DISBURSED (enter on line 1603)    $243,974.20 |
| 006. Flood    months @ $    per month | | |
| 007. Windstorm Ins    months @ $    per month | | Total Wire:    $21,014.64 |
| 008. | | |
| 100. Title Charges | | |
| 101. Settlement or closing fee to  MIS | $500.00 | |
| 102. Abstract or title search to | | |
| 103. Title examination to  MIS | $225.00 | |
| 104. Title insurance binder to | | |
| 105. Document preparation to | | |
| 106. Notary fees to | | |
| 107. Attorney's fees to | | |
| 108. Title insurance to  MIS | $600.00 | |
| 109. Lender's coverage    $600.00 | | |
| 110. Owner's coverage    $ | | |
| 111. Settlement/Disbursement fee to | | |
| 112. Escrow Fee to | | |
| 200. Government Recording and Transfer Charges | | |
| 201. Recording fees | $175.00 | |
| 202. City/county tax/stamps | | **N.    NET SETTLEMENT** |
| 203. State tax/ stamps | | |
| 204. State specific fee | | 1600. Loan Amount    278,000.00 |
| 205. State specific fee | | |
| 300. Additional Settlement Charges | | 1601. Plus Cash/Check from Borrower |
| '1301. Demand to | | |
| 1302. Pest Inspection to | | 1602. Minus Total Settlement Charges<br>(line 1400)    $14,596.16 |
| 1303. Survey Fee | | |
| 1304. Staff Appraiser Fee | | 1603. Minus Total Disbursements to Others<br>(line 1520)    $243,974.20 |
| 1305. Reconveyance Fee to  MIS | $25.00 | |
| 1306. | | 1604. Equals Disbursements to Borrower<br>(after expiration of any applicable rescission<br>period)    $19,429.64 |
| 1307. Property Val Fee to | | |
| 1308. Courier Fee | $60.00 | |
| **1400. Total Settlement Charges (enter on line 1602)** | $14,596.16 | |

0000006418608330305170201

orrower(s) Signature(s):

Approved:    Frank A. Wright    Branch:  Rancho Cordova, CA 95670
Approved for Funding By:    Mortgage Lenders License - License Number ML0702

**EXHIBIT FF**

# FIXED RATE NOTE

Loan No.  0064186083 - 5644

**THIS LOAN HAS A PREPAYMENT PENALTY PROVISION.**

December 17, 2003                    Orange                                CA
[Date]                              [City]                                [State]

8 Ruskindale Road, MATTAPAN, MA  02126
[Property Address]

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S.  $  278,000.00    (this amount is called "principal"), plus interest, to the order of the Lender.  The Lender is   Ameriquest Mortgage Company .

I understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid.  I will pay interest at a yearly rate of  6.350 %.

The interest rate required by Section 2 is the rate I will pay both before and after any default described on Section 6(B) of this Note.

## 3.  PAYMENTS

**(A)    Time and Place of Payments**

I will pay principal and interest by making payments every month.

I will make my monthly payments on the first day of each month beginning on    **February 1, 2004.**

I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal.  If, on    **January 1, 2034,** I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

**I will make my monthly payments at:    505 City Parkway West, Suite 100,  Orange, CA 92868  .**

or at a different place if required by the Note Holder.

**(B)    Amount of Monthly Payments**

My monthly payments will be in the amount of U.S. **$1,729.82.**

## 4.  BORROWER'S RIGHT TO PREPAY

I may repay this loan at any time as provided in this paragraph.  If I repay this loan within the first Three (3)  year(s) of the date of the execution of this Note, I agree to pay a prepayment penalty, subject to the following conditions:

1)  If I repay this loan within the first year by refinancing with another lender, I will pay a penalty equal to the sum of: (a) the lesser of three (3) months interest or the remainder of the first years interest; plus (b) three (3) months additional

2)  If I repay this loan within the first year by any other means, I will pay a penalty equal to the lesser of three (3) months interest or the remainder of the first years interest.

3)  If I repay this loan within the second or third year by refinancing with another lender, I will pay a penalty equal to three (3) months interest.

## 5.  LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then; (i) any such loan charged shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

## 6.  BORROWER'S FAILURE TO PAY AS REQUIRED

**(A)    Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of  **fifteen**  calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be  **3.000   %** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B)    Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)    Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed me.

Initials:

200-1MA (Rev. 7/03)                                                        12/17/2003 5:11:30 PM

Loan No. 0064186083 - 5644

**(D)    No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)    Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorney's fees.

**7.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to Pay all of the amounts owed under this Note.

**9.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10.  UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender shall also not exercise this option if prohibited by federal law as of the date of this Security Instrument.

If the Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____(Seal)

Borrower:  Frank L White
SSN:        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

_____(Seal)

Borrower:  Martha A White
SSN:        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

_____(Seal)

Borrower:
SSN:

_____(Seal)

Borrower:
SSN:

**EXHIBIT GG**

## NOTICE OF RIGHT TO CANCEL

LENDER:   Ameriquest Mortgage Company

DATE:   December 17, 2003
LOAN NO.:   0064186083 - 5644
TYPE:   FIXED RATE

BORROWER(S): Frank L White        Martha A White

ADDRESS:        8 Ruskindale Road
CITY/STATE/ZIP:   MATTAPAN,MA 02126

PROPERTY:   8 Ruskindale Road
              MATTAPAN, MA 02126

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

1.   The date of the transaction, which is

| ENTER DOCUMENT SIGNING DATE |
| --- |
| _____ |

;

or

2.   The date you received your Truth in Lending disclosures;
      or
3.   The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

---

### HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

**Ameriquest Mortgage Company**
**1100 Town and Country Road, Suite 200**
**Orange, CA 92868**

ATTN:  **FUNDING**
PHONE: **(714)541-9960**
FAX:     **(800)664-2256**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of

| ENTER FINAL DATE TO CANCEL |
| --- |
| _____ |

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.
**I WISH TO CANCEL**

_____
SIGNATURE

_____
DATE

---

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

_____
BORROWER/OWNER Frank L White          Date

_____
BORROWER/OWNER Martha A White          Date

_____
BORROWER/OWNER          Date

_____
BORROWER/OWNER          Date

I064-NRC (Rev 11/03)


0000006418608304000050101

**LENDER COPY**

12/17/2003 5:11:30 PM

*EXHIBIT HH*

# RODDY KLEIN & RYAN

### Attorneys at Law

727 Atlantic Ave., 2nd Floor
Boston, Massachusetts 02111

Gary Klein

Tel. (617) 357-5500 x 15
Fax (617) 357-5030
klein@roddykleinryan.com

March 3, 2005

*By Certified Mail, Return Receipt*
*Requested No. 7000 1670 0000 7575 2766*

Mr. Wayne Lee
Chief Executive Officer
Ameriquest Mortgage Company
1100 Town & Country Road
Orange, CA 92868

*By Certified Mail, Return Receipt*
*Requested No. 7000 1670 0000 7575 2773*

Ameriquest Mortgage Company
ATTN: Funding
1100 Town and Country Road, Suite 200
Orange, CA 92868

> Re:  Frank and Martha White
>        8 Ruskindale Road, Mattapan, MA 02126
>        Ameriquest Loan No.:0064186083
>        Loan Date: December 17, 2003

Dear Mr. Lee:

I represent the above referenced homeowners, who entered into a consumer loan transaction with Ameriquest Mortgage Company in December, 2003.

I have been authorized by my clients to rescind this transaction and hereby exercise that right pursuant to the Massachusetts Consumer Credit Cost Disclosure Act, M.G.L. c. 140D, § 10 and the regulation promulgated thereunder, 209 CMR 32.23.

Mr. and Mrs. White retain a current right to rescind because the Notice of Right to Cancel Form provided in connection with the transaction failed to comply the requirements set forth in Appendix H of Regulation Z, § 226.23 as required by M.G.L. c. 140D § 10(a) and 209 CMR 32.23(2)(a). Mr. and Mrs. White were refinancing an

*Martha and Frank White*
*March 3, 2005*
*p. 2 of 2*

Ameriquest home mortgage loan in the December 17, 2003 loan transaction. Therefore, Ameriquest should have provided them with an H-9 Notice of Right to Cancel form, which is specific to refinancings with the original creditor, rather than with the H-8 form they received. In addition, the form provided to Mr. and Mrs. White was not filled out with relevant dates and deadlines.

Under the law, Mr. and Mrs. White's right to rescind the transaction continues once foreclosure has been initiated. *See*, M.G.L. c. 140D § (10)(i)(1)(b), 209 C.M.R. § 32.23(8)(a)(2). Upon their rescission, the security interest held by Ameriquest as a result of this transaction is void pursuant to M.G.L. c. 140D § (10)(b), 209 C.M.R. §32.23(4). Pursuant to the state statute, your client has twenty days after receipt of this notice of rescission to return to Mr. and Mrs. White all monies paid and to take any action necessary and appropriate to reflect termination of the security interest. Upon completion of these responsibilities, Mr. and Mrs. White will perform all necessary actions required by M.G.L. c. 140D, § 10 and 209 CMR § 32.23, including tender of any amounts then due.

If your client fails to act in conformity with its statutory obligations, Mr. and Mrs. White will consider their options, including but not limited to a legal action seeking a declaratory judgment that the loan is rescinded together with claims for statutory and actual damages, attorneys fees and costs. In addition, any violation of the federal or state truth in lending laws is a *per se* violation of the Massachusetts unfair or deceptive acts or practices statute as well as regulations enacted thereunder (Mass. Gen. Laws Ann. ch.93A, 940 C.M.R. §1.01 et seq.).

Mr. and Mrs. White reserve the right to raise other bases upon which the loan at issue may be rescindable on statutory or common law grounds.

If you have any questions please do not hesitate to contact me.

Sincerely,

Gary Klein

cc:    Frank and Martha White
       R. Bruce Allensworth, Esquire

2

*EXHIBIT II*

# TRUTH-IN-LENDING DISCLOSURE STATEMENT
## (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

Mortgage Lenders License - License Number ML0702          ☐ Preliminary          ☒ Final
LENDER:Ameriquest Mortgage Company
    20 William St., # 145
    Wellesley, MA 02481
    (781)237-2835

Broker License:

Borrowers:Harriet Holder

Type of Loan:  ADJUSTABLE RATE
Date:  November 24, 2003

Address:      86 STANDARD ST
City/State/Zip:  Mattapan,MA 02126

Loan Number:  0062513601 - 7350

Property:    86 STANDARD ST, Mattapan, MA  02126

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 9.001      % | $  505,926.12 | $  264,404.17 | $  770,330.29 |

YOUR PAYMENT SCHEDULE WILL BE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 359 | $2,139.83 | 02/01/2004 | | | |
| 1 | $2,131.32 | 01/01/2034 | | | |

**VARIABLE RATE FEATURE:**
☒ Your loan has a variable rate feature .  Disclosures about the variable rate feature have been provided to you earlier.

**SECURITY:**    You are giving a security interest in the property located at: 86 STANDARD ST, Mattapan, MA  02126

**ASSUMPTION:**  Someone buying this property   ☒ cannot assume the remaining balance due under original terms.
☐ may assume, subject to lender's conditions, the remaining balance due under original terms.

**PROPERTY INSURANCE:**    You may obtain property insurance from anyone you want that is acceptable to
Ameriquest Mortgage Company

**LATE CHARGES:**  If a payment is late, you will be charged  **3.000%**  of the overdue principal and interest payment. .

**PREPAYMENT:**  If you pay off your loan early, you
☒ may  ☐ will not    have to pay a penalty.
**See your contract documents for any additional information regarding non-payment, default, required repayment in full before the scheduled date, and prepayment refunds and penalties.**

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_____          _____
Borrower:Harriet Holder    Date          Borrower    Date

_____          _____
Borrower    Date          Borrower    Date

7777777707070700076765242717744400775352
7611564401071311543667125400774243735560
1001077424173726601001074253422376033110 7
0000062513601036573610 1

TIL1 (Rev. 7/01)          **ORIGINAL COPY**

12/02/2003 10:39:28 AM

**EXHIBIT JJ**

Settlement Statement
U.S. Department of Housing
and Urban Development

OMB Approval No. 2502-0265
WLI

| Name & Address of Borrower: | Name & Address of Lender: |
|---|---|
| Harriet Holder | Ameriquest Mortgage Company |
| | 20 William St., # 145 |
| 86 STANDARD ST    Mattapan, MA 02126 | Wellesley, MA 02481 |

| Property Location: (if different from above) | Settlement Agent: CROWLEY, ESQ., GEORGE T. |
|---|---|
| 86 STANDARD ST, Mattapan, MA  02126 | Place of Settlement: 63 SHORE ROAD  WINCHESTER, MA  01890 |

## L.   Settlement Charges

| 800.  Items Payable in Connection with Loan | | Loan Number: 0062513601 - 7350 | Settlement Date: Estimated 12/01/2003 |
|---|---|---|---|
| 801. Loan origination fee     % to | | | |
| 802. Loan discount  2.000  % to  Ameriquest Mortgage Company | $5,760.00 | **M.   Disbursement to Others** | |
| 803.  Apprsl/Prop Val to Jim Swift     *L $300.00 *   $0.00 | $0.00 | 1501. WASHINGTON MUTUAL    (W) | $231,216.44 |
| 804.  Credit report to | | 1502. | |
| 805.  Inspection fee to | | UNIV GUARD    (W) | $654.00 |
| 806. | | 1503. | |
| 807. | | CAPITAL 1 BK RECOVERY    (W) | $110.00 |
| 808.  Yield Spread Premium to | | 1504. | |
| 809. | | MASS HOUSING    (W) | $14,324.00 |
| 810. Tax Related Service Fee to  Ameriquest Mortgage | $70.00 | 1505. | |
| 811. Flood Search Fee to  Ameriquest Mortgage Company | $16.00 | HFC/USA    (W) | $5,012.00 |
| 812. Lenders Processing Fee to  Ameriquest Mortgage | $626.00 | 1506. | |
| 813.Admin to Ameriquest Mortgage Company | $239.00 | CAPITAL ONE    (W) | $4,777.00 |
| 814. Doc. Prep. Fee to | | 1507. | |
| 815. Credit Report Fee to | | CAPTIAL ONE    (W) | $3,027.00 |
| 816.  Origination Fee     % to | | 1508. | |
| 817. Application Fee to  Ameriquest Mortgage Company | $360.00 | | |
| 818. Underwriting Fee to | | 1509. | |
| 819. Service Provider Fee to | | | |
| 820. Processing Fee  to | | 1510. | |
| 821. Underwriting Fee to | | | |
| 822. Appraisal Fee to | | 1511. | |
| **900.  Items Required by Lender to be Paid In Advance** | | | |
| 901.  Interest from  12/01/2003  to  01/01/2004  @  $65.10  per day | $2,018.10 | 1512. | |
| 902. Mortgage insurance premium for        months to | | | |
| 903.  Hazard ins prem  to | $0.00 | 1513. | |
| 904. Flood Ins prem  to | | | |
| **1000. Reserves Deposited with Lender** | | 1514. | |
| 1001. Hazard insurance  3   months @ $ 81.08  per month | $243.24 | | |
| 1002. Mortgage insurance     months @ $     per month | | 1515. | |
| 1003. Earthquake Ins     months @ $     per month | | | |
| 1004. County max. taxes  3   months @ $  57.58  per month | $172.74 | 1520. TOTAL DISBURSED (enter on line 1603) | $259,120.44 |
| 1005. Annual assess.     months @ $     per month | | | |
| 1006. Flood     months @ $     per month | | Total Wire:      $280,249.92 | |
| 1007.  Windstorm Ins     months @ $     per month | | | |
| 1008. | | L = Lender Paid | |
| **1100. Title Charges** | | | |
| 1101. Settlement or closing fee to  The Law Office's Of | $300.00 | | |
| 1102. Abstract or title search to | | | |
| 1103. Title examination to | | — | |
| 1104. Title insurance binder to | | | |
| 1105. Document preparation to | | | |
| 1106. Notary fees to | | | |
| 1107. Attorney's fees to | | | |
| 1108. Title insurance to  The Law Office's Of George T     *L $705.00 *   $0.00 | $0.00 | | |
| 1109. Lender's coverage          $ | | | |
| 1110. Owner's coverage          $ | | | |
| 1111. Settlement/Disbursement fee to     *L $750.00 *   $0.00 | $0.00 | | |
| 1112. Escrow Fee to The Law Office's Of George T Crowley | $295.00 | | |
| **1200. Government Recording and Transfer Charges** | | | |
| 1201. Recording fees | $315.00 | | |
| 1202. City/county tax/stamps | $50.00 | **N.   NET SETTLEMENT** | |
| 1203. State tax/ stamps | | | |
| 1204. State specific fee | | 1600. Loan Amount | 288,000.00 |
| 1205. State specific fee | | | |
| **1300. Additional Settlement Charges** | | 1601. **Plus** Cash/Check from Borrower | |
| 1301. Demand to | | | |
| 1302. Pest Inspection to | | 1602. **Minus** Total Settlement Charges (line 1400) | $10,520.08 |
| 1303. Survey Fee | $30.00 | | |
| 1304. Staff Appraiser Fee | | 1603. **Minus** Total Disbursements to Others (line 1520) | $259,120.44 |
| 1305. Reconveyance Fee to | | | |
| 1306. | | 1604. **Equals** Disbursements to Borrower (after expiration of any applicable rescission period) | $18,359.48 |
| 1307. Property Val Fee to | | | |
| 1308. Courier Fee | $25.00 | | |
| **1400. Total Settlement Charges (enter on line 1602)** | $10,520.08 | | |

Borrower(s) Signature(s):

X

| Approved for Funding By: | Approved: | Branch:  Wellesley, MA 02481 |
|---|---|---|

Mortgage Lenders License - License Number ML0702

*EXHIBIT KK*

## ADJUSTABLE RATE NOTE
### (LIBOR Index - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY. THIS LOAN HAS A PREPAYMENT PENALTY PROVISION.**

| November 24, 2003 | Orange | CA |
|---|---|---|
| [Date] | [City] | [State] |

86 STANDARD ST, Mattapan, MA  02126
[Property Address]

### 1.  BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. **$272,000.00**     (this amount is called "principal"), plus interest, to the order of the Lender.  The Lender is    Ameriquest Mortgage Company .

I understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2.  INTEREST
Interest will be charged on unpaid principal until the full amount of principal has been paid.  I will pay interest at a yearly rate of  **8.750%.**  This interest rate I will pay may change in accordance with Section 4 of this Note.
The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### 3.  PAYMENTS
#### (A)  Time and Place of Payments
I will pay principal and interest by making payments every month.
I will make my monthly payments on the first day of each month beginning on   **February 1, 2004**   . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note.  My monthly payments will be applied to interest before principal.  If, on   **January 1, 2034**   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make payments at: 505 City Parkway West, Suite 100,  Orange, CA 92868

or at a different place if required by the Note Holder.

#### (B)  Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. **$2,139.83**.  This amount may change.

#### (C)  Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay.  The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

### 4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES
#### (A)  Change Dates
The interest rate I will pay may change on the first day of  **January, 2006**  , and on that day every  sixth  month thereafter.  Each date on which my interest rate could change is called a "Change Date."

#### (B)  The Index
Beginning with the first Change Date, my interest rate will be based on an Index.  The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal.  The most recent Index figure available as of the date 45 days before the Change Date is called the "Current Index."
If at any point in time the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information.  The Note Holder will give me notice of this choice.

#### (C)  Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding   **six**  percentage point(s) ( **6.000 %**) to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-eight of one percent (0.125%).  Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.  The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments.  The result of this calculation will be the new amount of my monthly payment.

Initials:

201-1MA (Rev. 7/03)

12/02/2003 10:39:28 AM

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **10.750 % or less than 8.750 %**. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **One** percentage point(s) **(1.000 %)** from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than **14.750** % or less than **8.750 %**.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I may repay this loan at any time as provided in this paragraph. If I repay this loan within the first Three (3) year(s) of the date of the execution of this Note, I agree to pay a prepayment penalty, subject to the following conditions:

1) If I repay this loan within the first year by refinancing with another lender, I will pay a penalty equal to the sum of: (a) the lesser of three (3) months interest or the remainder of the first years interest; plus (b) three (3) months additional interest.

2) If I repay this loan within the first year by any other means, I will pay a penalty equal to the lesser of three (3) months interest or the remainder of the first years interest.

3) If I repay this loan within the second or third year by refinancing with another lender, I will pay a penalty equal to three (3) months interest.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces the principal, the reduction will be treated as a partial prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A)  Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **3.000 %** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is delivered or mailed to me.

**(D) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given notice of that different address.

Initials:

201-2MA (Rev. 7/03)

12/02/2003 10:39:28 AM

**9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed.  Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things.  Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note.  The Note Holder may enforce its rights under this Note against each person individually or against all of us together.  This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor.  "Presentment" means the right to require the Note Holder to demand payment of amounts due.  "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.  UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions.  In addition, to the protections given to the Note Holder under this Note, A Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note.  That the Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note.  Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower.  If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without the Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.  Lender also shall not exercise this option if: (a) Borrower causes to be submitted to lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonable determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition of Lender's consent to the loan assumption.  Lender may also require the transferee to sign an assumption agreement that is acceptable to lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument.  Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which the Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**12.  GOVERNING LAW PROVISION**

This Note and the related Security Interest  are governed by Federal and State law applicable to the jurisdiction of the Property.

**Oral agreements, promises or commitments to lend money, extend credit, or forbear from enforcing repayment of a debt, including promises to extend, modify, renew or waive such debt, are not enforceable.  This written agreement contains all the terms the Borrower(s) and the Lender have agreed to.  Any subsequent agreement between us regarding this Note or the instrument which secures this Note, must be in a signed writing to be legally enforceable.**

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.


_____(Seal)          _____(Seal)
Borrower  Harriet Holder                                Borrower


_____(Seal)          _____(Seal)
Borrower                                                Borrower

12/02/2003 10:39:28 AM

201-3MA (Rev. 7/03)

*EXHIBIT LL*

# TRUTH-IN-LENDING DISCLOSURE STATEMENT
## (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

Mortgage Lenders License - License Number ML0702
LENDER: Ameriquest Mortgage Company
   10600 White Rock Road, Suite 200-21
   Rancho Cordova, CA 95670
   (916)853-4721

[ ] Preliminary   [X] Final

Broker License:

Borrowers: Harriet Holder

Type of Loan: ADJUSTABLE RATE
Date: May 12, 2004

Address:   86 STANDARD ST
City/State/Zip:  MATTAPAN, MA 02126

Loan Number: 0079227328 - 7404

Property:   86 STANDARD ST, Mattapan, MA  02126

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.568 % | $ 461,455.16 | $ 298,724.73 | $ 760,179.89 |

YOUR PAYMENT SCHEDULE WILL BE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 24 | $2,078.52 | 07/01/2004 | | | |
| 335 | $2,114.00 | 07/01/2006 | | | |
| 1 | $2,105.41 | 06/01/2034 | | | |

VARIABLE RATE FEATURE:
[X] Your loan has a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier.

SECURITY: You are giving a security interest in the property located at: 86 STANDARD ST, Mattapan, MA 02126

ASSUMPTION: Someone buying this property [X] cannot assume the remaining balance due under original terms.
[ ] may assume, subject to lender's conditions, the remaining balance due under original terms.

PROPERTY INSURANCE: You may obtain property insurance from anyone you want that is acceptable to Ameriquest Mortgage Company

LATE CHARGES: If a payment is late, you will be charged 3.000% of the overdue principal and interest payment. .

PREPAYMENT: If you pay off your loan early, you
[X] may [ ] will not have to pay a penalty.
See your contract documents for any additional information regarding non-payment, default, required repayment in full before the scheduled date, and prepayment refunds and penalties.

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_____  Date _____
Borrower Harriet Holder

_____  Date _____
Borrower

_____  Date _____
Borrower

_____  Date _____
Borrower

TIL1 (Rev. 7/01)   0000007922732B0305750101

**ORIGINAL COPY**

05/12/2004 1:29:39 PM

*EXHIBIT MM*

| Settlement Statement Optional Form for Transactions without Sellers | U.S. Department of Housing and Urban Development | OMB Approval No. 2502-0491 |
|---|---|---|
| | | **WLI** |

| Name & Address of Borrower: Harriet Holder | Name & Address of Lender: Ameriquest Mortgage Company 10600 White Rock Road, Suite 200-21 Rancho Cordova, CA 95670 |
|---|---|

86 STANDARD ST    MATTAPAN, MA 02126

| Property Location: (if different from above) 86 STANDARD ST, Mattapan, MA 02126 | Settlement Agent: ATM CORPORATION OF AMERICA |
|---|---|
| | Place of Settlement: 345 ROUSER ROAD CORAOPOLIS, PA 15108 |

**L.**    **Settlement Charges**

| Loan Number: 0079227328 - 7404 | Settlement Date: Estimated 05/19/2004 |
|---|---|

| 800. Items Payable in Connection with Loan | | **M.** Disbursement to Others | |
|---|---|---|---|
| 801. Loan origination fee   % to | | | |
| 802. Loan discount 4.050 % to Ameriquest Mortgage Company | $12,717.00 | **1501.** CAPITAL ONE BANK (W) | $4,183.00 |
| 803. Apprsl/Prop Val to Reimbursed to Lender | $450.00 | | |
| 804. Credit report to | | **1502.** Ameriquest Mortgage - 0062513601 | $275,392.56 |
| 805. Inspection fee to | | | |
| 806. | | **1503.** FLEETCC (W) | $1,283.00 |
| 807. | | | |
| 808. Yield Spread Premium to | | **1504.** CAPITAL ONE BANK (W) | $2,685.00 |
| 809. | | | |
| 810. Tax Related Service Fee to Ameriquest Mortgage | $35.00 | **1505.** | |
| 811. Flood Search Fee to Ameriquest Mortgage Company | $16.00 | | |
| 812. Lenders Processing Fee to Ameriquest Mortgage | $626.00 | **1506.** | |
| 813. Admin to Ameriquest Mortgage Company | $239.00 | | |
| 814. Doc. Prep. Fee to | | **1507.** | |
| 815. Credit Report Fee to | | | |
| 816. Origination Fee   % to | | **1508.** | |
| 817. Application Fee to Ameriquest Mortgage Company | $360.00 | | |
| 818. Underwriting Fee to | | **1509.** | |
| 819. Service Provider Fee to | | | |
| 820. Processing Fee to | | **1510.** | |
| 821. Underwriting Fee to | | | |
| 822. Appraisal Fee to | | **1511.** | |
| **900. Items Required by Lender to be Paid in Advance** | | | |
| 901. Interest from 05/19/2004 to 06/01/2004 @ $59.79 per day | $777.27 | **1512.** | |
| 902. Mortgage insurance premium for   months to | | | |
| 903. Hazard ins prem to | $0.00 | **1513.** | |
| 904. Flood ins prem to | | | |
| **1000. Reserves Deposited with Lender** | | **1514.** | |
| 1001. Hazard insurance 2 months @ $ 81.58 per month | $163.16 | | |
| 1002. Mortgage insurance   months @ $   per month | | **1515.** | |
| 1003. Earthquake ins   months @ $   per month | | | |
| 1004. County prop. taxes 2 months @ $ 88.01 per month | $176.02 | | |
| 1005. Annual assess.   months @ $   per month | | **1520. TOTAL DISBURSED (enter on line 1603)** | $283,543.56 |
| 1006. Flood   months @ $   per month | | | |
| 1007. Windstorm ins   months @ $   per month | | Total Wire:   $22,697.99 | |
| 1008. | | | |
| **1100. Title Charges** | | | |
| 1101. Settlement or closing fee to UDX | $350.00 | | |
| 1102. Abstract or title search to ATM CORPORATION OF | $715.00 | | |
| 1103. Title examination to | | | |
| 1104. Title insurance binder to | | — | |
| 1105. Document preparation to ATM CORPORATION OF | $50.00 | | |
| 1106. Notary fees to | | | |
| 1107. Attorney's fees to | | | |
| 1108. Title insurance to ATM CORPORATION OF AMERICA | $775.00 | | |
| 1109. Lender's coverage | $775.00 | | |
| 1110. Owner's coverage   $ | | | |
| 1111. Settlement/Disbursement fee to | | | |
| 1112. Escrow Fee to ATM CORPORATION OF AMERICA | $100.00 | | |
| **1200. Government Recording and Transfer Charges** | | | |
| 1201. Recording fees | $175.00 | 00000079227328005170201 | |
| 1202. City/county tax/stamps | | **N.** NET SETTLEMENT | |
| 1203. State tax/ stamps | | | |
| 1204. State specific fee | | **1600. Loan Amount** | 314,000.00 |
| 1205. State specific fee | | | |
| **1300. Additional Settlement Charges** | | **1601. Plus Cash/Check from Borrower** | |
| 1301. Demand to | | | |
| 1302. Pest Inspection to | | **1602. Minus Total Settlement Charges (line 1400)** | $17,779.45 |
| 1303. Survey Fee to | | | |
| 1304. Staff Appraiser Fee | | **1603. Minus Total Disbursements to Others (line 1520)** | $283,543.56 |
| 1305. Reconveyance Fee to | | | |
| 1306. | | **1604. Equals Disbursements to Borrower (after expiration of any applicable rescission period)** | $12,676.99 |
| 1307. Property Val Fee to | | | |
| 1308. Courier Fee | $55.00 | | |
| **1400. Total Settlement Charges (enter on line 1602)** | $17,779.45 | | |

Borrower(s) Signature(s):

X _____

| Approved for Funding By: | Approved: | Branch: Rancho Cordova, CA 95670 |
|---|---|---|
| | | Mortgage Lenders License - License Number ML0702 |

*EXHIBIT NN*

Loan Number:  0079227328 - 7404

# ADJUSTABLE RATE NOTE
## (LIBOR Index - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY. THIS LOAN HAS A PREPAYMENT PENALTY PROVISION.**

May 12, 2004                       Orange                       CA
[Date]                             [City]                       [State]
                    86 STANDARD ST, Mattapan, MA  02126
                         [Property Address]

## 1.  BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. **$314,000.00**      (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is    Ameriquest Mortgage Company .

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST
Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of  **6.950%**. This interest rate I will pay may change in accordance with Section 4 of this Note.
The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3.  PAYMENTS
### (A)  Time and Place of Payments
I will pay principal and interest by making payments every month.
I will make my monthly payments on the first day of each month beginning on    **July 1, 2004**    . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on    **June 1, 2034**
, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make payments at: 505 City Parkway West, Suite 100,  Orange, CA 92868

or at a different place if required by the Note Holder.

### (B)  Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. **$2,078.52**. This amount may change.

### (C)  Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES
### (A)  Change Dates
The interest rate I will pay may change on the first day of  **June, 2006**  , and on that day every  sixth  month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B)  The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before the Change Date is called the "Current Index."
If at any point in time the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C)  Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding  **five and seven-hundred forty-eight thousandth(s)**  percentage point(s) (  **5.748**  %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eight of one percent (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

Initials:

00000079227328030440301

201-1MA (Rev. 7/03)

05/12/2004 1:29:39 PM

Loan Number:  0079227328 - 7404

**(D)  Limits on Interest Rate Changes**
The interest rate I am required to pay at the first Change Date will not be greater than **8.950 % or less than  6.950** %.  Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **One**  percentage point(s)  **(1.000 %)** from the rate of interest I have been paying for the preceding  six  months. My interest rate will never be greater than  **12.950**  % or less than **6.950 %**.

**(E)  Effective Date of Changes**
My new interest rate will become effective on each Change Date.  I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)  Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change.  The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.  BORROWER'S RIGHT TO PREPAY**

I may repay this loan at any time as provided in this paragraph.  If I repay this loan within the first Three (3)  year(s) of the date of the execution of this Note, I agree to pay a prepayment penalty, subject to the following conditions:

1)  If I repay this loan within the first year by refinancing with another lender, I will pay a penalty equal to the sum of: (a) the lesser of three (3) months interest or the remainder of the first years interest; plus (b) three (3) months additional interest.
2)  If I repay this loan within the first year by any other means, I will pay a penalty equal to the lesser of three (3) months interest or the remainder of the first years interest.
3)  If I repay this loan within the second or third year by refinancing with another lender, I will pay a penalty equal to three (3) months interest.

**6.  LOAN CHARGES**
If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me.  The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me.  If a refund reduces the principal, the reduction will be treated as a partial prepayment.

**7.  BORROWER'S FAILURE TO PAY AS REQUIRED**
**(A)    Late Charges for Overdue Payments**
If the Note Holder has not received the full amount of any monthly payment by the end of  **fifteen**    calendar days after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be  **3.000**  % of my overdue payment of principal and interest.  I will pay this late charge promptly but only once on each late payment.

**(B)  Default**
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)  Notice of Default**
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount.  The date must be at least 30 days after the date on which the notice is delivered or mailed to me.

**(D)  No Waiver by Note Holder**
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)  Payment of Note Holder's Costs and Expenses**
If the Note Holder has required me to pay immediately in full  as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorneys' fees.

**8.  GIVING OF NOTICES**
Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.
Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given notice of that different address.

Initials:



201-2MA (Rev. 7/03)

05/12/2004 1:29:39 PM

**9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.  UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition, to the protections given to the Note Holder under this Note, A Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That the Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without the Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonable determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition of Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which the Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**12.  GOVERNING LAW PROVISION**

This Note and the related Security Interest  are governed by Federal and State law applicable to the jurisdiction of the Property.

**Oral agreements, promises or commitments to lend money, extend credit, or forbear from enforcing repayment of a debt, including promises to extend, modify, renew or waive such debt, are not enforceable. This written agreement contains all the terms the Borrower(s) and the Lender have agreed to. Any subsequent agreement between us regarding this Note or the instrument which secures this Note, must be in a signed writing to be legally enforceable.**

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____(Seal)        _____(Seal)
Borrower  Harriet Holder                                          Borrower

_____(Seal)        _____(Seal)
Borrower                                                                   Borrower



3 of 3

**EXHIBIT OO**

# NOTICE OF RIGHT TO CANCEL

LENDER:  Ameriquest Mortgage Company

DATE:  May 12, 2004
LOAN NO.:  0079227328 - 7404
TYPE:  ADJUSTABLE RATE

BORROWER(S): Harriet Holder

ADDRESS:       86 STANDARD ST
CITY/STATE/ZIP:  MATTAPAN,MA 02126

PROPERTY:   86 STANDARD ST
            Mattapan,  MA  02126

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

1.  The date of the transaction, which is

**ENTER DOCUMENT SIGNING DATE**

_____

or

2.  The date you received your Truth in Lending disclosures;

or

3.  The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

---

### HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

**Ameriquest Mortgage Company**
**1100 Town and Country Road, Suite 200**
**Orange, CA 92868**

ATTN: **FUNDING**
PHONE: **(714)541-9960**
FAX:     **(800)664-2256**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of

**ENTER FINAL DATE TO CANCEL**

_____

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.
**I WISH TO CANCEL**

_____          _____
SIGNATURE                                                              DATE

---

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

_____          Date          _____          Date
BORROWER/OWNER Harriet Holder                                BORROWER/OWNER

_____          Date          _____          Date
BORROWER/OWNER                                                    BORROWER/OWNER

1064-NRC (Rev 11/03)

0000007922732804000501O1

**BORROWER COPY**

05/12/2004 1:29:39 PM

**EXHIBIT PP**

# RODDY KLEIN & RYAN

### Attorneys at Law

727 Atlantic Ave., 2nd Floor
Boston, Massachusetts 02111

Gary Klein

Tel. (617) 357-5500 x 15
Fax (617) 357-5030
klein@roddykleinryan.com

February 11, 2005

*By Certified Mail, Return Receipt
Requested No.*

Mr. Wayne Lee
Chief Executive Officer
Ameriquest Mortgage Company
1100 Town & Country Road
Orange, CA 92868

*By Certified Mail, Return Receipt
Requested No.* 7000  1670  0000 7575  3404

Ameriquest Mortgage Company
ATTN: Funding
1100 Town and Country Road, Suite 200
Orange, CA 92868

**RE:** Ms. Harriet Holder
86 Standard Street
Mattapan, MA
Ameriquest Loan No.: 0079227328-7404
Loan Date: May 12, 2004

Dear Mr. Lee:

I represent the above referenced homeowner, who entered into a consumer loan transaction with Ameriquest Mortgage Company in May, 2004.

I have been authorized by my client to rescind this transaction and hereby exercise that right pursuant to the Massachusetts Consumer Credit Cost Disclosure Act, M.G.L. c. 140D, § 10 and the regulation promulgated thereunder, 209 CMR 32.23.

Ms. Holder retains a current right to rescind because the Notice of Right to Cancel Form provided in connection with the transaction failed to comply the requirements set forth in Appendix H of Regulation Z, § 226.23 as required by M.G.L. c. 140D § 10(a) and 209 CMR 32.23(2)(a). Ms. Holder was refinancing an Ameriquest home mortgage loan in the May 12, 2004 loan transaction. Therefore, Ameriquest should have provided her with an H-9 Notice of Right to Cancel form, which is specific to

Ameriquest Mortgage Co.
2/11/05
Page 2

refinancings with the original creditor, rather than with the H-8 form she received.  In addition, the form provided to Ms. Holder was not filled out with relevant dates and deadlines, nor was it delivered to Ms. Holder until several days after the loan was consummated.  More specifically, the document was sent to Ms. Holder by mail rather than left with her at closing.

Under the law, Ms. Holder's right to rescind the transaction continues once foreclosure has been initiated. *See* M.G.L. c. 140D  § (10)(i)(1)(b), 209 C.M.R. § 32.23(8)(a)(2).  Upon her rescission, the security interest held by Ameriquest as a result of this transaction is void pursuant to  M.G.L. c. 140D  § (10)(b), 209 C.M.R. § § 32.23(4). Pursuant to the state statute, your client has twenty days after receipt of this notice of rescission to return to Ms. Holder all monies paid and to take any action necessary and appropriate to reflect termination of the security interest.  Upon completion of these responsibilities, Ms. Holder will perform all necessary actions required by M.G.L. c. 140D, § 10 and 209 CMR § 32.23, including tender of any amounts then due.

If your client fails to act in conformity with its statutory obligations, Ms. Holder will consider her options, including but not limited to a legal action seeking a declaratory judgment that the loan is rescinded together with claims for statutory and actual damages, attorneys fees and costs.  In addition, any violation of the federal or state truth in lending laws is a *per se* violation of the Massachusetts unfair or deceptive acts or practices statute as well as regulations enacted thereunder (Mass. Gen. Laws Ann. ch.93A, 940 C.M.R. §1.01 et seq.).

Ms. Holder reserves the right to raise other bases upon which the loan at issue may be rescindable on statutory or common law grounds.

If you have any questions please do not hesitate to contact me.

Sincerely,

Gary Klein

cc:    Harriet Holder
       R. Bruce Allensworth, Esquire
       William J. Amann, Esquire

*EXHIBIT QQ*

# RODDY KLEIN & RYAN

### Attorneys at Law

---

727 Atlantic Ave., 2nd Floor
Boston, Massachusetts 02111

Gary Klein

Tel. (617) 357-5500 x 15
Fax (617) 357-5030
klein@roddykleinryan.com

November 3, 2004

*By Certified Mail, Return Receipt
Requested No. 7000 1670 0000 7575 3374*

Mr. Wayne Lee
Chief Executive Officer
Ameriquest Mortgage Company
1100 Town & Country Road
Orange, CA 92868

> *Re: Isabelle and David Murphy, Lynn Gay, and David and Janet Wakefield, and all
> other similarly situated individuals  - Demand for Relief Pursuant to Mass. Gen.
> Laws, Chapter 93A §9*

Dear Mr. Lee:

Please consider this a demand for relief pursuant to Massachusetts General Laws, Chapter 93A, made on behalf of our clients, Isabelle and David Murphy, Lynn Gay, David and Janet Wakefield, and the class of Massachusetts borrowers which they seek to represent, as described in Civil Action No. 04-####, currently pending in Norfolk Superior Court. Ameriquest used a pattern of deceit, misrepresentation and other stratagems to induce our clients and others like them to enter into residential mortgage loans with unfair financial benefits to Ameriquest and hidden costs to our clients.  In committing these unfair and deceptive acts and practices, Ameriquest violated the consumer protection statute G.L. c. 93A (hereinafter "93A"), the regulations enacted thereunder (940 C.M.R. §3.01 *et seq*, 6.01 *et seq* and 8.01 *et seq*), the Massachusetts Consumer Credit Cost Disclosure Act (hereinafter "CCCDA"), G.L. c. 140D together with that law's implementing regulations (209 C.M.R. § 32.1 *et seq*) and other applicable laws.

Ameriquest – 93A
October 25, 2004
Page 2

The following summaries described these violations of law, and provide Ameriquest with an opportunity to settle this matter:

### Isabelle and David Murphy

Isabelle and David Murphy ("the Murphys") are unsophisticated consumers with little experience in mortgage financing. They own a home at 13 Crescent Street, Plympton, Massachusetts. The Murphys applied to refinance their home mortgage loan with Ameriquest in April 2004. Based on their discussions with Ameriquest, the Murphys understood that they were applying for a 5.75% fixed rate loan with no points. When the Murphys asked their loan officer, Jason Kerr, why the estimated closing costs were so high, and, specifically, what the "loan discount fee" of over $8,000.00 represented, he assured them it was "just to make the numbers work."

The Murphys were unaware that the loan closing was to take place until they received a call from Mr. Kerr, the loan officer, telling Ms. Murphy that he and an attorney, Nicholas Barrett, were on their way to the Plympton residence. The closing was completed in less than an hour. The final disclosures given to the Murphys at the April 22, 2004 loan closing stated that the Annual Percentage Rate applicable to the loan would be 6.529% and that the monthly payments would be $1,497.92 for the first two years and $1,576.70 for the remaining 28 years. At the closing, the Murphys expressed concern over the fact that the loan was an adjustable rate loan rather than a fixed rate loan, and that the loan terms included a prepayment penalty. In response, Mr. Kerr assured the Murphys that they could refinance within four to six months of the closing and obtain a lower, fixed-rate mortgage. Mr. Kerr also stated that if the Murphys refinanced with Ameriquest, they would not be subject to a prepayment penalty.

The April 22, 2004 loan Settlement Statement shows that a loan discount fee of 3.326% ($8,537.18) was paid to Ameriquest Mortgage Company. The Murphys believe that they were not provided with a "discount" of any kind on the rate in the transaction. The Murphys were never offered an alternative loan with a higher rate that did not involve payment of discount points. Therefore, they had no opportunity to evaluate whether the "discount" would be advantageous to them. The loan contains a "one-way" variable rate provision under which the rate in the transaction could increase from the initial rate disclosed in the loan note, but could not decrease below that rate. The Murphys were not given sufficient information to understand the variable rate associated with their loan and did not understand the complex provisions for a variable rate until many months after their transaction.

The Murphys are having significant problems affording the payments on April 22, 2004 loan. The Murphys have explored the possibility of refinancing the

Ameriquest – 93A
October 25, 2004
Page 3

loan to obtain a lower interest rate but have been frustrated in doing so by the cost of Ameriquest's prepayment penalty. The Murphys also now understand that the thousands of dollars in points and closing costs that they paid in connection with the loan would act as an additional *de facto* prepayment penalty if they refinance early, even if that refinancing is with Ameriquest. Since the points and closing costs are treated as earned when the loan is made, they drive up the effective rate on the original loan if the loan is repaid in a shorter period than its expected term. In addition, by refinancing the points, the Murphys would be required to pay interest on the points in connection with the refinanced loan.

### Lynn Gay

Lynn Gay is an unsophisticated consumer with little experience in mortgage financing. She owns a home at 43 Oak Street, Bridgewater, Massachusetts. On March 14, 2003, Ms. Gay refinanced her home mortgage loan with Ameriquest. Ms. Gay completed the application for the March 14, 2003 loan over the phone. Based on her discussions with Ameriquest, Ms. Gay understood that she was applying for a loan with a rate of 7.5%.

The March 14, 2003 closing took place at Ms. Gay's workplace during business hours. Ms. Gay and a closing agent were present. The closing was completed in less than one hour. The final disclosures given to Ms. Gay at the March 14, 2003 closing stated that the Annual Percentage Rate applicable to the loan would be 9.259% and that the monthly payments would be $2,058.80. At closing, Ms. Gay expressed concern regarding the change in terms from the preliminary discussions; the APR and monthly payment amount had both increased and the settlement charges had doubled. Ms. Gay was told by the closing agent that he was not a representative of Ameriquest and that he therefore could not answer questions about the loan terms.

The March 14, 2003 loan Settlement Statement shows a loan discount fee of 3.800% ($9,944.60) to Ameriquest Mortgage Company. Ms. Gay believes that she was not provided with a "discount" of any kind on the rate in the transaction. Ms. Gay was never offered an alternative loan with a higher rate that did not involve payment of discount points. Therefore, she never had an opportunity to evaluate whether the "discount" would be advantageous to her.

The March 14, 2003 loan contains a "one-way" variable rate provision under which the rate in the transaction could increase from the initial rate disclosed in the loan note, but could not decrease below that rate. Ms. Gay was not given sufficient information to understand the variable rate associated with her loan and did not understand the complex provisions for a variable rate until many months after her transaction.

Following consummation of the March 14, 2003 loan, Ms. Gay received a telephone call from an Ameriquest loan officer, during which he offered to refinance her home mortgage at a lower rate. Ms. Gay refinanced her home mortgage loan with Ameriquest again on September 2, 2003 ("September 2, 2003 loan"). By refinancing with Ameriquest, Ms. Gay suffered significant hidden financial harm, including capitalization of points and closing costs and exposure to substantial new and additional closing costs. These hidden costs of refinancing were well known and highly profitable to Ameriquest.

Ms. Gay completed the loan application for the September 2, 2003 loan over the phone. Based on her discussions with Ameriquest's loan officer, Ms. Gay she understood that her refinancing loan would be at a rate of 7.25%.

The September 2, 2003 closing took place at Ms. Gay's workplace during business hours. Ms. Gay and a closing agent were present. The closing was completed in less than one hour. The final disclosures given to Ms. Gay at the September 2, 2003 closing stated that the Annual Percentage Rate applicable to the loan would be 9.012% and that the monthly payments would be $2,283.68. At closing, Ms. Gay once again expressed concern, this time calling her Ameriquest loan officer, regarding the fact that the APR was greater than that orally disclosed prior to closing.

The September 2, 2003 loan Settlement Statement shows a loan discount fee of 3.900% ($11,583.00) to Ameriquest Mortgage Company. Ms. Gay believes and therefore avers that she was not provided with a "discount" of any kind on the rate in the transaction. Ms. Gay was never offered an alternative loan with a higher rate that did not involve payment of discount points for the purposes of allowing her to choose whether the "discount" would be advantageous to her.

The September 2, 2003 loan contains a "one-way" variable rate provision under which the rate in the transaction could increase from the initial rate disclosed in the loan note, but could not decrease below that rate. Ms. Gay did not understand the complex provisions for a variable rate until many months after the September, 2 2003 loan transaction.

The September 2, 2003 loan Settlement Statement shows that disbursements to Ameriquest were made to pay off the March 14, 2003 Ameriquest loan in the amounts of $16,774.61 and $150,000.00, respectively. The CCCDA requires lenders to provide borrowers with notice of their right to cancel which accurately explains the effects of rescinding a loan transaction. G.L. c. 140D § 10(a); 209 C.M.R. 32.23(2). Specifically, a creditor must provide the borrower with a notice that conforms with the model forms provided in Appendix H to 12 C.F.R. § 226.23, or substantially similar notice. G.L. c. 140D §§ 10(a), 18; 209 C.M.R. 32.23(2)(b).

Ameriquest – 93A
October 25, 2004
Page 5

Since Ms. Gay was refinancing an Ameriquest loan with Ameriquest in the September 2, 2003 transaction, she should have received a disclosure that described the effects of canceling a refinance transaction. See 12 C.F.R. § 226.23(b)(2), Appendix H, Model Form H-9. Instead Ameriquest provided Ms. Gay with a form that explained her right to cancel an initial transaction. See 12 C.F.R. § 226.23(b)(2), Appendix H, Model Form H-8. As a result, Ameriquest failed to accurately disclose to Ms. Gay the effect that canceling the refinance transaction would have on her home mortgage.

Ms. Gay would like to refinance with another lender on better terms, but has not fully explored that option because of the prepayment penalty associated with her Ameriquest loan. Ms. Gay also now also understands that the thousands of dollars in points and closing costs that she paid in connection with each loan has acted or could act as an additional *de facto* prepayment penalty. She understands that since the points and closing costs are treated as earned when the loan is made, they drive up the effective rate on the original loan if the loan is repaid in a shorter period than its expected term. In addition, by refinancing the points on a previous occasion, Ms. Gay has been required to pay interest on the points in connection with the refinanced loan.

### David and Janet Wakefield

David and Janet Wakefield ("the Wakefields") are unsophisticated consumers with little experience in mortgage financing. They own a home at 303 Marion Road, Wareham, Massachusetts. On April 17, 2003, the Wakefields refinanced their home mortgage loan with Argent Mortgage Company ("Argent loan"). Under the terms of the Argent loan, the Wakefields paid a loan origination fee of 2.00% ($3,825.00).

On January 15, 2004, the Wakefields refinanced their Argent loan with a loan from Ameriquest. The January 15, 2004 loan Settlement Statement shows that a $192,555.96 disbursement was made to Ameriquest to pay off the Agent loan. By refinancing with Ameriquest, the Wakefields suffered significant hidden financial harm, including capitalization of points and closing costs and exposure to substantial new and additional closing costs. These costs of refinancing were well known and highly profitable to Ameriquest.

The preliminary disclosures given to the Wakefields and dated January 2, 2004, stated that the Annual Percentage Rate applicable to the loan would be 9.736% and that the monthly payments would be $1,809.89. Based on the preliminary disclosures, the Wakefields believed they were to receive a loan on those terms. The final disclosures given to the Wakefields at the January 15, 2004 closing stated that the Annual Percentage Rate to the applicable loan would be 12.102% and that the monthly payments would be $2,446.27. Upon learning of the change in terms, the Wakefields told their loan officer that they could not afford a $2,446.27 monthly

Ameriquest – 93A
October 25, 2004
Page 6

payment. The loan officer assured them that they would only have to make one $2,446.27 payment on March 1, 2003, after which they could refinance at a lower rate to lower their monthly payments. The loan officer also stated that by refinancing with Ameriquest, the Wakefields would avoid paying a prepayment penalty.

The January 15, 2004 loan closing took place at the Wakefield's home with the Wakefields and a closing agent present. The entire loan closing was completed in less than one hour. The January 15, 2004 loan contains a one-way variable rate provision under which the rate in the transaction could increase from the initial rate were not given sufficient information to understand the variable rate associated with their loan and did not understand the complex provisions for a variable rate until many months after their transaction.

On April 2, 2004, the Wakefields refinanced their January 15, 2004 Ameriquest loan with Ameriquest. The Wareham residence was collateral for this loan ("April 2, 2004 loan"). The Wakefields completed the application for the April 2, 2004 loan by phone. The preliminary disclosures given to the Wakefields and dated February 24, 2004, stated that the Annual Percentage Rate applicable to the loan would be 8.860% and that the monthly payments would be $1,637.96

The April 2, 2004 loan closing took place at the Wakefield's home with the Wakefields and a closing agent present. The loan closing was completed less in than one hour. The final disclosures given to the Wakefields at the April 2, 2004 closing stated that the Annual Percentage Rate to the applicable loan would be 8.75% and that the monthly payments would be $1,966.82. The April 2, 2004 loan Settlement Statement shows that a $242,057.42 disbursement was to be made to Ameriquest to pay off the January 15, 2004 Ameriquest loan.

The April 2, 2004 loan Settlement Statement also shows that a loan discount fee of 3.990% ($10,445.82) was paid to Ameriquest Mortgage Company. The Wakefields believe that they were not provided with a discount of any kind on the rate in the transaction. The Wakefields were never offered an alternative loan with a higher rate that did not involve payment of discount points. Therefore, they never had an opportunity to evaluate whether the discount would be advantageous to them. The April 2, 2004 loan contains a one-way variable rate provision under which the rate in the transaction could increase from the initial rate disclosed in the loan note, but could not decrease below that rate.

Following the April 15, 200 loan closing, Ameriquest sent the Wakefields a "Statement of Credit Denial," stating: "We do not grant credit to any applicant on the terms and conditions you have requested." Upon receiving the "Statement of Credit Denial," Mr. Wakefield called his loan officer to inquire about the status of the April 2, 2004 loan and was informed that the April 2, 2004 loan had been cancelled because there had been "fraud in the application and the appraisal." The

information that the Wakefields submitted by telephone in connection with their April 2, 2004 loan application was accurate.

Upon learning that the April 15, 2004 loan had been cancelled, the Wakefields retained an attorney, Lee Berger to represent them in the matter of Ameriquest's cancellation of the April 2, 2004 loan. In an August 13, 2004 letter to Mr. Berger, a representative of Ameriquest Mortgage Company, Donald Larkin, wrote that the January 15, 2004 loan had been cancelled due to "what [Ameriquest] perceived to be, false income information that was submitted in connection with the subject loan information. Consequently, Ameriquest Loan Number 0066656760 [the January 15, 2004 loan] is still in effect and the terms, obligations and duties related thereto remain unchanged."

The Wakefields have been unable to afford the payments on the January 15, 2004 loan. At the time this letter was sent, the Wakefields were seven months in arrears on their monthly mortgage payments to Ameriquest. On October 21, 2004, Ameriquest, through its attorneys Korde & Associates, P.C., sent the Wakefields a Deficiency Notice to notify them of Ameriquest's intention to foreclose on or about December 13, 2004.

As set forth above, the CCCDA requires creditors to provide borrowers with accurate information regarding the effects of rescinding a loan transaction. Since the Wakefields were refinancing Ameriquest loans with Ameriquest in both the January 15, 2004 and April 2, 2004 loan transactions, they should have received a disclosure that described the effects of canceling a refinance transaction. Instead, in both loan transactions, Ameriquest provided the Wakefields with a form that explained their right to cancel an initial transaction. See 12 C.F.R. § 226.23(b)(2), Appendix H, Model Form H-8. As a result, Ameriquest failed to accurately disclose to the Wakefields the actual effect that such a cancellation would have on that transaction. On October 27, 2004 the Wakefields rescinded the refinance loan as was their right pursuant to G.L. c. 140D, §10 and the regulation promulgated thereunder, 209 C.M.R. 32.23

The Wakefields would like to refinance with another lender on better terms, but have been unable to do so because of the prepayment penalty associated with the January 15, 2004 loan. The Wakefields also now understand that the thousands of dollars in points and closing costs that they paid in connection with prior loans have acted or could act as an additional *de facto* prepayment penalty. They understand that since the points and closing costs are treated as earned when the loan is made, they drive up the effective rate on the original loan if the loan is repaid in a shorter period that its expected term. In addition, by refinancing the points paid in earlier loans, the Wakefields have been required to pay interest on the points in connection with the refinanced loan.

## Violations Of Law

Ameriquest has violated G.L. c. 93A § 2 with respect to each plaintiff and each class member by utilizing terms and practices that were unfair, deceptive, and/or unconscionable. The violations the Defendant engaged in included, without limitation:

a.  Employing a bait and switch strategy by offering borrowers mortgages on favorable terms prior to closing and then offering a different mortgage loan product at closing in violation of 940 C.M.R. §§ 8.04(4) and 8.06(1) and c. 93A;

b.  Promising to refinance borrowers' mortgages on more favorable terms to induce them to close loans in violation of 940 C.M.R. § 8.06(1) and c. 93A;

c.  Implying but failing to provide borrowers with a "discount" in violation of 940 C.M.R. §§ 3.04, 3.05, 3.13, and 6.05 and c. 93A;

d.  Failing to provide borrowers with necessary information to evaluate whether payments of "discount points" would be financially advantageous in violation of 940 C.M.R. §§ 3.05, 3.13, and 6.05 and c. 93A § 2;

e.  Making loans on terms that were unfair and deceptive in light of their hidden advantages to the Defendant and their hidden costs to the Plaintiffs, including, without limitation, using unjustified and undisclosed points as a means to create a hidden advantage in refinancing the loan in violation of 940 C.M.R. §§ 3.04, 3.05, 3.13, and 6.05, M.G.L. c. 183 § 63 and c. 93A;

f.  Using prepayment penalties to trap borrowers into foregoing better loan terms from other lenders and/or to encourage borrowers to refinance on disadvantageous terms with Ameriquest;

g.  Providing confusing variable rate provisions in its loans designed to protect Ameriquest if rates increase from those in place when the loan is made without providing a benefit to borrowers when rates decline;

h.  Failing to make the preliminary mortgage lender disclosures required by the Attorney General's Consumer Protection regulations at 940 C.M.R. § 8.05(2) in the manner required by 940 C.M.R. § 8.05(6) or, in the alternative, as mandated by G.L. c. 184 § 17Dwhich requires disclosure of settlement costs and related information;

i.  Failing to make disclosures mandated by 209 C.M.R. §§ 32.18;

j.  Failing to make disclosures mandated by 209 C.M.R. §§ 32.19; and

Ameriquest – 93A
October 25, 2004
Page 9

    k.      Failing to accurately disclose borrowers' rights to rescind their loans in violation of G.L. 140D § 10(a) and 209 C.M.R. § 32.23(2).

## Damages and Demand For Relief

The Murphys, Ms. Gay, the Wakefields and other similarly situated individuals were damaged and continue to be damaged by Ameriquest's home mortgage refinancing practices in that they have either been placed at risk of foreclosure or they have been prevented from refinancing with other lenders on more favorable terms due to prepayment penalties and points they have paid in connection with their Ameriquest loans. Accordingly, by this correspondence, on their behalf we demand that Ameriquest:

    a.      disclose to all affected borrowers the option of rescinding their loan contracts or reforming them to expunge the illegal terms;

    b.      cancel and/or refund unjustified points;

    c.      cancel and/or refund prepayment penalties;

    d.      pay actual and statutory damages pursuant to c. 93A § 9 and G.L 140D §§ 32(a)(1) and 32(a)(2)(b) ; and

    e.      provide an assurance that it will take all steps necessary to insure that all borrowers so entitled receive proper disclosures of loan and rescission terms in accordance with applicable law from this date forward.

M.G.L. c. 93A, § 9 provides Ameriquest with the opportunity to make a reasonable written settlement offer within thirty days of its receipt of this letter. Should litigation under c. 93A ensue, Ameriquest may become liable for up to three times actual damages, plus attorney's fees and costs.

In this regard, I direct your attention to the Supreme Judicial Court's view of the policy behind c. 93A's settlement encouraging directive.

Indeed, the conduct proscribed by the Statute *is as much the failure to make a reasonable settlement offer* as it is the substantive violation of c. 93A. Multiple damages are "the appropriate punishment" for forcing plaintiffs to litigate clearly valid claims. International Fidelity Ins. Co. v. Wilson, 443 NE 2d 1308, 1318 (1983)(emphasis added).

Ameriquest – 93A
October 25, 2004
Page 10

    I look forward to hearing from Ameriquest or its attorneys so that we may work toward a prompt and equitable settlement of this matter.

Yours very truly,

Gary Klein

GK:pc
cc:
Isabelle and David Murphy
Lynn Gay
David and Janet Wakefield

Ameriquest – 93A
October 25, 2004
Page 10

     I look forward to hearing from Ameriquest  or its attorneys so that we may work toward a prompt and equitable settlement of this matter.

                        Yours very truly,

                        Gary Klein

GK:pc
cc:
Isabelle and David Murphy
Lynn Gay
David and Janet Wakefield

*EXHIBIT RR*

# RODDY KLEIN & RYAN
### Attorneys at Law

---

727 Atlantic Ave., 2nd Floor
Boston, Massachusetts 02111

Gary Klein

Tel. (617) 357-5500 x 15
Fax (617) 357-5030
klein@roddykleinryan.com

March 24, 2005

*By Certified Mail, Return Receipt
Requested No. 7000 1670 0000 7575 2742*

R. Bruce Allensworth
Kirkpatrick & Lockhart
75 State Street
Boston, MA 02119

> **Re:** *Harriet Holder, Frank and Martha White And All Similarly Situated Individuals -
> Demand for Relief Pursuant to Mass. Gen. Laws, Chapter 93A §9*

Dear Mr. Allensworth:

This is a demand for relief pursuant to Massachusetts General Laws, Chapter 93A, made on behalf of our clients, Harriet Holder and Frank and Martha White, and a class of similarly situated Massachusetts borrowers. Ameriquest used a pattern of deceit, misrepresentation and other stratagems to induce our clients and others like them to enter into residential mortgage loans with unfair financial benefits to Ameriquest and hidden costs to our clients. In committing these unfair and deceptive acts and practices, Ameriquest violated the consumer protection statute G.L. c. 93A (hereinafter "93A"), the regulations enacted thereunder (940 C.M.R. §3.01 *et seq*, 6.01 *et. seq* and 8.01 *et. seq.*), the Massachusetts Consumer Credit Cost Disclosure Act (hereinafter "CCCDA"), G.L. c. 140D together with that law's implementing regulations, 209 C.M.R. § 32.1 *et. seq.,* the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691d, the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681m,  and other applicable laws.

The following summaries describe these violations of law, and provide Ameriquest with an opportunity to settle this matter:

### *Harriet Holder*

Harriet Holder is an unsophisticated consumer with little experience in mortgage financing. She owns a home at 86 Standard Street, Mattapan, MA 02126. Ms. Holder purchased her home in 2001 for $240,000 and lives there with her daughter and her mother. A recent appraisal indicates that the residence has a current fair market value of approximately $425,000.

On November 24, 2003, Ms. Holder refinanced her home mortgage loan with Ameriquest. Based on her initial discussions with Ameriquest, Ms. Holder understood that she

Ameriquest – 93A
Ameriquest Mortgage Co.
March 24, 2005
Page 2

was applying for a loan with a fixed rate, without points. Only at closing did Ms. Holder learn that the rate would be variable and that Ameriquest would charge substantial points in the transaction. When Ms. Holder inquired about why she was not being given a loan on the terms she had applied for, she was told that the changes benefited her because she could refinance earlier. She was also told that the terms were required based on her credit record. Ms. Holder was not given an adverse action notice under either the ECOA ,15 U.S.C. § 1691d, or the FCRA, 15 U.S.C. § 1681m.

The November 24, 2003 loan Settlement Statement shows a loan discount fee of 2.00% ($5,760.00) to Ameriquest Mortgage Company. Ms. Holder believes that she was not provided with a "discount" of any kind on the rate in the transaction. Ms. Holder was never offered an alternative loan with a higher rate that did not involve payment of discount points. Therefore, she never had an opportunity to evaluate whether the "discount" would be advantageous to her.

The November 24, 2003 loan contains a "one-way" variable rate provision under which the rate in the transaction could increase from the initial rate disclosed in the loan note, but could not decrease below that rate. Ms. Holder did not understand the variable rate associated with her loan until many months after the transaction.

Following consummation of the November 24, 2003 loan, Ms. Holder received a telephone call from an Ameriquest loan officer, during which he offered to refinance her home mortgage at a lower rate. Ms. Holder refinanced her home mortgage loan with Ameriquest on May 12, 2004 ("May 12, 2004 loan"). By refinancing with Ameriquest, Ms. Holder suffered significant hidden financial harm, including capitalization of points and closing costs and exposure to substantial new and additional closing costs. These hidden costs of refinancing were well known and highly profitable to Ameriquest.

Ms. Holder completed the loan application for the May 12, 2004 loan over the phone. Based on her discussions with Ameriquest's loan officer, Ms. Holder understood that she would not pay additional points and that the loan would provide a substantial benefit to her.

The May 12, 2004 loan Settlement Statement shows a loan discount fee of 3.050% ($12,717.00) to Ameriquest Mortgage Company. Ms. Holder believes and therefore avers that she was not provided with a "discount" of any kind on the rate in the transaction. Ms. Holder was never offered an alternative loan with a higher rate that did not involve payment of discount points for the purposes of allowing her to choose whether the "discount" would be advantageous to her. Total settlement charges on the new loan were $17,779.45 and all of the finance charges on the earlier loan were capitalized. In exchange, Ms. Holder received less than $21,000 in additional proceeds of the loan.

The May 12, 2004 loan contains a "one-way" variable rate provision under which the rate in the transaction could increase from the initial rate disclosed in the loan note, but could not decrease below that rate. Ms. Holder did not understand the variable rate associated with her loan at the time of the transaction.

2

Ameriquest – 93A
Ameriquest Mortgage Co.
March 24, 2005
Page 3

Finally, the May 12, 2004 loan Settlement Statement shows that disbursements to Ameriquest were made to pay off the November 24, 2003 Ameriquest loan in the amount of $275,392.56, thus capitalizing various excessive charges in the earlier loan and allowing Ameriquest to charge interest thereon and leading to substantial increases in Ms. Holder's overall indebtedness to Ameriquest. These additional charges strip equity from Ms. Holder's interest in her home. Ms. Holder is having significant problems affording the payments on the May 12, 2004 loan.

The CCCDA requires lenders to provide borrowers with notice of their right to cancel which accurately explains the effects of rescinding a loan transaction. G.L. c. 140D § 10; 209 C.M.R. 32.23(2). Specifically, a creditor must provide the borrower with a notice that conforms with the model forms provided in Appendix H to 12 C.F.R. § 226.23, or substantially similar notice. G.L. c. 140D §§ 10, 18; 209 C.M.R. 32.23(2)(b).

Since Ms. Holder was refinancing an Ameriquest loan with Ameriquest in the May 12, 2004 transaction, she should have received a disclosure that described the effects of canceling a refinance transaction. See 12 C.F.R. § 226.23(b)(2), Appendix H, Model Form H-9. Instead Ameriquest provided Ms. Holder with a form that explained her right to cancel an initial transaction. See 12 C.F.R. § 226.23(b)(2), Appendix H, Model Form H-8. As a result, Ameriquest failed to accurately disclose to Ms. Holder the effect that canceling the refinance transaction would have on her home mortgage. In addition, Ms. Holder did not receive a completed copy of the Model Form with the applicable deadline filled in. Further, completed copies of settlement documents, including the Truth in Lending disclosures and the Notice of Right to Cancel were not left with Ms. Holder at the time of closing. Rather they were mailed to her and received several days later – when a substantial portion of the allowable time for rescission had already run.

Ms. Holder has rescinded the refinance loan as was her right pursuant to G.L. c. 140D, §10 and the regulation promulgated thereunder, 209 C.M.R. 32.23. Ameriquest has improperly declined to rescind as required by law.

Ms. Holder would like to refinance with another lender on better terms, but has not fully explored that option because of the prepayment penalty associated with her Ameriquest loan. Ms. Holder also now also understands that the thousands of dollars in points and closing costs that she paid in connection with each loan has acted or could act as an additional *de facto* prepayment penalty. She understands that since the points and closing costs are treated as earned when the loan is made, they drive up the effective rate on the original loan if the loan is repaid in a shorter period than its expected term. In addition, by refinancing the points on a previous occasion, Ms. Holder has been required to pay interest on the points in connection with the refinanced loan.

3

Ameriquest – 93A
Ameriquest Mortgage Co.
March 24, 2005
Page 4

### *Frank and Martha White*

Frank and Martha White ("the Whites") are unsophisticated consumers with little experience in mortgage financing. They own a home at 8 Ruskindale Road, Mattapan, MA 02126. The Whites purchased their residence in 1998 for an initial purchase price of approximately $125,000.

On May 23, 2003, the Whites refinanced their home mortgage loan with Ameriquest Mortgage Company ("May 23, 2003 loan"). Under the terms of the May 23, 2003 loan, the Whites paid a loan origination fee of 3.50% ($8,400) together with other substantial settlement charges. The May 23, 2003 Settlement Statement shows that a $203,421.77 disbursement was made to Ameriquest to pay off an earlier loan. Total settlement charges on the May 23, 2003 loan were $12,159.64 and all of the charges on the earlier loan were capitalized. In exchange, The Whites received less than $25,000 in additional proceeds of the loan.

By refinancing with Ameriquest, the Whites suffered significant hidden financial harm, including capitalization of points and closing costs and exposure to substantial new and additional closing costs. These costs of refinancing were well known and highly profitable to Ameriquest.

Based on their initial discussions with Ameriquest, the Whites understood that they were applying for a loan with a fixed rate, without points. Only at closing did the Whites learn that the rate would be variable and that Ameriquest would charge substantial points in the transaction. Despite the change in terms, the Whites were not given an adverse action notice under either the Equal Credit Opportunity Act or the Fair Credit Reporting Act.

The May 23, 2003 loan contains a "one-way" variable rate provision under which the rate in the transaction could increase from the initial rate disclosed in the loan note, but could not decrease below that rate. The Whites did not understand the variable rate associated with their loan until many months after the transaction.

Following consummation of the May 23, 2003 loan, the Whites received a telephone call from an Ameriquest loan officer, during which he offered to refinance their home mortgage at a lower rate. The Whites refinanced their home mortgage loan with Ameriquest on December 17, 2003 ("December 17, 2003 loan"). By refinancing with Ameriquest, the Whites suffered significant hidden financial harm, including capitalization of points and closing costs and exposure to substantial new and additional closing costs. These hidden costs of refinancing were well known and highly profitable to Ameriquest.

The Whites completed the loan application for the December 17, 2003 loan over the phone. Based on discussions with Ameriquest's loan officer, the Whites understood that they would not pay additional points and that the loan would provide a substantial benefit to them.

4

Ameriquest – 93A
Ameriquest Mortgage Co.
March 24, 2005
Page 5

The December 17, 2003 loan Settlement Statement shows a loan discount fee of 4.000% ($11,120.00) to Ameriquest Mortgage Company. The Whites believe and therefore aver that they were not provided with a "discount" of any kind on the rate in the transaction. The Whites were never offered an alternative loan with a higher rate that did not involve payment of discount points for the purposes of allowing them to choose whether the "discount" would be advantageous to them. Total settlement charges on the new loan were $14,596.16 and all of the charges on the earlier loan were capitalized. In exchange, the Whites received less than $21,500 in additional proceeds.

The December 17, 2003 loan contains a "one-way" variable rate provision under which the rate in the transaction could increase from the initial rate disclosed in the loan note, but could not decrease below that rate. The Whites did not understand the variable rate associated with their loan at the time of the transaction.

Finally, the December 17, 2003 loan Settlement Statement shows that disbursements to Ameriquest were made to pay off the May 23, 2003 Ameriquest loan in the amount of $242,303.62, thus capitalizing various excessive charges in the earlier loan and allowing Ameriquest to charge interest thereon. This lead to a substantial increase in the Whites's overall indebtedness to Ameriquest. These additional charges stripped equity from the Whites's interest in their home. The Whites are having significant problems affording the payments on the December 17, 2003 loan.

The CCCDA requires lenders to provide borrowers with notice of their right to cancel which accurately explains the effects of rescinding a loan transaction. G.L. c. 140D § 10; 209 C.M.R. 32.23(2). Specifically, a creditor must provide the borrower with a notice that conforms with the model forms provided in Appendix H to 12 C.F.R. § 226.23, or substantially similar notice. G.L. c. 140D §§ 10, 18; 209 C.M.R. 32.23(2)(b).

Since the Whites were refinancing an Ameriquest loan with Ameriquest in the December 17, 2003 transaction, they should have received a disclosure that described the effects of canceling a refinance transaction. See 12 C.F.R. § 226.23(b)(2), Appendix H, Model Form H-9. Instead, Ameriquest provided the Whites with a form that explained their right to cancel an initial transaction. See 12 C.F.R. § 226.23(b)(2), Appendix H, Model Form H-8. As a result, Ameriquest failed to accurately disclose to the Whites the effect that canceling the refinance transaction would have on their home mortgage. In addition, the Whites did not receive a completed copy of the Model Form with the applicable deadline filled in.

The Whites have rescinded the refinance loan as was their right pursuant to G.L. c. 140D, §10 and the regulation promulgated thereunder, 209 C.M.R. 32.23. Ameriquest has improperly declined to rescind as required by law.

The Whites would like to refinance with another lender on better terms, but have not fully explored that option because of the prepayment penalty associated with their Ameriquest loan.

5

Ameriquest – 93A
Ameriquest Mortgage Co.
March 24, 2005
Page 6

The Whites also now also understand that the thousands of dollars in points and closing costs that they paid in connection with each loan has acted or could act as an additional *de facto* prepayment penalty. They understand that since the points and closing costs are treated as earned when the loan is made, they drive up the effective rate on the original loan if the loan is repaid in a shorter period than its expected term. In addition, by refinancing the points on a previous occasion, the Whites have been required to pay interest on the points in connection with the refinanced loan.

## Violations Of Law

Ameriquest has violated G.L. c. 93A § 2 with respect to each plaintiff and each class member by utilizing terms and practices that were unfair, deceptive, and/or unconscionable. The violations the Defendant engaged in included, without limitation:

a. Employing a bait and switch strategy by offering borrowers mortgages on favorable terms prior to closing and then offering a different mortgage loan product at closing in violation of 940 C.M.R. §§ 8.04(4) and 8.06(1) and c. 93A;

b. Promising to refinance borrowers' mortgages on more favorable terms to induce them to close loans in violation of 940 C.M.R. § 8.06(1) and c. 93A;

c. Implying but failing to provide that borrowers are being given a "discount" in violation of 940 C.M.R. §§ 3.04, 3.05, 3.13, and 6.05 and c. 93A;

d. Making loans on terms that were unfair and deceptive in light of their hidden advantages to the Defendant and their hidden costs to the Plaintiffs, including, without limitation, using unjustified and undisclosed points as a means to create a hidden advantage in refinancing the loan in violation of 940 C.M.R. §§ 3.04, 3.05, 3.13, and 6.05, M.G.L. c. 183 § 63 and c. 93A;

e. Using prepayment penalties to trap borrowers into foregoing better loan terms from other lenders and/or to encourage borrowers to refinance on disadvantageous terms with Ameriquest;

f. Providing confusing variable rate provisions in its loans designed to protect Ameriquest if rates increase from those in place when the loan is made without providing a benefit to borrowers when rates decline;

g. Failing to make the preliminary mortgage lender disclosures required by the Attorney General's Consumer Protection regulations at 940 C.M.R. § 8.05(2) within the manner required by 940 C.M.R. § 8.05(6) or, in the alternative as mandated by G.L. c. 184 § 17D which required disclosure of settlement costs and related information in the manner mandated by 209 C.M.R. 38.04;

6

Ameriquest – 93A
Ameriquest Mortgage Co.
March 24, 2005
Page 7

h.   Failing to make disclosures mandated by 209 C.M.R. §§ 32.18;

i.   Failing to make disclosures mandated by 209 C.M.R. §§ 32.19;

j.   Failing to provide adverse action notices required by the Equal Credit Opportunity Act, 15 U.S.C. § 1691d,  and the Fair Credit Reporting Act, 15 U.S.C. § 1681m;  and

k.   Failing to accurately disclose borrowers' rights to rescind their loans in violation of G.L. 140D § 10(a) and 209 C.M.R. § 32.23(2).

### Damages and Demand For Relief

Ms. Holder, the Whites and other similarly situated individuals were damaged and continue to be damaged by Ameriquest's home mortgage refinancing practices in that they have either been placed at risk of foreclosure or they have been prevented from refinancing with other lenders on more favorable terms due to prepayment penalties and points they have paid in connection with their Ameriquest loans.  Accordingly, by this correspondence, on their behalf we demand that Ameriquest:

a.   disclose to all affected borrowers their the option of rescinding their loan contracts or reforming them to expunge the illegal terms;

b.   cancel and/or refund unjustified points;

c.   cancel/and or refund prepayment penalties;

d.   pay actual and statutory damages pursuant to c. 93A § 9 and G.L 140D §§ 32(a)(1) and 32(a)(2)(b) together with attorney's fees and costs; and

e.   provide an assurance that it will take all steps necessary to insure that all borrowers so entitled receive proper disclosures of loan and rescission terms in accordance with applicable law from this date forward.

M.G.L. c. 93A, § 9 provides Ameriquest with the opportunity to make a reasonable written settlement offer within thirty days of its receipt of this letter.  Should litigation under c. 93A ensue, Ameriquest may become liable for up to three times actual damages, plus attorney's fees and costs.

In this regard, I direct your attention to the Supreme Judicial Court's view of the policy behind c. 93A's settlement encouraging directive:

7

Ameriquest – 93A
Ameriquest Mortgage Co.
March 24, 2005
Page 8

> Indeed, the conduct proscribed by the Statute *is as much the failure to make a reasonable settlement offer* as it is the substantive violation of c. 93A.  Multiple damages are "the appropriate punishment" for forcing plaintiffs to litigate clearly valid claims.  <u>International Fidelity Ins. Co. v. Wilson</u>, 443 NE 2d 1308, 1318 (1983)(emphasis added).

I look forward to hearing from Ameriquest or its attorneys so that we may work toward a prompt and equitable settlement of this matter

Yours very truly,

Gary Klein

GK:pc
cc:    Harriet Holder
       Frank and Martha White